UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
C.D.T.S. NO. 1 AND A.T.U. LOCAL 1321    :   Civil Action No. 1:12-cv-04924-KBF-HBP
PENSION PLAN, Individually and on Behalf  :
of All Others Similarly Situated,          :   <u>CLASS ACTION</u>
                                        :
                 Plaintiff,       :   FIRST AMENDED CONSOLIDATED
                                        :   COMPLAINT FOR VIOLATIONS OF THE
   vs.                           :   FEDERAL SECURITIES LAWS
                                        :
UBS AG, et al.,                   :
                                        :
                 Defendants.     :
                                        :
———————————————————— x

1.      Lead Plaintiffs, Westchester Teamsters Pension Fund and Teamsters Local 456 Annuity Fund (collectively "Plaintiffs"), on behalf of themselves and all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys.

## NATURE OF THE ACTION

2.      This is a federal securities class action brought against UBS AG ("UBS" or the "Company") and certain of its officers for violations of the Securities Exchange Act of 1934 (the "1934 Act").  This action is brought on behalf of all purchasers of UBS securities on any domestic exchange and/or in any domestic transaction, during the period from November 17, 2009 through September 15, 2011 (the "Class Period"), who were damaged as a result of defendants' violations of the federal securities laws.  This action seeks to pursue remedies for violations of the anti-fraud provisions of the federal securities laws.

3.      Defendants are UBS, Oswald J. Grübel ("Grübel"), John Cryan ("Cryan"), Philip J. Lofts ("Lofts") and Carsten Kengeter ("Kengeter").  Each of the individual defendants was a senior executive of UBS during the Class Period, as more fully described in ¶¶12-15.

4.      This action concerns defendants' misleading statements and material omissions regarding UBS's purportedly robust risk management systems and internal controls.  Throughout the Class Period, defendants assured investors that they were taking a "more cautious approach" to trading and that UBS's risk management systems and disclosure controls and procedures were robust, disciplined and operating effectively.  Defendants further assured investors that they were personally involved in and focused on monitoring risk at UBS, and specifically within the Company's Investment Bank division.  As defendant and former UBS CEO Grübel explained when

- 1 -

questioned about UBS's risk management: "if ever anything goes wrong, at least *you will not hear any of us say, we didn't know* . . . ; *we do know*. *We do know what we are doing*. *We do know what kind of risks we have*."  Unfortunately for investors, the picture defendants portrayed – one of a conservative financial institution supported by rigorous and effective internal controls and risk management systems – was not accurate.  Rather, defendants promoted a culture of risky behavior in the interest of driving up investment banking revenues and increasing UBS's profits, while knowingly or recklessly disregarding that the Company's internal controls and risk management systems were wholly inadequate and had been designed and implemented to allow risky and unhedged proprietary trading to go unchecked.

5.      The problems with UBS's deficient internal controls and risk management systems became readily apparent to investors on September 15, 2011, when the Company disclosed that a "rogue" trader in the Investment Bank division had engaged in unhedged proprietary trades with non-existent counterparties that exposed the Company to losses that ultimately exceeded $2.3 billion.  As a result of the disclosure of UBS's risk management failures and poor internal controls, the Company's stock price dropped more than 10% and UBS's market capitalization plummeted over $4.7 billion on September 15, 2011 alone.

6.      In the weeks following the September 15, 2011 disclosure, defendant Grübel accepted responsibility for the improper trading and resigned while UBS publicly acknowledged that the risk controls defendants had touted during the Class Period "were not operating effectively."  Grübel's replacement as CEO, Sergio Ermotti, publicly acknowledged that the unhedged proprietary trading was "evidence of a failure to exercise appropriate controls," and UBS conceded that defendants' prior statements regarding risk and disclosure controls could not be relied upon.  The Company and former officers and employees have subsequently identified specific controls that, while defendants

- 2 -

pushed for increased profits from the Investment Bank, were not implemented or enforced, and allowed unhedged proprietary trading to occur.  As a result, the U.K.'s Financial Services Authority ("FSA") and the Swiss Financial Market Supervisory Authority ("FINMA") brought enforcement proceedings against the Company for the gaps in oversight that permitted the improper trading that took place during the Class Period, finding "***serious failings in UBS's risk management and control environment***" and concluding that "***UBS failed to ensure that [risk management] systems and controls were fully complied with and implemented***" in the Investment Bank.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t-1, and the rules and regulations promulgated thereunder by the SEC, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

8.      Jurisdiction is conferred by §27 of the 1934 Act and 28 U.S.C. §1331.

9.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391. UBS conducts business in this District and its stock trades on the New York Stock Exchange ("NYSE") in this District.

## THE PARTIES

**Lead Plaintiffs**

10.     By Court Order dated August 30, 2012, Westchester Teamsters Pension Fund ("Westchester") and Teamsters Local 456 Annuity Fund ("Local 456") were appointed Lead Plaintiffs in this action.  Westchester and Local 456 are multiemployer benefits plans managed and administered in Elmsford, New York.  As set forth in Westchester's and Local 456's Certifications, filed in connection with their motion for appointment as lead plaintiff, Plaintiffs purchased UBS

securities during the Class Period and, as a result of defendants' conduct detailed herein, suffered damages in connection with those purchases.

**Defendants**

11.     Defendant UBS is a global financial services company headquartered in Zurich, Switzerland.  During the Class Period, the Company provided an array of fixed income, equities, foreign exchange and investment banking services to customers in the United States and around the world.  In addition, UBS provided wealth management services ranging from asset management to tax planning to clients around the globe.  UBS has branch offices and subsidiaries throughout the United States, including its United States corporate headquarters at 1285 Avenue of the Americas, New York, NY 10019.  At all relevant times, UBS's common stock was listed and traded under the symbol "UBS" on the NYSE and on the SIX Swiss Exchange, both of which are efficient markets. UBS directly made, and is liable for, the misstatements and omissions set forth herein at ¶¶25-30, 34-37, 39-40, 43, 45-48, 52-55, 59-61.

12.     Defendant Grübel was CEO of UBS from February 26, 2009 until his resignation on September 24, 2011, immediately following the end of the Class Period.  Grübel was a member of the Company's Group Executive Board ("GEB") throughout the Class Period.  Grübel directly made, and is liable for, the misstatements and omissions set forth herein at ¶¶29, 34-37, 39-40, 48, 52-55, 59, 61.  Grübel also had authority over the content, and whether and how to communicate it, of the misstatements and omissions set forth herein at ¶¶25-28, 30, 45-47 and is liable for those misstatements and omissions.

13.     Defendant Cryan was CFO of UBS from September 2008 until his departure on May 31, 2011.  Cryan was also Chairman and CEO of UBS AG London Branch and UBS Limited from November 2010 through May 31, 2011 and was a member of the GEB since September 2008.  Cryan

directly made, and is liable for, the misstatements and omissions set forth herein at ¶¶36-37, 43, 54-55.  Cryan also had authority over the content, and whether and how to communicate it, of the misstatements and omissions set forth herein at ¶¶25-30, 35, 39-40, 45-48, 52-53, 59 and is liable for those misstatements and omissions.

14.      Defendant Lofts was Chief Risk Officer ("CRO") of UBS from November 2008 through December 31, 2010, when he was promoted to CEO of UBS Group Americas.  Lofts was a member of the GEB throughout the Class Period.  Lofts directly made, and is liable for, the misstatements and omissions set forth herein at ¶¶25-26, 30, 45-46, 60.  Lofts also had authority over the content, and whether and how to communicate it, of the misstatements and omissions set forth herein at ¶¶27-29, 35-36, 39-40, 47-48, 52-54, 59 and is liable for those misstatements and omissions.

15.      Defendant Kengeter was co-CEO of UBS Investment Bank from April 27, 2009 until November 1, 2010, when he became sole head of the Investment Bank.  Kengeter was a member of the GEB throughout the Class Period.  Following the end of the Class Period, Kengeter was removed from the GEB and as head of the Investment Bank.  He subsequently left UBS.  Kengeter directly made, and is liable for, the misstatements and omissions set forth herein at ¶¶28, 47.  Kengeter also had authority over the content, and whether and how to communicate it, of the misstatements and omissions set forth herein at ¶¶25-27, 29-30, 35-36, 39-40, 45-46, 48, 52-54, 59 and is liable for those misstatements and omissions.

## FACTUAL BACKGROUND

**The Creation and Expansion of UBS**

16.      UBS, as it exists today, is the result of the 1998 merger of Union Bank of Switzerland with the Swiss Bank Corporation and the acquisition of investment bank Dillon, Read & Co.  While

- 5 -

historically focused on wealth management, a driving purpose of the merger was to further expand into the lucrative investment banking sphere.  Almost immediately, the new Company found itself in trouble due to unhedged investments in the Long Term Capital Management hedge fund. UBS would prove to be the largest single loser in the collapse of Long Term Capital Management.  The Chairman of UBS was forced to resign and investors were assured that, going forward, UBS would "'focus even more intensively on those areas of business likely to generate sustainable earnings with a justifiable level of risk.'"

17.     Two years after the Long Term Capital Management fiasco, UBS paid $11.5 billion for New York-based investment bank Paine Webber Group, Inc., and the Company's executives began a drive to break into the elite "bulge bracket" of investment banks – the largest and most profitable investment banks in the world.  UBS spent hundreds of millions of dollars hiring new investment bankers – the "Front Office" – and, by 2005, the Investment Bank division was generating over $2 billion in annual earnings, driving the Company's financial results.  The rapid expansion of UBS's Investment Bank business would, however, come at the expense of the Company's well-publicized traditions of conservative and disciplined risk control.

**UBS's Financial Scandals Nearly
Destroy the Company**

18.     By 2005, UBS's fixed-income proprietary trading desk was generating profits of over $700 million, primarily on securities backed by subprime mortgages.  In the pursuit of more profits, the trading desk was spun off as a UBS-backed hedge fund called Dillon Read Capital Management LLC ("Dillon Read").  At the same time, UBS's Investment Bank continued to pursue proprietary trades and unhedged investments in United States asset-backed securities.  The Investment Bank's biggest bets came from the team that invested in collateralized debt obligations ("CDOs").  CDOs pool bonds, loans and other fixed-income assets.  Rather than securitizing and selling the CDOs, by

early 2006 UBS was keeping the instruments on the bank's books so they could profit from the yields.  When the financial crisis hit, UBS's risky bets proved disastrous and, as a result, in 2007 alone, the Company suffered losses of more than $21 billion and had to be bailed out by the Swiss government.

19.     UBS's losses continued to pile up in 2008, as it was forced to write down another $19 billion of investments in mortgage assets.  In addition to these losses, the Company settled charges brought by New York Attorney General Andrew Cuomo that it had misled customers when it sold them what had been described as nearly risk-free auction-rate securities.  In fact, as the market for those securities was collapsing, UBS dumped its inventory on its clients with no risk warning.  As a result, UBS agreed to pay $19.4 billion to its clients and a $150 million fine.  As *The New York Times* described it, "the headlong pursuit of growth at any cost trumped ethical and legal behavior, especially in the investment bank."

20.     After its government rescue, UBS published two reports about the Company's near-collapse.  Both reports focused on the lack of appropriate risk management and internal controls.  The April 2008 "Shareholder Report on UBS's Write-Downs" charged the Company's executives with a "failure to demand holistic assessment," "incomplete risk reporting" and the "inability to accurately assess valuation risk on a timely basis."  The September 2010 report, "The UBS Crisis in Historical Perspective," again criticized UBS's risk management as "too complacent," as the Company "oriented its compensation strategy more and more towards growth in volume and earnings.  For this reason too little attention was paid, particularly in the Investment Bank, to the quality and sustainability of the business."  "Wrongly believing that everything was under control, given that the numerous risk reports, internal audits and external reviews almost always ended in a

positive conclusion," the 2010 report found that "[t]he bank did not lack risk consciousness; it lacked healthy mistrust, independent judgement and strength of leadership."

**UBS Attempts to Restore Its
Tarnished Reputation**

21.     Hobbled by the financial crisis and reeling from the Company's risk management failures, UBS vowed to overhaul its internal controls and restore its reputation.  On February 26, 2009, UBS announced the hiring of Grübel, UBS's third CEO in less than two years.  Grübel's appointment was promoted as "a further step to restore stakeholder confidence and to pave the way back to success."  Shareholders were assured that Grübel "***will also be adept in balancing our focus on prudent risk taking and client confidence***, and our goal to position UBS for future success."  Grübel himself stated "'[o]ur primary goal will be to regain the trust of our clients and other stakeholders.'"

22.     After taking the helm at UBS, Grübel began a campaign to regain credibility and restore investor and market confidence.  Immediate efforts were made to curb risks in the Investment Bank and more than 7,500 jobs were cut to reduce overhead costs.  UBS's share price, however, languished.  As competitor banks took advantage of the 2009 boom in fixed-income trading, UBS was reporting financial losses.  In the second and third quarters of 2009, Grübel was forced to report that UBS had missed earnings expectations.  The Company's stock price remained depressed while rivals such as Goldman Sachs, Credit Suisse and Deutsche Bank reported profits and recovered much of the share price losses they had suffered in the financial crisis.

23.     By November 2009, Grübel was under increasing pressure to prove he could turn around UBS's fortunes.  On November 17, 2009, he publicly set a target of reaching CHF 15 billion ($14.7 billion) in pretax profit by 2014.  At the same time, Grübel announced that UBS would expand its fixed-income and trading operations, and 1,700 employees were quickly added in the

Investment Bank division.  Investors and analysts recognized that reaching Grübel's financial target would largely depend on the profits that could be generated by the Investment Bank.  As a result, public attention was immediately focused on whether those profits could be generated without incurring the same breakdowns in risk management and internal controls that had nearly destroyed UBS only two years earlier.

24.     While Grübel and his cohorts internally rewarded increasing risk in the pursuit of profits, and failed to implement adequate controls, they externally began a campaign of false statements and omissions to assure investors that the Company's risk management was conservative, robust and rigorous.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

**UBS Investor Day 2009**

25.     The Class Period commences on November 17, 2009, when defendants began a campaign to highlight the purportedly disciplined and effective risk management and control systems that were "at the center of [UBS's] strategic plan" to restore the Company's reputation and return to profitability.  During UBS's annual Investor Day in Zurich, Switzerland, defendants Grübel, Cryan, Lofts and Kengeter each spoke and answered questions about the Company's risk controls.  Lofts stated that one of the "key messages" investors should take away from the presentation is "that ***we have made significant improvements in the way in which we measure and manage risk care at UBS.  We have instilled a new risk culture at the firm***."  Lofts continued, touting the "considerable enhancement" UBS had made to its risk management and controls since the 2008 financial crisis:

> In 2008, we initiated a series of fundamental changes to our risk control organization.  This centered around bringing in new people and stepping up our investment in

technology with the objective of being able to materially improve our representation of and our measurements of risk.

*        *        *

The second area we were focused on is in stress, *we have expanded considerable efforts to improve the firm stress framework making it robust and firm-wide. It is at the center of our risk control framework*.

> *Such tests are conducted on a regular basis*. They seem to *capture all risks across the firm. Be it positional, funding or operational in nature*. Test our scenario consistent[ly]. They used shocks for the trading books that we believe would replicate those seen in crisis and they also are adjusted for the liquidity impact of such crisis.

26.    Lofts further stated that UBS's "governance ha[d] been overhauled"; "*Management is clearly accountable for taking off on the management of risks of the firm* with the board of directors providing supervisory oversight." And, with respect to UBS's operational and trading risk management, Lofts stated that "a strong, controlled framework that takes the risk and finance must be alive and *there is robust supervision of trade capture and valuation*." Lofts concluded by explaining management's focus on and oversight over UBS's risk management systems, assuring investors that "*the nature of and the size of the risk that we take is one of the core discussions topics among senior management*."

27.    Alexander Wilmot-Sitwell, as Co-CEO of UBS's Investment Bank, and speaking along with defendants Grübel, Cryan, Lofts and Kengeter at the annual Investor Day conference, continued the emphasis on UBS's "new risk framework" stating:

> [W]e have thoroughly reviewed and improve substantially our risk management and control framework. There is a new risk culture within the Investment Bank with *clear accountability for and ownership of risk by the entire front office*. *Risk is no longer only the responsibility of the controlled function.* We will continue to refine this framework based on the demand of the market environment and our overall business mix, but importantly, it lies at the center of our strategic plan.

28.    Defendant Kengeter, as co-CEO of UBS's Investment Bank, reiterated:

- 10 -

We run our business using a new approach to risk.  We are refining and perfecting our coverage across equities and fixed, we will place the firm at the center of price discovery.  We will increase the velocity of our balance sheet.  We will ensure an efficient and effective delivery of our offering and services by an integrated and aligned work bench.

That's, in conclusion, let me live [sic] you with the following messages.  **We have a resized franchise with a controlled and disciplined risk culture**.  We have strong resilient underlying businesses which are already generating recurring profits.

29.      During the Question & Answer portion of the November 17, 2009 Investor Day conference, Grübel assured investors that he personally took responsibility for the Company's risk management and reiterated the robust nature of the controls that had purportedly been put into place at UBS:

Q:      I just had one question and I am afraid [w]hat stuck with me through the most of the presentation is that we've changed the risk culture of the organization.  Now doing that in the space of three years in achievement in the best of environments, now when you add to this the turnover that you've had and the number of people that you've added in your key and your going forward investment bank, I just wondered if you could provide a few specific examples, maybe two or three, of how things were doing in the investment bank before and how that's different now.  And by this I mean, how trades were originated, booked, managed and rewarded for in the past, and how that's different today?  . . . .

. . . We just want to be comfortable I suppose as investors that things that happened in the past are now firmly wired out of the UBS system by process and by responsibility. . . .

A:      [Grübel]: . . . **We have weekly risk calls or I have weekly risk calls with the leaders in investment bank** with the Chief Risk Officer and where **we go through our risk position in the old bank weekly**.  And since I know about them I feel responsible for them as well.  And you can ask the guys I do feel responsible for them.

*            *            *

I think, as an example is that **our risk cannot be over ruled, so fill outs cannot be avoided if he say no, it is no, even I can avoid it, but I don't want avoid it [sic].  But it is important to have brakes like that within a company, because if you don't than you are getting in problems sooner or later**.

- 11 -

30.     Following Grübel's response, Lofts elaborated and provided "specific examples" of how things were now different in the investment bank:

> And of course, we look forward to them [weekly risk calls] every week.  In terms of just going through some of the basic principles, **what we brought into play is responsibility from the front office to make sure that when the represent [sic] the trades in the front office system that is what feeds for instance straight into the risk engines**.

> Historically what would happen was their book to front assist the trades, you would then see an aggregation engine which would then be manipulated to try and then represent the risk in the risk control system.  If there was an issue with the risk position, some time would elapse while there was a discussion between the risk controller and the front office as to exactly what was the risk profile.

> But now, because we said to the front office, how you represent the trade in your front office engine that is what's going to feed into the risk aggregation engine.  **There's no debate about waiver or not**.  That trade is being currently represented in the eyes of the transactor.  So it immediately takes out that one level or so circuitry discussion and you get straight to the issue about discussing what is the risk acceptable?  What are the options in terms of replacing that risk reducing it and distributing it?  So that would be one example.

> The second other key change that we would make or have made is then making sure as I mentioned earlier, this link with finance really works well.  And the critical part of that is you come back to looking at what you trade, will tell you at the end of day what his P&L should be on the positions.

> You can get from the risk engines or risk-based P&L and say these are the risk factors.  This is what happened today in the market in these risk positions.  This if the trade has been booked correctly should be what the P&L should be.  And then you get obviously **John's [Cryan] team comes in and does the actual P&L**.  So it gives you that complete circuit to be able to look back in circuit.  Now why are there differences?  And if there are differences, what does that tell you about was the trading currently booked?  Was there a representation issue?  Was there something wrong with the risk slides?  **So you get that daily check if you like through the processes**.  So there are just a couple of **example of how things have fundamentally changed**.

> I go back to Ossie's [Grübel] point about having the weekly risk call of the CEO.  That was instituted upon his arrival, so it's a **very hands on involvement of the CEO** [and] the firm **in terms of what the risk positions are**.  And the other thing that we've clearly made challenge or improvements on, is historically what the firm had done had netted down, some of the positions have fed into the risk engines.  Now everything comes in gross, so you can then see then what effectively the netting claims are.  So rather than bringing the upstream it's then down in the risk

- 12 -

aggregation engines that that netting will then take place. ***So you see actually the full picture of the positions*** and ***you don't see just what has been fed in as a netted down position***.

31.     Defendants' statements during UBS's November 17, 2009 Investor Day, as set forth in ¶¶25-30, were materially false and misleading when made because defendants failed to disclose that:

(a)     Rather than instilling "a new risk culture" or "disciplined risk culture" at UBS, defendants had incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity.

(b)     At the same time that Investment Bank traders were incentivized to engage in high-risk trading, UBS's risk and disclosure controls did not require the identification or confirmation of internal counterparties.  When such trades were cancelled, re-booked or amended, the related monitoring control failed to ensure the validity of these changes, allowing proprietary traders to book trades with fictitious counterparties.

(c)     UBS's risk controls for the inter-desk reconciliation process within the Investment Bank failed to ensure internal transactions, including cancellations and amendments of internal trades, were valid or accurately reported in the Company's books and records.

(d)     UBS's risk controls also failed to include a cash flow system that mirrored its transaction accounting system and reported profits or losses were not compared to specific transactions, which facilitated the use of fictitious trading where no cash was actually sent or received.

(e)     UBS's risk control systems and management did not did not provide "robust supervision of trade capture and valuation" and failed to conduct regular balance sheet checks to

- 13 -

evaluate any mismatch or discrepancy between a trader's total, or "gross," trading exposure and either his desk's internal risk limits or "net" exposure and, as such, UBS was unable to monitor or evaluate the "full picture" on trading activity and risk exposure.

(f)     Violations of internal controls were routinely waived and UBS's Back Office risk management divisions operated to facilitate Front Office trading rather than having a specific risk control mandate.  The corporate culture was to assist the proprietary traders in clearing internal control breaks rather than investigate or report such violations.

(g)     UBS's risk management system was not "controlled and disciplined" and permitted Investment Bank traders to exceed daily and overnight risk limits and book fictitious counterparty trades, including proprietary trades, magnifying the Company's potential for profit and risk of loss.  Risk limits were set orally and there were no controls to prevent or punish violations of any risk limits.  UBS's controls were not designed or able to detect or prevent the booking of fictitious counterparty trades.

(h)     UBS's internal controls were not designed to prevent trading activity which generated high transaction modifications and cancellation rates, transactions with delayed start dates, off-market price deals pending confirmations in end-of-day reports and/or the absence of third-party confirmations, all of which are indicia of fictitious transactions used to facilitate unhedged trading.

(i)     UBS's risk management systems did not include any automated monitoring of the desk's positions against any formal or informal risk limits, did not include any report of daily or overnight risk limits during the Class Period, failed to monitor or generate any reports on deferred settlement trades and lacked the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.

- 14 -

(j)     UBS's risk management systems failed to include an automatic filter or alert in the trade input systems to identify off-market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

(k)     UBS's risk management system permitted individual traders to maintain "umbrella" or "suspense" accounts where profits made by a trading desk were held to offset and hide future trading losses and activity which exposed UBS to trading losses.

(l)     UBS's risk controls did not provide, and the Company's risk managers did not have access to, real-time trading data which would have (i) allowed risk management personnel to monitor and corroborate the existence of a trade with a counterparty before settling a trade; (ii) alerted the Company to violations of the daily and overnight risk limits; and (iii) flagged fictitious trading activity.

(m)     UBS's risk controls were not "integrated and aligned" because UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk.

(n)     Risk supervision was not robust, as defendants had reduced costs and increased reported earnings by laying off predominantly "Back Office" staff involved in internal controls and risk management, even while hiring additional "Front Office" personnel and increasing UBS's value at risk in Investment Bank trading.  Support and control functions were under pressure from senior management to reduce staff numbers, and requests for additional risk management staff were denied.

(o)     As set forth in ¶¶106-112, 114-115, 136-138, 148-150, 156-158, 164-166, defendants failed to require, receive or review reports concerning significant indicia of internal

control and risk management failures, and UBS did not perform a substantive "daily check" of the risks in the Investment Bank.

(p)     As a result of the failure to design and implement an effective risk management system, UBS's disclosure controls were deficient and ineffective.

(q)     As UBS ultimately admitted, the Company's "risk and operational systems did not detect unauthorized or unexplained activity" and this activity "was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced."

32.     As a result of defendants' false and misleading statements during the November 17, 2009 Investor Day conference, UBS's securities traded at artificially inflated levels.

33.     On February 9, 2010, UBS announced a profit of CHF 1.2 billion for the fourth quarter of 2009.  In a letter to shareholders, Grübel explained: "2009 was a transformative year for UBS.  The actions we took have created a solid foundation that will support us in rebuilding our reputation, sustainable profitability and shareholder value.  We achieved a significant milestone in the fourth quarter by returning to profitability."  Grübel noted that "[w]hile the investment banking department improved its results compared with the previous quarter, the sales and trading activities of the Investment Bank's equities and fixed income, currencies and commodities businesses were affected by sharp declines in trading and client activity."

**UBS's 2009 Annual Report and Form 20-F
and Grübel's March 1, 2010 Statement**

34.     On March 1, 2010, in a *Financial Times* article entitled "Rebuilding UBS," Grübel addressed the Company's "robust" risk management and contrasted the new risk management model used in the Investment Bank against the Company's past failures, assuring investors that defendants had "'structured the bank so that what happened should not happen again'":

- 16 -

"The structure is radically different, with new people and new rules. *We have a risk meeting every week and I have calls with senior bankers every day. I am kept informed*," says Mr. Grübel. Most importantly, he says that risk management heads cannot be over-ruled by anybody. "Risk management has real power and real accountability," he says.

35.     On March 15, 2010, UBS issued its 2009 Annual Report, approved and signed by

Grübel, and reviewed and approved for issuance by Cryan, Lofts and Kengeter, in which defendants

discussed at length the Company's risk management and controls:

> *Our operational risk management and control systems and processes are designed to help ensure that the risks associated with our activities*, including those arising from process error, failed execution, *unauthorized trading*, fraud, systems failure and failure of security and physical protection, *are appropriately controlled*.
>
> *            *            *
>
> Effective risk management and control are essential to our success and we have made further progress in implementing the risk renewal program we initiated in 2008.
>
> *            *            *
>
> We significantly enhanced our stress testing framework which comprises portfolio-specific stress tests as well as combined firm-wide stress tests. *Our firm-wide stress testing captures all major risks across our business divisions* and is one of the most critical inputs for discussions between management, our Board of Directors (BoD) and our regulators on the risk profile of our firm.
>
> *            *            *
>
> As a result of management's investigation into the losses we experienced in 2007 and 2008, we launched a comprehensive remediation program in the Investment Bank. We made further progress in implementing this program and developing sustainable solutions. *Our remediation activity has resulted in enhanced risk governance* including changes in risk management and control personnel, and *we have improved our risk infrastructure and processes and the associated capabilities to capture, represent and monitor risks.*
>
> *            *            *
>
> *Our risk culture demands that all employees make the protection of our reputation an overriding concern*.
>
> *            *            *

Disclosure of risk to provide comprehensive, transparent and periodic reporting to senior management, the BoD, shareholders, regulators, rating agencies and other stakeholders.

Our risk management and control principles are implemented via a risk management and control framework.  The framework comprises qualitative elements such as policies and authorities, and quantitative components including risk measurement and limits.

36.     On March 15, 2010, UBS also filed its Form 20-F Annual Report with the SEC for

the year 2009.  The Form 20-F was signed by Grübel and Cryan, reviewed and approved for filing

by Lofts and Kengeter, and stated in relevant part:

### Management's Report on Internal Control Over Financial Reporting

The Board of Directors and management of UBS AG (UBS) are responsible for establishing and maintaining adequate internal control over financial reporting.  UBS's internal control over financial reporting is designed to provide reasonable assurance regarding the preparation and fair presentation of published financial statements in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board.

UBS's internal control over financial reporting includes those policies and procedures that:

*       *       *

– *Provide reasonable assurance that transactions are recorded as necessary to permit preparation and fair presentation of financial statements*, and that receipts and expenditures of the company are being made only in accordance with authorizations of UBS management; and

– *Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements*.

*       *       *

UBS management assessed the effectiveness of UBS's internal control over financial reporting as of 31 December 2009 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.  Based on this assessment, *management believes that, as of 31 December 2009, UBS's internal control over financial reporting was effective*.

- 18 -

37.   UBS's Form 20-F also contained certifications signed by defendants Grübel and Cryan.  Each certification stated that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report."  Grübel and Cryan, in their certifications, also stated:

4.   The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others in those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

- 19 -

5.       The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    a.       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    b.       Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

38.       On May 4, 2010, UBS announced a net profit of CHF 2.2 billion for the first quarter of 2010, an 83% increase from the prior quarter.  In a letter to shareholders, Grübel commented on the results, stating: "The Investment Bank made the strongest contribution to the growth in our profits, but we are encouraged by the progress we see in all of our business divisions as we work towards our medium-term pre-tax profit target of CHF 15 billion."

39.       Then, on July 27, 2010, defendants announced a net profit of CHF 2.0 billion for the second quarter of 2010.  The results included a CHF 1.3 billion pre-tax profit from the Investment Bank, up 10% from the first quarter of 2010.  Commenting on the results, Grübel claimed that "***we adopted a more cautious approach to risk-taking during the quarter***" and "[i]n the Investment Bank, our average trading risk decreased."  Despite the purported decrease in trading risk, Grübel explained that "[t]he Investment Bank is making good progress against its strategic goals."  Grübel further assured investors: "Our portfolio of business is increasingly able to generate competitive returns in a variety of market conditions, and ***our risk management framework has proven robust***."

40.       In the accompanying letter to shareholders announcing UBS's second quarter 2010 results, signed by Grübel and Kaspar Villiger, UBS's Chairman of the Board of Directors,

defendants detailed how the Company had decreased risk in the investment bank and had "adopted a more cautious approach to risk-taking":

> *Our risk management framework has proven to be robust in testing market conditions*.  In light of these conditions, we adopted a more cautious approach to risk-taking during the quarter.  In the Investment Bank, *our average trading risk decreased* and we achieved further significant reductions in our residual risk positions.  Risk-weighted assets, at CHF 205 billion, were down slightly as *we continued to reduce the overall risk profile of the Group*.

41.     Defendants' statements on March 1, 2010, in the March 15, 2010 Annual Report and Form 20-F and on July 27, 2010, as set forth in ¶¶34-37, 39-40, were materially false and misleading when made because defendants failed to disclose that:

(a)     Rather than a "risk culture [that] demands that all employees make the protection of [UBS's] reputation an overriding concern" and adopting "a more cautious approach to risk taking," defendants had incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity.

(b)     At the same time that Investment Bank traders were incentivized to engage in high-risk trading, UBS's risk and disclosure controls did not require the identification or confirmation of internal counterparties.  When such trades were cancelled, re-booked or amended, the related monitoring control failed to ensure the validity of these changes, allowing proprietary traders to book trades with fictitious counterparties.

(c)     UBS's risk controls for the inter-desk reconciliation process within the Investment Bank also failed to ensure internal transactions, including cancellations and amendments of internal trades, were valid or accurately reported in the Company's books and records.

(d)     UBS's risk controls failed to include a cash flow system that mirrored its transaction accounting system and reported profits or losses were not compared to specific

- 21 -

transactions, which facilitated the use of fictitious trading where no cash was actually sent or received.

(e)     UBS's risk control systems and management did not "capture, represent and monitor risks" and failed to conduct regular balance sheet checks to evaluate any mismatch or discrepancy between a trader's total, or "gross," trading exposure and either his desk's internal risk limits or "net" exposure and, as such, UBS was unable to monitor or evaluate the true exposure on trading activity.

(f)     UBS's Back Office risk management divisions did not have "real power and real accountability," but operated to facilitate Front Office trading rather than having a specific risk control mandate.  The corporate culture was to assist the proprietary traders in clearing internal control breaks rather than investigate or report such violations.

(g)     UBS's risk management system was not controlled and disciplined, had not "proven to be robust" and permitted Investment Bank traders to exceed daily and overnight risk limits and book fictitious counterparty trades, including proprietary trades, magnifying the Company's potential for profit and risk of loss.  Risk limits were set orally and there were no controls to prevent or punish violations of any risk limits.  UBS's controls were not designed or able to detect or prevent the booking of fictitious counterparty trades.

(h)     UBS's "operational risk management and control systems and processes" were not designed to control trading risk or prevent trading activity which generated high transaction modifications and cancellation rates, transactions with delayed start dates, off-market price deals pending confirmations in end-of-day reports and/or the absence of third-party confirmations, all of which are indicia of fictitious transactions used to facilitate unhedged trading.

- 22 -

(i)     UBS's risk management systems did not include any automated monitoring of the desk's positions against any formal or informal risk limits, did not include any report of daily or overnight risk limits during the Class Period, failed to monitor or generate any reports on deferred settlement trades and lacked the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.

(j)     UBS's risk management systems failed to include an automatic filter or alert in the trade input systems to identify off-market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

(k)     UBS's risk management system permitted individual traders to maintain "umbrella" or "suspense" accounts where profits made by a trading desk were held to offset and hide future trading losses and activity which exposed UBS to trading losses.

(l)     UBS's risk controls did not provide, and the Company's risk managers did not have access to, real-time trading data which would have (i) allowed risk management personnel to monitor and corroborate the existence of a trade with a counterparty before settling a trade; (ii) alerted the Company to violations of the daily and overnight risk limits; and (iii) flagged fictitious trading activity.

(m)     UBS's risk controls were not "integrated and aligned" because UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk.

(n)     Risk supervision was not "robust," as defendants had reduced costs and increased reported earnings by laying off predominantly "Back Office" staff involved in internal controls and risk management, even while hiring additional "Front Office" personnel and increasing UBS's value at risk in Investment Bank trading.  Support and control functions were under pressure

- 23 -

from senior management to reduce staff numbers, and requests for additional risk management staff were denied.

(o)     As set forth in ¶¶106-112, 114-115, 136-138, 148-150, 156-158, 164-166, defendants failed to require, receive or review reports concerning significant indicia of internal control and risk management failures.

(p)     As a result of the failure to design and implement an effective risk management system, UBS's disclosure controls were deficient and ineffective.

(q)     As UBS ultimately admitted, the Company's "risk and operational systems did not detect unauthorized or unexplained activity" and this activity "was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced."

42.     As a result of defendants' false and misleading statements set forth in ¶¶34-37, 39-40, the Company's securities continued to trade at artificially inflated levels.

**Bank of America Merrill Lynch Conference
and UBS Investor Day 2010**

43.     On September 30, 2010, Cryan appeared at the Bank of America Merrill Lynch Banking & Insurance CEO Conference, during which he discussed the steps UBS had purportedly taken to reduce risk, stating:

> I don't think the history of UBS over the past two or three years needs any recap, but we had a pretty bad crisis.  And we've had to take a lot of management action to remediate the bank.  We've *substantially de-risked*, we've substantially deleveraged. We've managed to bring the bank back to profitability.  We hope it's sustainable. We think it will be.  *We've remediated a lot of our systems*, a lot of what you don't see, the boring stuff internally, *done a lot of work on risk management and control*. We changed the government for the bank almost completely and *we're ironing out all sorts of finance and risk control systems to try to ensure that nothing untoward happens to the bank again*.

44.     On October 26, 2010, UBS announced a net profit of CHF 1.7 billion for the third quarter of 2010, and profits of CHF 5.9 billion to date in 2010.  Grübel assured investors that

- 24 -

defendants "remain confident that we are taking the right steps to deliver on our mid-term goals," and explained that "[o]ver the past twelve months we have delivered on our commitment to improve our financial performance."

45.     On November 16, 2010, defendants Grübel, Lofts, Cryan and Kengeter spoke and answered questions about UBS's risk management and controls at the Company's annual Investor Day conference.  Lofts continued the campaign to promote UBS's risk management and internal controls, assuring investors that  "*senior management is aware of all material risks*," and that the Company's internal controls were "*providing an objective check on all risk taking and protecting the integrity of the risk management process*."  Lofts also touted the Company's "risk management and control" principles, explaining that UBS's *"comprehensive, transparent and objective risk disclosure[s]"* ensure *"that senior management is aware of all material risks."*

46.     Lofts continued, explaining the manner in which UBS's risk management and control principles "translate into some of our day-to-day activities":

> We'll take two examples.  The first, is the way in which we measure risk. It's important to stress, there is no single measure of risk that is sufficient in isolation. *We have a comprehensive risk framework in place which encompasses various risk measures*.  As we explained last year, *we have a robust firm-wide stress testing capability*.  *Stress tests are conducted on a regular basis, seek to capture all risks across the firm, be they positional, funding, operational or litigation*, and are scenario consistent with shocks for the trading books that reflect potential changes in liquidity.
>
> *     *     *
>
> These enterprise-wide level measures though, are not well suited to control the risk day-to-day or the risk taking on a day-to-day basis in the firm.  To achieve the latter, *we use a variety of measures that will control risks at lower levels in the organizational hierarchy, as well as controlling single counterparty exposures for specific trading positions*.

47.     Kengeter further assured investors that "*[e]verything we do is tied to risk management*":

A year ago, we set out a clear strategy of the Investment Bank. It was centered on an aligned and integrated client-centric business model, both around flow as well as advice, **underpinned by disciplined risk framework** of which Philip was telling us about right now.

\*         \*         \*

Our risk management framework stands as the compass to ensure we keep on course as we accelerate our business.

\*         \*         \*

**We have a new risk culture**. Embedded within this, risk limits are a two-way dialogue. **We are committed to ensuring that our risk management is prudent, dynamic, multifaceted, comprehensive, technology-based and based on thorough and thoughtful scenario planning**.

\*         \*         \*

We have assembled the most client-centric, uncompromising and risk-aware investment banking team in the market, focused on generating sustained and growing returns for our shareholders.

48.     During the Question & Answer portion of the Investor Day presentation, Grübel

addressed questions concerning UBS's efforts to evaluate and control risk while meeting earnings

targets:

Q:     And the second question I wanted to ask, I'd like to direct at Mr. Grübel. I think we heard in the morning probably two or three times that the plan is to increase the risk taking at UBS, which I'm sure you mean in a very prudent way. But I think we heard it from your Risk Officer, we heard it from the head of your Investment Bank and this is a genuine question. Is it your perception that this increased risk taking is in tune with what the shareholders of UBS would like to see from the bank currently?

A:     [Grübel]: . . . And when do you feel better as to increase risk is when you are convinced that you have the right people, that you're in the right positions, that we, yes, have rebuilt certain areas where we now are confident that we do get all those returns on capital in these areas. When we have a concept within the company where these costs – **at least once in a month all the risks we have in the bank and the asset and liability committee, where the whole management, the executive board is part of** . . . .

        **For the Investment Banking risk, we are looking nearly twice a week at it**. And we do have opinions about that, we are not lightly going into risks. You will not

*– if ever anything goes wrong, at least you will not hear any of us say, we didn't know, like normally management does when something is going wrong; we do know*.  We do know what we are doing.  *We do know what kind of risks we have*.  We think we know what we are doing. . . .

*There are much better controls on returns being installed in Investment Banking, and you don't get away just claiming you made a 100 million, you actually have to prove it.  You have to prove also how much capital you used for it, was it an intelligent risk, was it a stupid risk and you just were lucky*.  These kind of things are measured and monitored today much better than they actually ever were in investment banking, and that is what makes it different.

*   *   *

*One thing I can assure you as long as I'm here, and as long as my colleagues are here, we do know about risk*.  We do know that we have to have risk to be able to make money.  Anything a bank does involves risk.  There is no risk-free trade at all in any bank.  And we do understand the risks we are going in.  We are all shareholders as well.  We have one thing in common with you; we want to get our share price up.

49.     Defendants' statements at the Bank of America Merrill Lynch Conference and during UBS's November 16, 2010 Investor Day, as set forth in ¶¶43, 45-48, were materially false and misleading when made because defendants failed to disclose that:

(a)     Defendants had not "substantially de-risked," but rather incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity.

(b)     At the same time that Investment Bank traders were incentivized to engage in high-risk trading, UBS's risk and disclosure controls did not require the identification or confirmation of internal counterparties.  When such trades were cancelled, re-booked or amended, the related monitoring control failed to ensure the validity of these changes, allowing proprietary traders to book trades with fictitious counterparties.

- 27 -

(c)     UBS's risk controls for the inter-desk reconciliation process within the Investment Bank also failed to ensure internal transactions, including cancellations and amendments of internal trades, were valid or accurately reported in the Company's books and records.

(d)     UBS's risk controls failed to include a cash flow system that mirrored its transaction accounting system and reported profits or losses were not compared to specific transactions, which facilitated the use of fictitious trading where no cash was actually sent or received.

(e)     UBS's risk control systems and management did not "capture all risks across the firm" and failed to conduct regular balance sheet checks to evaluate any mismatch or discrepancy between a trader's total, or "gross," trading exposure and either his desk's internal risk limits or "net" exposure and, as such, UBS was unable to monitor or evaluate the true exposure on trading activity and senior management was not "aware of all material risks."

(f)     UBS's risk controls did not provide an "objective check on all risk taking" and the Investment Bank's Back Office risk management divisions operated to facilitate Front Office trading rather than having a specific risk control mandate.  The corporate culture was to assist the proprietary traders in clearing internal control breaks rather than investigate or report such violations.

(g)     UBS's risk management system was not controlled and disciplined and permitted Investment Bank traders to exceed daily and overnight risk limits and book fictitious counterparty trades, including proprietary trades, magnifying the Company's potential for profit and risk of loss.  Risk limits were set orally and there were no controls to prevent or punish violations of any risk limits.  UBS's controls were not designed or able to detect or prevent the booking of fictitious counterparty trades.

- 28 -

(h)     UBS's internal controls were not designed to prevent trading activity which generated high transaction modifications and cancellation rates, transactions with delayed start dates, off-market price deals pending confirmations in end-of-day reports and/or the absence of third-party confirmations, all of which are indicia of fictitious transactions used to facilitate unhedged trading.

(i)     UBS's risk management systems did not include any automated monitoring of the desk's positions against any formal or informal risk limits, did not include any report of daily or overnight risk limits during the Class Period, failed to monitor or generate any reports on deferred settlement trades and lacked the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.

(j)     UBS's risk management systems failed to include an automatic filter or alert in the trade input systems to identify off-market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

(k)     UBS's risk management system permitted individual traders to maintain "umbrella" or "suspense" accounts where profits made by a trading desk were held to offset and hide future trading losses and activity which exposed UBS to trading losses.

(l)     UBS's risk controls did not provide, and the Company's risk managers did not have access to, real-time trading data which would have (i) allowed risk management personnel to monitor and corroborate the existence of a trade with a counterparty before settling a trade; (ii) alerted the Company to violations of the daily and overnight risk limits; and (iii) flagged fictitious trading activity.

(m)     UBS's risk controls were not "integrated and aligned" because UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk.

- 29 -

(n)     Risk supervision was not "robust," as defendants had reduced costs and increased reported earnings by laying off predominantly "Back Office" staff involved in internal controls and risk management, even while hiring additional "Front Office" personnel and increasing UBS's value at risk in Investment Bank trading.  Support and control functions were under pressure from senior management to reduce staff numbers, and requests for additional risk management staff were denied.

(o)     As set forth in ¶¶106-112, 114-115, 136-138, 148-150, 156-158, 164-166, defendants failed to require, receive or review reports concerning significant indicia of internal control and risk management failures.

(p)     As a result of the failure to design and implement an effective risk management system, UBS's disclosure controls were deficient and ineffective.

(q)     As UBS ultimately admitted, the Company's "risk and operational systems did not detect unauthorized or unexplained activity" and this activity "was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced."

50.     As a result of defendants' false and misleading statements at the Bank of America Merrill Lynch Conference and during UBS's November 16, 2010 Investor Day conference, UBS's securities continued to trade at artificially inflated levels.

51.     On February 8, 2011, UBS announced a net profit of CHF 7.2 billion for fiscal year 2010, compared with a loss of CHF 2.7 billion in 2009.  Net profits in the fourth quarter of 2010 were CHF 1.3 billion, and UBS realized "[i]mproved Investment Bank result on third quarter, with revenues up 17%."  Commenting on the results in a letter to shareholders, Grübel stated that the 2010 financial results were "a significant improvement over the net loss we recorded in 2009."  And, while Investment Bank "[r]evenues increased by 17% to CHF 2.2 billion," Grübel explained that the

- 30 -

results, "while improved, remain unsatisfactory in relation to our ambitions for the Investment

Bank."

**UBS's 2010 Annual Report, Form 20-F
and Second Quarter 2011 Results**

52.     On March 15, 2011, UBS issued its 2010 Annual Report, signed by Grübel and

reviewed and approved for issuance by Cryan, Lofts and Kengeter, in which defendants discussed at

length the Company's "dynamic" risk management and controls.  In the Annual Report, defendants

set forth five key principles that they claimed supported UBS in achieving an appropriate balance

between risk and return:

> ***Our operational risk management and control systems and processes are designed
> to help ensure that the risks associated with our activities***, including those arising
> from process error, failed execution, ***unauthorized trading***, fraud, system failures
> and failure of security and physical protection, ***are appropriately controlled***.
>
> *          *          *
>
> –      Protection of financial strength by ***controlling our overall risk exposures and
> assessing potential risk concentrations at position and portfolio levels, as well as
> across all risk types and business divisions***.
>
> –      Reputation protection, which depends on ***a sound risk culture characterized
> by a holistic and integrated view of risk, performance and reward, including
> effectively managing and controlling risks***. Our risk culture demands that all
> employees make protecting the firm's reputation a priority.
>
> –      Management is accountable for all risks in their business, and is responsible
> for the continuous and active management of their respective risk exposures to
> ensure that risk and return are balanced.
>
> –      Independent control functions oversee the risk-taking activities of the
> business, the effectiveness of risk management in the business and the mitigation of
> operational risks.
>
> –      Disclosure of risk to provide comprehensive and transparent reporting to
> senior management, the Board of Directors (BoD), shareholders, regulators, rating
> agencies and other stakeholders.

53.     In UBS's 2010 Annual Report, defendants also discussed "[t]he most important developments that took place in 2010 with regard to risk management and control," including:

> ***We have made further significant enhancements to our firmwide risk measures and tools***.  Our stress testing framework has continued to evolve, including the development of new scenarios to capture our risk exposure to extreme market events and macroeconomic developments.

*       *       *

> Over the last two years, we took comprehensive steps to help ensure that our compensation plans and processes were redesigned and implemented in such a way to ensure appropriate risk-taking.  ***Risk awareness, assessment and management were integrated into our compensation framework***.  They now form a basis for designing our compensation plans, determining the overall bonus pool, allocating individual bonuses, and identifying and monitoring performance and compensation of key risk takers and controllers across the organization.

54.     On March 15, 2011, UBS also filed its Form 20-F Annual Report with the SEC for the year 2010.  The Form 20-F was signed by Grübel and Cryan, and reviewed and approved for filing by Lofts and Kengeter, and stated, in relevant part:

> An evaluation was carried out under the supervision of management including the Group CEO and Group CFO, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a–15e) under the US Securities Exchange Act of 1934. Based upon that evaluation, the Group CEO and Group CFO concluded that ***our disclosure controls and procedures were effective as of 31 December 2010***.  No significant changes have been made in our internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation.

*       *       *

> UBS management assessed the effectiveness of UBS's internal control over financial reporting as of 31 December 2010 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on this assessment, management believes that, ***as of 31 December 2010, UBS's internal control over financial reporting was effective.***

55.     UBS's March 15, 2011 Form 20-F also contained certifications signed by defendants Grübel and Cryan with statements identical to those issued on March 15, 2010 and set forth in ¶37.

56.     Defendants' statements in UBS's March 15, 2011 Annual Report and Form 20-F, as set forth in ¶¶52-55, were materially false and misleading when made because defendants failed to disclose that:

(a)     Defendants had not "integrated [risk awareness] into [UBS's] compensation framework," but rather incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity.

(b)     At the same time that Investment Bank traders were incentivized to engage in high-risk trading, UBS's risk and disclosure controls did not require the identification or confirmation of internal counterparties.  When such trades were cancelled, re-booked or amended, the related monitoring control failed to ensure the validity of these changes, allowing proprietary traders to book trades with fictitious counterparties.

(c)     UBS's risk controls for the inter-desk reconciliation process within the Investment Bank also failed to ensure internal transactions, including cancellations and amendments of internal trades, were valid or accurately reported in the Company's books and records.

(d)     UBS's risk controls failed to include a cash flow system that mirrored its transaction accounting system and reported profits or losses were not compared to specific transactions, which facilitated the use of fictitious trading where no cash was actually sent or received.

(e)     UBS's risk control systems and management failed to conduct regular balance sheet checks to evaluate any mismatch or discrepancy between a trader's total, or "gross," trading exposure and either his desk's internal risk limits or "net" exposure and, as such, UBS was unable to monitor or evaluate the true exposure on trading activity or assess potential risk concentrations.

- 33 -

(f)     UBS's Back Office risk management divisions operated to facilitate Front Office trading rather than having a specific risk control mandate.  The corporate culture was to assist the proprietary traders in clearing internal control breaks rather than investigate or report such violations.

(g)     UBS's risk management system was not "effectively managing and controlling risks," and permitted Investment Bank traders to exceed daily and overnight risk limits and book fictitious counterparty trades, including proprietary trades, magnifying the Company's potential for profit and risk of loss.  Risk limits were set orally and there were no controls to prevent or punish violations of any risk limits.  UBS's controls were not designed or able to detect or prevent the booking of fictitious counterparty trades.

(h)     UBS's "operational risk management and control systems and processes" were not designed to control trading risk or prevent trading activity which generated high transaction modifications and cancellation rates, transactions with delayed start dates, off-market price deals pending confirmations in end-of-day reports and/or the absence of third-party confirmations, all of which are indicia of fictitious transactions used to facilitate unhedged trading.

(i)     UBS's risk management systems did not include any automated monitoring of the desk's positions against any formal or informal risk limits, did not include any report of daily or overnight risk limits during the Class Period, failed to monitor or generate any reports on deferred settlement trades and lacked the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.

(j)     UBS's risk management systems failed to include an automatic filter or alert in the trade input systems to identify off-market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

- 34 -

(k)     UBS's risk management system permitted individual traders to maintain "umbrella" or "suspense" accounts where profits made by a trading desk were held to offset and hide future trading losses and activity which exposed UBS to trading losses.

(l)     UBS's risk controls did not provide, and the Company's risk managers did not have access to, real-time trading data which would have (i) allowed risk management personnel to monitor and corroborate the existence of a trade with a counterparty before settling a trade; (ii) alerted the Company to violations of the daily and overnight risk limits; and (iii) flagged fictitious trading activity.

(m)     UBS's risk controls were not "integrated and aligned" because UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk.

(n)     Risk supervision was not robust, as defendants had reduced costs and increased reported earnings by laying off predominantly "Back Office" staff involved in internal controls and risk management, even while hiring additional "Front Office" personnel and increasing UBS's value at risk in Investment Bank trading.  Support and control functions were under pressure from senior management to reduce staff numbers, and requests for additional risk management staff were denied.

(o)     As set forth in ¶¶106-112, 114-115, 136-138, 148-150, 156-158, 164-166, defendants failed to require, receive or review reports concerning significant indicia of internal control and risk management failures.

(p)     As a result of the failure to design and implement an effective risk management system, UBS's disclosure controls were deficient and ineffective.

- 35 -

(q)     As UBS ultimately admitted, the Company's "'risk and operational systems did not detect unauthorized or unexplained activity'" and this activity "'was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced.'"

57.     As a result of defendants' false and misleading statements on March 15, 2011, set forth in ¶¶52-55, the Company's securities continued to trade at artificially inflated levels.

58.     On April 26, 2011, UBS announced that profits for the first quarter of 2011 had "increased to CHF 1.8 billion from CHF 1.7 billion in the fourth quarter of 2010."  According to UBS, during the first quarter "[t]he Investment Bank's pre-tax profit rose to CHF 835 million from CHF 100 million in the fourth quarter of 2010," and "[w]ithin securities, equities revenues increased to CHF 1,310 million from CHF 945 million."  In a letter to shareholders commenting on the first quarter results, Grübel explained that the increase in revenues "reflects improved performance in our credit and equities trading businesses within the Investment Bank."  In the corresponding presentation to UBS investors, UBS revealed that the Investment Bank had realized the "positive revenues from a number of items including improved proprietary trading revenues."

59.     Further commenting on first quarter results, in the April 26, 2011 letter to shareholders, Grubel stated "we expect to see some improvement in a number of our business lines in the Investment Bank, *even taking into account the constraint imposed on some of our FICC businesses by our focus on controlling risk levels*."

60.     On May 10, 2011, Lofts appeared at the UBS Global Financial Services Conference and commented on the progress the Company had made during the preceding two years, touting the improved performance of the Investment Bank:

> Following our exit from the crisis, our financial results have improved, partly due to better market conditions, but more importantly, due to strategic decisions and actions that we've taken to strengthen the firm.  We have cut costs across the group. We have instilled discipline in managing scarce resources, be it balance sheet,

liquidity, risk capital. We've made investments in technology. And we put in place a strong management team combing experienced professionals who have an intimate knowledge of the firm and with the market as well as recruiting exceptional new talent, and deployed them strategically across our businesses.

*    *    *

[Our] improved performance was in part due to the stronger performance by the Investment Bank. The group generated a return on equity of 15.5%, which compares favorably with our peer group.

61.    On July 26, 2011, Grübel participated in a conference call with analysts and investors to discuss UBS's results for the second quarter of 2011. During the call, Grübel had the following exchange with Matthew Clark, an analyst with Keefe, Bruyette & Woods:

[Q:]  [T]he final question is just on how you think risk management performed during the quarter, because your risk-weighted assets were up. Your VaR was – on average VaR was up versus the first quarter both fairly materially in dollar terms and yet you saw quite a steep fall in credit trading in particular. And I'm just wondering whether you felt that you were well positioned for the disruption or whether there are some regrettable losses buried in that FICC result.

*    *    *

A:    [Grübel]:  Overall I think our risk management performed very well. And *we have no undue risk in our positions* and in credit trading probably it was a timing mistake so to speak by trading. And – but otherwise *I'm pretty convinced that we have one of the best risk management in the industry*.

62.    Defendants' statements on April 26, 2011, May 10, 2011 and July 26, 2011, as set forth in ¶¶59-61, were materially false and misleading when made because defendants failed to disclose that:

(a)    Defendants had incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity.

(b)    At the same time that Investment Bank traders were incentivized to engage in high-risk trading, UBS's risk and disclosure controls did not require the identification or

- 37 -

confirmation of internal counterparties.  When such trades were cancelled, re-booked or amended, the related monitoring control failed to ensure the validity of these changes, allowing proprietary traders to book trades with fictitious counterparties.

(c)     UBS's risk controls for the inter-desk reconciliation process within the Investment Bank failed to ensure internal transactions, including cancellations and amendments of internal trades, were valid or accurately reported in the Company's books and records.

(d)     UBS's risk controls also failed to include a cash flow system that mirrored its transaction accounting system and reported profits or losses were not compared to specific transactions, which facilitated the use of fictitious trading where no cash was actually sent or received.

(e)     UBS was not discipline in managing their balance sheet and risk capital and UBS's risk control systems and management failed to conduct regular balance sheet checks to evaluate any mismatch or discrepancy between a trader's total, or "gross," trading exposure and either his desk's internal risk limits or "net" exposure and, as such, UBS was unable to monitor or evaluate the true exposure on trading activity or whether there were "undue risk" in its positions.

(f)     UBS's Back Office risk management divisions operated to facilitate Front Office trading rather than having a specific risk control mandate.  The corporate culture was to assist the proprietary traders in clearing internal control breaks rather than investigate or report such violations.

(g)     UBS's risk management system was not controlled and disciplined and permitted Investment Bank traders to exceed daily and overnight risk limits and book fictitious counterparty trades, including proprietary trades, magnifying the Company's potential for profit and risk of loss.  Risk limits were set orally and there were no controls to prevent or punish violations of

819129_1

any risk limits.  UBS's controls were not designed or able to detect or prevent the booking of fictitious counterparty trades.

(h)     UBS's internal controls were not designed to prevent trading activity which generated high transaction modifications and cancellation rates, transactions with delayed start dates, off-market price deals pending confirmations in end-of-day reports and/or the absence of third-party confirmations, all of which are indicia of fictitious transactions used to facilitate unhedged trading.

(i)     UBS's risk management systems did not include any automated monitoring of the desk's positions against any formal or informal risk limits, did not include any report of daily or overnight risk limits during the Class Period, failed to monitor or generate any reports on deferred settlement trades and lacked the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.

(j)     UBS's risk management systems failed to include an automatic filter or alert in the trade input systems to identify off-market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

(k)     UBS's risk management system permitted individual traders to maintain "umbrella" or "suspense" accounts where profits made by a trading desk were held to offset and hide future trading losses and activity which exposed UBS to trading losses.

(l)     UBS's risk controls did not provide, and the Company's risk managers did not have access to, real-time trading data which would have (i) allowed risk management personnel to monitor and corroborate the existence of a trade with a counterparty before settling a trade; (ii) alerted the Company to violations of the daily and overnight risk limits; and (iii) flagged fictitious trading activity.

(m)     UBS's risk controls were not "integrated and aligned" because UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk.

(n)     Risk supervision was not robust, as defendants had reduced costs and increased reported earnings by laying off predominantly "Back Office" staff involved in internal controls and risk management, even while hiring additional "Front Office" personnel and increasing UBS's value at risk in Investment Bank trading.  Support and control functions were under pressure from senior management to reduce staff numbers, and requests for additional risk management staff were denied.

(o)     As set forth in ¶¶106-112, 114-115, 136-138, 148-150, 156-158, 164-166, defendants failed to require, receive or review reports concerning significant indicia of internal control and risk management failures.

(p)     As a result of the failure to design and implement an effective risk management system, UBS's disclosure controls were deficient and ineffective.

(q)     As UBS ultimately admitted, the Company's "'risk and operational systems did not detect unauthorized or unexplained activity'" and this activity "'was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced.'"

63.     As a result of defendants' false and misleading statements on April 26, 2011, May 10, 2011 and July 26, 2011 set forth in ¶¶59-61, the Company's securities continued to trade at artificially inflated levels.

## THE DISCLOSURE OF THE TRUTH ABOUT UBS'S RISK MANAGEMENT SYSTEMS AND INTERNAL CONTROLS

64.     On September 15, 2011, defendants shocked the market when, two minutes before trading began on the Swiss stock exchange, they were forced to disclose that UBS's risk and

- 40 -

disclosure controls were inadequate and that unauthorized trading in excess of risk limits in its Investment Bank had caused losses "in the range of USD 2 billion."

65.     The market reacted swiftly to defendants' disclosure.  Within hours of the announcement, Moody's Investors Service placed UBS on "review for possible downgrade," stating that its "review will centre on **ongoing weaknesses in the Group's risk management and controls that have become evident again** by the events leading to UBS announcing a loss due to unauthorised trading."  Moody's further reported that while the losses may be manageable, the disclosure of the improper trading "call into question [UBS's] ability to successfully complete the rebuilding of its investment banking operations."  Moody's was quickly followed the next day by Standard & Poor's Rating Services and Fitch, which placed their ratings on UBS on "CreditWatch with negative implications" and "Rating Watch Negative," respectively.

66.     Securities analysts who covered UBS during the Class Period also reacted swiftly and negatively to the disclosure of the Company's inadequate risk management and control failures and questioned the viability of the Investment Bank division:

- "**It is disturbing to think that**, three years to the day Lehman fell, **every bank across the globe hasn't learned to effectively manage risk.  Unauthorized trades totaling $2 billion shouldn't have gone unnoticed by UBS**."  (TheStreet.com, Sept. 15, 2011.)

- "**UBS can absorb loss, but raises concerns on risk mgmt. . . .  The bigger concern will be on the effectiveness of risk controls and on the overall level of proprietary risk the unit is running**."  (Cheuvreux Credit Agricole Group, Sept. 15, 2011.)

- "[T]he whole case again **raises questions about the bank's risk management** and could also accelerate the restructuring process announced in July and updated in August." (Commerzbank, Sept. 15, 2011.)

- "**That an unauthorised position of this size could have escaped oversight will renew pressure on management to radically scale back the FICC business** . . . ." (Collins Stewart, Sept. 15, 2011.)

- "Unauthorized trading losses tend to **reflect on the state of a bank's control infrastructure and staffing of middle and back offices**. . . . [I]t may well be **indicative of an unsustainable disparity between front office ambitions and support infrastructure**." (The Royal Bank of Scotland, Sept. 15, 2011.)

- "[W]e view the US$2bn loss announced today, due to unauthorized trading, as the **final straw** in UBS's ambitious build-out to a [tier 1 investment bank]." (J.P. Morgan Cazenove, Sept. 15, 2011.)

- "The fraud reflects potential **dysfunctions in the design and implementation of the bank's internal controls** and requires immediate action from the top management, not least the recently appointed Head of Risk. . . . Despite the fact that the CEO's initial reaction was to encourage UBS employees to stay focused on client needs, we assess that from the Swiss regulator's perspective, **UBS will be urged to focus on internal control procedures**." (Mediobanca Securities, Sept. 16, 2011.)

- "While there is limited detail we would not expect the finer details to change the conclusion that **risk management was inadequate given the size of the loss**. . . . There is the possibility of the loss involving fraud at this stage. Even if this was the case it will still beg the question as to **how such a large loss could have gone undetected especially in the business in which it occurred and raises significant concerns regarding the risk management** at the investment bank. . . . There are a number of things to consider now post the trading loss. Obviously how it develops in terms of the seriousness of the risk management lapse is a factor although the size of the loss means the details are unlikely to change the conclusion that **there was a failure in risk controls**." (RBC Capital Markets, Sept. 16, 2011.)

- "The direct financial impact remains manageable for UBS. . . . "[A] much bigger problem" is that "**UBS will have to explain how a single trader could run circles around UBS's control and risk management systems** for three month [sic], and at an order of magnitude that created such a large loss. . . . It also **remains unclear to us how the rogue trader could hide the cash flow consequences of his illicit trades** for three months. The whole tale seems like a replay of the Kerviel case at SocGen in early 2008. We would have thought that this high profile case provided plenty of incentives to risk managers across the street to tighten processes in this particular area to make sure history does not repeat itself. . . . We stick to our view that after two rounds of middle and back office focussed [sic] cost cutting in 2009/10 and again at present, UBS may not have the control infrastructure needed to keep a front office in check that has seen considerable re-expansion . . . ." (The Royal Bank of Scotland, Sept. 19, 2011.)

67.    Media reports in the immediate aftermath of the September 15, 2011 disclosure also focused on UBS's internal controls and risk management:

- Nick Sawyer, editor of the publication "Risk," commented that "*it seems astonishing that anyone could actually rack up losses of $2 billion without a bank actually being aware of the trades that any particular traders is putting on*. Usually, traders have specific risk limits, and banks will monitor that."  (PBS NewsHour, Sept. 15, 2011.)

- "*All of this unauthorized trading raises the question who is keeping track of the trading?  Who is watching the money?  Adoboli was a newbie, 4.5 years into the business.  He was just a trainee two years ago.  Why wasn't his work more closely watched by management*?" (*The Willis Report*, Sept. 15, 2011.)

- "'*It's a shock to UBS and the rest of the investment banking system that someone could have got to this level of problem without either the system, or management, stopping it*,' said Chris Roebuck, visiting professor at Cass Business School in London." (*The Washington Post*, Sept. 16, 2011.)

- "*There is certainly a sense that this time around, the Swiss bank will not be able to get away so lightly with trying to heap responsibility for alleged losses on to the shoulders of a single trader*.  After all, between the derivatives losses of 1997 and this week's rogue trading incident, *UBS has booked no fewer than three other major losses on risky market bets*." (*The Telegraph*, Sept. 17, 2011.)

68. As a direct result of the September 15, 2011 disclosure, the price of UBS securities dropped more than 10%.  On September 15, 2011 alone, the price of UBS's common stock on the NYSE fell $1.26 per share, on extraordinarily high volume of more than 29.9 million shares, and the Company's market capitalization dropped over $4.7 billion in one day.

## POST-CLASS PERIOD ADMISSIONS, INVESTIGATIONS AND SETTLEMENTS

69. Following the September 15, 2011 disclosure, it was revealed that UBS Investment Bank trader Kweku Adoboli had engaged in improper trades in amounts up to $12 billion.  The 32-year-old Adoboli had joined UBS straight out of college in 2003, working in the Operations Department, the "Back Office" of the Investment Bank.  In December 2005 he was promoted to a "Front Office" trader position and, by the end of 2006, Adoboli was promoted to the Exchange Traded Funds ("ETF") or "Delta One" desk.  Delta One desks at investment banks focus on hedged trading, including proprietary trading with the bank's capital (as opposed to client funds), and derive

- 43 -

profits from differences in the value between derivatives and their underlying assets.  Following the financial collapse of 2008, Delta One desks became a source of significant profit for investment banks.  Immediately prior to and during the Class Period, Adoboli's compensation increased significantly as a result of the profits he generated for UBS on trades at the Delta One desk.  From October 2008 to October 2010, Adoboli's salary increased over 200%, even as defendants were laying off Back Office compliance personnel, and Adoboli was named a director and selected for UBS's selective "Ascent programme," designated for future leaders of the Company.

72.     On September 23, 2011, it was announced that the accounting firm KPMG would lead an investigation on behalf of British and Swiss regulators, the FSA and FINMA, into the risk management and control failures at UBS.  UBS's Board of Directors also initiated an independent investigation into the Company's inadequate internal controls during the Class Period.  In an initial report on UBS's risk controls and the prevention of rogue trading, KPMG noted with regard to traders like Adoboli that "[d]ue to their success, they were celebrated like stars, gained higher salaries and full backing from senior management."

71.     On September 24, 2011, UBS issued a press release announcing that defendant Grübel took responsibility for the risk management failures disclosed nine days earlier and had resigned from the Company.  Notifying the Company just three days after the September 15, 2011 disclosure that he would be resigning, Grübel explained in an email to staff "I am convinced that it is in the best interest of UBS to approach the future with a new leader . . . ."

72.     On October 3, 2011, a *Financial Times* analysis of UBS's risk management failures entitled "Banking: Lightning strikes twice" quoted a former UBS executive and other banking professionals who identified specific areas which, had defendants actually undertaken the risk

- 44 -

management procedures they publicly touted during the Class Period, would have raised "red flags" of the large, unhedged exposure which led to UBS's $2.3 billion trading loss:

> A former UBS executive who directly supervised Delta One says **regular balance sheet checks should have revealed a big mismatch between Mr Adoboli's total, or "gross," trading exposure and his desk's internal limits – even if the bank's "net" exposure on the trades appeared to be zero**.

> Bankers familiar with Delta One operations have also criticised UBS's explanation of how Mr Adoboli allegedly avoided detection. The bank says he first used fictitious internal futures – trades with other parts of the bank that did not generate electronic or paper confirmation statements – to make it appear as if his positions were hedged.

> When that attracted the attention of the UBS control functions, UBS executives say, he switched to using phantom ETFs with financial counterparties that allegedly did not confirm the trades until a few days before settlement, leaving no paper trail of his activities.

> But bankers at rival institutions say that, even so, trades **of the magnitude of Mr Adoboli's should have been double-checked manually by his manager or executives further up the food chain**. "This was supposed to be a low-risk area," Mr Kengeter said in the days following the losses' discovery.

73.  As alleged herein, had UBS's internal controls and risk management systems performed "balance sheet checks," monitored deferred settlement transactions, enforced trading limits and evaluated trading exposure on a gross rather than net basis, as defendants had represented (*e.g.*, ¶¶26, 28-30, 35, 39-40, 43, 45-48, 52, 59-61), UBS would not have been exposed to the proprietary trading losses of $2.3 billion.

74.  On October 5, 2011, interim UBS CEO Sergio Ermotti issued an internal memo to UBS employees concerning the Company's Class Period failure to enforce "risk and operational systems":

> We have to be straight with ourselves. In no circumstances should something like this ever occur. **The fact that it did is evidence of a failure to exercise appropriate controls. Our internal investigation indicates that risk and operational systems did detect unauthorized or unexplained activity but this was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced**.

- 45 -

75.     On October 25, 2011, UBS filed a Form 6-K with the SEC in which it admitted that

"*certain controls designed to prevent or detect the use of unauthorized and fictitious transactions*

*on a timely basis were not operating effectively*."  The SEC filing acknowledged:

> *We have further determined that the control deficiencies that led to the failure to prevent or detect unauthorized and fictitious trading on a timely basis also existed at the end of 2010*.

> A material weakness is a deficiency or combination of deficiencies in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a registrant's financial statements will not be prevented or detected on a timely basis.  Management has re-assessed whether our internal control over financial reporting was effective on 31 December 2010, and has determined that there is a reasonable possibility that the control deficiencies that existed on that date could have been sufficient to result in a material misstatement of our consolidated financial statements as of and for the year ended 31 December 2010.

> On this basis, *management, including our Group CEO and Group CFO, has concluded that there was a material weakness in our internal control over financial reporting on 31 December 2010 and, accordingly, that our internal control over financial reporting was not effective as of that date*.  On the basis of the available information to date, management has concluded that (i) the control requiring bilateral confirmation with counterparties of trades within our Investment Bank's equities business with settlement dates of greater than 15 days after trade date was not operating, and when such trades were cancelled, re-booked or amended, the related monitoring control to ensure the validity of these changes had ceased to operate effectively, and (ii) the controls in the inter-desk reconciliation process within the Investment Bank's equities and fixed income, currencies and commodities businesses to ensure that internal transactions are valid and accurately recorded in our books and records, including controls over cancellations and amendments of internal trades that require supervisor review, intervention and resolution, did not operate effectively.

> *Management has likewise determined that, solely because of these deficiencies, our disclosure controls and procedures (as defined in Rule 13a-15(e) under the U.S. Securities Exchange Act of 1934) were not effective on 31 December 2010*.

> Accordingly, our previous evaluation stating that our disclosure controls and procedures were effective on 31 December 2010 and the reports of management and of our independent registered public accounting firm on internal control over financial reporting on 31 December 2010, all of which were included in our 2010 Annual Report on Form 20-F filed with the SEC on 15 March 2011, *should no longer be relied upon.*

- 46 -

76.     Concurrent with the filing of the Form 6-K, UBS issued a press release which

provided, in pertinent part:

> As a US-listed company, UBS is required under the Sarbanes-Oxley Act to evaluate
> the effectiveness of its "internal control over financial reporting" and "disclosure
> controls and procedures" on an annual basis. Following the discovery of the
> unauthorized trading activities, *management has determined that these controls
> were not effective on December 31, 2010*. In a document submitted to the US
> Securities and Exchange Commission (SEC), *we have identified two control
> deficiencies*: (i) the control requiring bilateral confirmation with counterparties of
> trades within our Investment Bank's equities business with settlement dates of
> greater than 15 days after trade date was not operating, and, when such trades were
> cancelled, re-booked or amended, the related monitoring control to ensure the
> validity of these changes had ceased to operate effectively, and (ii) the controls in the
> inter-desk reconciliation process within the Investment Bank's equities and fixed
> income, currencies and commodities businesses to ensure that internal transactions
> are valid and accurately recorded in our books and records, including controls over
> cancellations and amendments of internal trades that require supervisor review,
> intervention and resolution, did not operate effectively. We have taken and are taking
> measures to address these control deficiencies.

77.     As reported in the *New York Times* in a September 13, 2012 article titled "Trial

Begins for Former UBS Trader," UBS's internal investigation "***showed that the firm's risk controls

had raised red flags about unusual trading activity, but that managers had failed to adequately

follow up.*** 'We have to be straight with ourselves,' Mr. Ermotti, the chief executive, said in 2011. ***In

no circumstances should something like this ever occur***."

78.     The same day that UBS admitted in its SEC filing and press release that the

Company's internal risk and disclosure controls were inadequate during the Class Period, the

Financial Industry Regulatory Authority ("FINRA") announced that it had fined UBS $12 million

"for violating Regulation SHO and failing to properly supervise short sales of securities."  According

to the FINRA release:

> FINRA found that UBS' Reg SHO supervisory system regarding locates and
> the marking of sale orders was significantly flawed and resulted in a systemic
> supervisory failure that contributed to serious Reg SHO failures across its equities
> trading business.  First, FINRA found that UBS placed millions of short sale orders

- 47 -

to the market without locates, including in securities that were known to be hard to borrow. These locate violations extended to numerous trading systems, desks, accounts and strategies, and impacted UBS' technology, operations, and supervisory systems and procedures. Second, FINRA found that UBS mismarked millions of sale orders in its trading systems. Many of these mismarked orders were short sales that were mismarked as "long," resulting in additional significant violations of Reg SHO's locate requirement. Third, FINRA found that UBS had significant deficiencies related to its aggregation units that may have contributed to additional significant order-marking and locate violations.

Brad Bennett, FINRA Executive Vice President and Chief of Enforcement, said, "Firms must ensure their trading and supervisory systems are designed to prevent the release of short sale orders without valid locates, and properly mark sale orders, in order to prevent potentially abusive naked short selling. The duration, scope and volume of UBS' locate and order-marking violations created a potential for harm to the integrity of the market."

79.     Commenting on the "***systemic supervisory failure***" and resulting fine, J. Bradley Bennett, FINRA's enforcement chief, stated that the "fine reflect[s] ***broad gaps in [UBS's] compliance system***. I think it's very significant."

80.     Following the September 15, 2011 disclosure, current and former UBS officers and employees acknowledged the culture of risk that existed at UBS during the Class Period and the Company's failure to implement effective risk and disclosure controls. According to John DiBacco ("DiBacco"), who began managing the Delta One desk in April 2011, five months before the end of the Class Period, there was a ***"culture that was risk-seeking and not risk-averse"*** at the Company under the leadership of Grübel. DiBacco testified that he told investigators from KPMG that he was "surprised" by the levels of risk taken by UBS traders and the size of the positions allowed to be taken, but that ***he had been cautioned upon taking his management position that "[y]ou have to be careful not to stifle these guys – they like to trade***." DiBacco himself congratulated Adoboli in June 2011 for generating a one-day profit of $6 million, despite the fact that the profit was the result of positions Adoboli took that far exceeded UBS's purported risk limits.

81.     John Hughes ("Hughes"), UBS's Senior Trader on the Delta One desk during the Class Period, described the desk as an *"oasis of profit,"* primarily as a result of the unchecked proprietary trading.  Hughes also testified about the risk limits for proprietary traders at UBS, describing *"the trading limits on the desk as loose . . . It was very, very loose*."

82.     Hughes, along with Tom White, the Executive Director in the Global Synthetic Equities division, further testified that profits from trades would be held back from quarter to quarter in "umbrella" or "suspense" accounts to manipulate the desk's annual results and cover losses.  And, according to UBS's December 2011 General Internal Audit report ("GIA Report"), Adoboli's supervisor was aware of his "propensity to smooth profit and loss and take unacceptably high levels of new debt," but took no steps to end that practice.

83.     The Senior Manager of the Delta One desk through March 2011, Ron Greenidge ("Greenidge"), testified that the focus of UBS under Grübel was increasingly on raising profits in the Investment Bank, and Ricardo Honegger ("Honegger"), who had been hired away from Deutsche Bank to be the new head of the Global Synthetic Equity division, was focused on increasing profits by $700 million to make UBS "a top three player in cash equities."  Greenidge confirmed that, during the Class Period, bankers were encouraged to and rewarded for placing bigger trades with bigger risks in order to drive up UBS's profits.

84.     Similarly, Phil Allison ("Allison"), UBS's co-head of Global Cash Equities during the Class Period and a member of the Company's Equities Global Risk Committee, testified that there was *"a change of ethos"* under Grübel that encouraged more risk taking at the bank. According to Allison, Grübel pushed for more proprietary trading at UBS and more risk to increase corporate profits.  UBS management's encouragement to take more risk and to conduct more proprietary trading during the Class Period to increase profits was further confirmed by statements

- 49 -

made by Yassine Bouhara ("Bouhara"), UBS's co-head of Global Cash Equities, who had told Adoboli ***"you don't know you are pushing the boundaries hard enough until you get a slap on the wrist."***  So long as Adoboli and other bankers' high-risk trades were profitable, no slap ever came. As Adoboli testified, "We were told to go for it, we went for it.  We were told to push the boundaries . . . ."

85.     On November 20, 2012, after nearly ten weeks of trial, Adoboli was convicted in Southwark Crown Court on two counts of fraud by abuse of position for exposing UBS to "a risk of loss" during the period from October 2008 through September 2011.  In addition, Adoboli was acquitted on four counts of falsely accounting for his unhedged proprietary trades because the jury was unable to find that Adoboli engaged in the relevant conduct "to make a financial gain for" himself, and, as the presiding Justice noted, "[i]t goes without saying [Adoboli] did not intend to cause . . . any loss – to the bank."  In sentencing Adoboli, the Justice found that Adoboli had been "persuaded" by his superiors "to trade on the basis that the market would rally" and that Adoboli had sought to "maximise the profits which the bank would make from [his] trading."[1]

86.     On November 25, 2012, following the Adoboli verdict, the FSA issued its Final Notice ("FSA Report"), which was the product of a year-long investigation into the circumstance surrounding the "systems and controls failings" at UBS which permitted the unhedged proprietary trading.[2]  The FSA Report identified UBS's failure to "take reasonable care to organise and control

---

[1]      On December 21, 2012, Adoboli appealed his conviction, filing a "an application against conviction and sentence."  No timetable for his appeal has yet been set.

[2]      A copy of the November 25, 2012 FSA Report, attached hereto as Ex. A, is publicly available at http://www.fsa.gov.uk/static/pubs/final/ubs-ag.pdf.  The FSA's press release is publicly available at http://www.fsa.gov.uk/library/communication/pr/2012/105.shtml.

its affairs responsibly and effectively, with adequate risk management systems" or conduct its business "with due skill, care and diligence."[3]   Tracey McDermott, director of enforcement and financial crime at the FSA, said:

> **UBS's systems and controls were seriously defective.  UBS failed to question the increasing revenue of the desk and failed to ensure that there was a corresponding increase in the controls in place over the desk**.  As a result Adoboli, a relatively junior trader, was allowed to take vast and risky market positions, and **UBS failed to manage the risks** around that properly.  We know from past experience that failures to manage risk properly can cause firms to fail and cause systemic harm.

87.   The FSA imposed a penalty of £42.4 million on UBS for "failing to take reasonable care to organise and control its affairs reasonably and effectively, with adequate risk management systems" and "failing to conduct its business . . . with due skill, care and diligence."   Of the aggravating factors considered in setting the penalty, the FSA focused on UBS's pattern of risk control failures, including a prior fine in November 2009 for the Company's "**failings in relation to the systems and controls**."   While the FSA made clear that it "expects firms to consider whether the issues identified in an enforcement action are applicable to other business areas and whether remedial action is necessary, **UBS failed to do this**."   Because UBS "agreed to settle at an early stage of the FSA's investigation," the fine was lowered to £29.7 million.

88.   Among other Class Period failures with the Investment Bank's risk control, the FSA Report "identified significant control breakdowns," at UBS including (i) failures to act on breaches

---

[3]      While the FSA's investigation focused on specific breaches which occurred between June 1, 2011 and September 14, 2011, the investigation "identified unauthorised trading, and the use of concealment mechanisms, from December 2008."   The FSA Report further identified that there was "a consistent use of concealment mechanisms" in the Investment Bank from December 2008 through September 14, 2011.   And, according to the KPMG report and confirmed by Colin Bell during the Adoboli trial, there were numerous incidents of unauthorized trading at UBS during the Class Period unrelated to the $2.3 billion loss and the ETF desk which "caused an element of restating profit and loss."

of risk limits; (ii) deficiencies in the "co-operation and co-ordination between front and back office"; and (iii) a "demonstrated . . . lack of capability to effectively identify, challenge and escalate significant and sustained control issues."

89.     The FSA Report also identified a number of risk management and control failures located at the point where trades were executed.  First, the "increase in revenue [generated by the Delta One desk] was several times greater than the increase in the risk limits of the Desk" and management failed to "make any enquiries into how the increase in revenue was being generated." Second, risk limits were not memorialized and were routinely breached without investigation or repercussion.  During the Class Period, UBS's "Operations Division [the back office] *acted as a facilitation division rather than having a specific risk control mandate*, providing a logistic support role and working closely with the Front Office to resolve and clear any trading breaks."  Control personnel's "*primary focus appears to have been on driving efficiency as opposed to more control based activities*."  Third, UBS's Supervisory Control Portal ("SCP"), which was purportedly developed to aid in risk control supervision, was deficient and "was *not effective in controlling for risk in unauthorised trading*."  Among the identified deficiencies of the SCP were that "the report feature was not functioning in respect to futures trades until 26 August 2011," and the SCP's functionality for flagging specific alerts for review by supervisory personnel, which was a manually operated feature, was not "utilised by the Operations Division *despite the fact that there were a high number of alerts generated by the system*."

90.     The FSA Report also found risk control deficiencies within UBS's Finance, Risk and Compliance Divisions.  The Finance Division would suspend or adjust profit and loss based on communication with traders and there was no policy or practice to identify these suspensions or adjustments in the Company's daily or monthly profit and loss reports.  "These suspension were not

adequately challenged" by the Finance Division and there was no policy to escalate or alert senior executives to these risks. Additionally, neither the Finance Department nor any of UBS's executives investigated the significant increase in profitability from the Delta One desk and they "conducted no analysis of the drivers and size of the [desk's] underlying intra-day positions."

91.     As the FSA concluded, these "significant" failures permitted (i) the "booking of unmatched trades to internal counterparties" such that "the Front Office system allowed internal futures trades to be booked to a generic counterparty of 'internal' and did not require an automatic mirror trade or identification of the particular internal counterparty"; (ii) the "late booking of trades," "which allowed manipulation of the profit and loss"; and (iii) the "use of false ETF trades, including false ETF trades with a deferred settlement date, false trades at off market prices and amendments to the prices of ETFs," as "[t]here was no automatic filter in the trade input systems which identified off market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system."

92.     Swiss regulator FINMA also released its report on UBS's deficient controls ("FINMA Report") which, like the FSA Report, "*highlighted serious deficiencies in risk management and controls at UBS's Investment Bank*."[4]  Substantially mirroring the FSA's findings, FINMA reached the following conclusions concerning the deficiencies which existed with UBS's risk management and internal controls:

---

[4]     A copy of the November 21, 2012 FINMA Report, attached hereto as Ex. B, is publicly available     at     http://www.finma.ch/d/aktuell/Documents/ubs-summary-report-20121121.pdf. FINMA's press release is publicly available at http://www.finma.ch/e/aktuell/Documents/mm-ubs-london-20121126-e.pdf.

- UBS failed to detect that trading activity had occurred outside the ETF desk's risk limits since late 2008. The failure to detect this activity for such a long period of time indicates widespread deficiencies across the Investment Bank's control environment;

- The focus of the Front Office was on generating profits, not risk management. Front Office managers showed lenience to traders and had little interest in controlling their trading activities so long as they were generating corporate earnings. Breaches of risk and trading limits were tolerated, not penalized, while significant increases in the Desk's proprietary trading revenue were not examined. The Company's emphasis on profits came at the expense of control and sound risk management;

- UBS's Back Office personnel were not adequately trained and had too little understanding of the trading activities they were supposed to be monitoring. As a result, they were unable to challenge high-risk proprietary trading by the Delta One desk;

- UBS failed to collate control functions for proprietary trading and, as a result, the Company was unable to monitor overall trading risk;

- Operational risks were evaluated to a large extent on the basis of a self-assessment process, which was carried out just once a year by traders and internal controllers;

- Following the April 2011 transfer of the Delta One desk from the Global Equities division to the Global Synthetic Equities division, UBS failed to install local risk management supervision and senior traders were given authority to supervise their own proprietary trading; and

- UBS rewarded revenue enhancing proprietary trading, without regard to risk, awarding pay increases and bonuses to the Delta One desk traders, despite repeated breaches of compliance policies.

93.    While FINMA is not authorized to levy fines, the agency required UBS to implement severe remedial and preventive measures, including:

- the requirement that any new business initiatives which UBS intends to take in its investment bank and which are likely to lead to increased operational complexity receive prior approval from FINMA;

- the setting of upper limits on the risk-weighted assets of the London branch;

- the prohibition of UBS's Investment Bank from making any new acquisitions;

- the appointment of an independent investigator to control the implementation and completion of the corrective measures at UBS; and

- the engagement of an audit by FINMA to review whether the remedial measures implemented by UBS have proved effective.

94.     On December 19, 2012, shortly after releasing its report on unhedged proprietary trading at UBS, FINMA issued a separate report finding that UBS had "severely violated Swiss supervisory law" when submitting interest rates for the calculation of the London Interbank Offered Rate or "LIBOR."  Once again, FINMA focused on "UBS's systems and controls" during the 2006-2009 period, and found "[s]ubstantial failings in the system and control processes":

> Substantial failings in the system and control processes for LIBOR submissions at UBS prevented the improper interference with interest rates from being discovered and the bank from reacting appropriately.  Internal guidelines, if they at all existed, were either deficient or not implemented consistently.  Moreover, the responsible line managers did not sufficiently control the submission process, neither did internal audits conducted by the Compliance department and Internal Audit uncover the misconduct.

95.     That same day, the FSA levied a £200,000,000 fine against UBS for violating Principles 3 and 5 of the FSA's Principles for Business between January 1, 2005, and December 31, 2010, through misconduct relating to the calculation of LIBOR and the Euro Interbank Offered Rate ("EURIBOR").[5]  Altogether, UBS has been forced to pay $1.5 billion to settle regulatory investigations into the Company's manipulation of interest rates between 2005 and 2010.

96.     Over two days of testimony in January 2013 before the British Parliamentary Commission on Banking Standards Commission, current and former UBS executives responded to questions regarding UBS's involvement in interest rate manipulation.  Andrew Williams, UBS's global head of compliance, testified he believed UBS's involvement in manipulating interest rates

---

[5]     As set forth in the FSA's December 19, 2012 Final Notice, Principle 3 provides: "[A] firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems."  Principle 5 provides: "[A ]firm must observe proper standards of market conduct."

revealed the Company's management "was ineffective" at the time. Jerker Johansson, former head of UBS's Investment Bank, admitted that UBS's risk management and codes of conduct during the relevant period were effectively "worthless." Johansson's predecessor, Huw Jenkins, testified that the revelations of illegal manipulation of rates illustrated "clearly a failing in our systems and controls and our culture."

97. In the wake of the September 15, 2011 disclosure of UBS's risk management failures, the Company has taken steps to exit the investment banking business. In October 2012, UBS announced that it would reduce its workforce by 10,000, the majority of which came from the Investment Bank, and scale back proprietary trading operations. At the same time, defendant Kengeter was forced to step down from the GEB and was stripped of his title as CEO of the Investment Bank. By February 2013, Kengeter had been pushed out of UBS as the Company's new management tried to erase any connections to the risk management failures during the Class Period.

## ALLEGATIONS OF SCIENTER

98. As alleged herein, each of the defendants made false or misleading statements while they knew or recklessly disregarded facts and had access to information indicating that their public statements, as set forth in ¶¶25-30, 34-37, 39-40, 43, 45-48, 52-55, 59-61, were materially inaccurate and incomplete. Each of the defendants also had the motive and opportunity to commit the alleged fraud.

**There Is a Strong Inference that UBS
Acted with the Requisite Scienter**

99. UBS's corporate liability derives from the actions of its agents. The allegations herein establish a strong inference that UBS, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard

- 56 -

for the truth, because they failed to ascertain and to disclose the truth about UBS's internal controls and risk management, even though such facts were available to them.  Taken collectively, these facts create a strong inference that UBS acted with the requisite scienter.

100.     ***The Change to UBS's Risk Culture***:  While defendants publicly touted UBS's "new risk culture," "more cautious approach" and "controlled and disciplined risk culture" during the Class Period, internally they promoted and rewarded increasingly risky behavior in the pursuit of Investment Bank profits.  Allison, UBS's co-head of Global Cash Equities during the Class Period and a member of the Company's Equities Global Risk Committee, testified that there was "a change of ethos" under Grübel that encouraged more risk taking at the bank, and Grübel pushed for more proprietary trading at UBS and more risk to increase corporate profits.  Similarly, Greenidge, the supervisor of UBS's Delta One desk for much of the Class Period, confirmed in testimony that the focus of UBS was increasingly on raising profits in the Investment Bank and traders were encouraged to place bigger trades with bigger risks in order to drive up UBS's profits.  The focus on profits was communicated to the Investment Bank traders.  Bouhara, UBS's Co-Head of Equities, told Adoboli and other traders in 2010, "in the new world" at UBS, "if they made loads of money for the bank they would make loads of money for themselves."

101.     In April 2011, DiBacco, the Global Head of Synthetic Equity Trading at UBS, replaced Greenidge as the Company's supervisor of the Delta One desk.  DiBacco testified he was "surprised" by the levels of risk taken by UBS traders and the size of the positions allowed to be taken, but that he was instructed that "***[y]ou have to be careful not to stifle these guys [traders] – they like to trade***."  According to DiBacco, there was a "***culture that was risk-seeking and not risk-averse***" at UBS under Grübel's leadership.  In June 2011, DiBacco himself congratulated Adoboli

- 57 -

for generating a one-day profit of $6 million, despite the fact that the profit was derived from trading positions that far exceeded UBS's risk limits.

102.     UBS's Back Office, like Greenidge and DiBacco, were instructed to assist proprietary trading activity, rather than enforce internal controls.  According to the FSA, "*[t]here was a culture of helping the traders to clear breaks on the basis of explanations they provided as opposed to challenging the traders and questioning whether their explanations were correct*."  The FSA further found that the very UBS divisions that were supposed to be monitoring for violations of internal controls "*acted as a facilitation division rather than having a specific risk control mandate*, providing a logistic support role and working closely with the Front Office to resolve and clear any trading breaks. . . .  As such *their primary focus appears to have been driving efficiency [profits] as opposed to more control based activities*."

103.     FINMA also found that, during the Class Period, UBS's "*Front Office managers showed lenience to traders and had little interest in controlling their activities.  Breaches of management instructions and risk limits were tolerated, not penalised, while significant increases in the Desk's proprietary trading revenue were not examined.  The emphasis on profits came at the expense of control and sound risk management*."  Indeed, during the Adoboli trial, a former Back Office analyst, Johannes Zuidmeer, admitted that he allowed Adoboli to avoid reporting a $1 billion loss based on nothing more than the explanation that the Delta One desk needed more time to reconcile its records.

104.     The rapid promotion of Adoboli prior to September 2011 is further evidence of the "*change of ethos*" at UBS under Grübel.  Only a few years removed from a summer internship, Adoboli was selected to work on the Delta One desk and, by age 28, was one of two senior traders running the desk and had been given responsibility for a £30 billion portfolio.  As he generated

- 58 -

profits for the bank, and despite the fact that he repeatedly violated risk limits and internal controls, Adoboli was rapidly promoted, selected to participate in the exclusive "Ascent programme" for future Company leaders and his salary rose from £30,000 to £360,000.  During this time, and as Adoboli repeatedly breached internal controls, UBS's Co-Head of Equities, Bouhara, emailed Adoboli and assured him that "You don't know what your limits are until you push the boundary so far that you receive a slap on the back of the wrist."  As FINMA later confirmed, no slap ever came so long as Adoboli generated profits.  UBS awarded pay increases and bonuses to Adoboli despite the fact that he "*clearly and repeatedly breached compliance rules*."

105.     *UBS Understaffed Risk Management Functions and Requests for Assistance Were Denied*:  After reversing their initial attempts to dramatically reduce the size of the Investment Bank, Grübel authorized the hiring of 1,700 bank personnel in an effort to achieve his stated goal of reaching CHF 15 billion in profits by 2014.  While the majority of the personnel defendants had initially laid off in cost-cutting measures were from the Back Office functions – the personnel who were supposed to be monitoring internal controls and risk management – the new hiring was concentrated on adding and assisting Front Office traders.  Even as the Investment Bank's VAR grew, UBS failed to proportionately increase the number of the Back Office personnel who were supposed to be monitoring the traders.  As the FINMA investigation identified, during the Class Period "*Senior management's emphasis on increasing efficiency compromised the effectiveness of [risk] controls.  Support and control functions were under pressure to reduce staff numbers, and requests for additional headcount were denied*."

106.     In lieu of adequate staffing and support for risk management, UBS primarily evaluated risk on the basis of a self-assessment process, which was carried out just once a year by traders and internal controllers.  As FINMA found:

- 59 -

UBS's Operational Risk Framework relied heavily upon a process of self assessment by the Front Office and support and control functions. Within this framework, ***UBS's Operational Risk department did not require evidence, or conduct substantive testing, to validate self assessment results. Self assessment was performed on an annual basis, which meant that it was possible for control deficiencies to go undetected for extended periods of time***.

Indeed, when the Delta One desk was transferred from Global Equities to the Global Synthetic Equities division in April 2011, no arrangements for local supervision of the desk were put in place and the senior traders, including Adoboli, were largely permitted to police their own trades and sign off on trading alerts. The FINMA investigation concluded that "***[b]y failing to appropriately adapt the support and control infrastructure at the time of the Desk's transfer, UBS prioritised risk taking at the expense of support and control***. In so doing, UBS contributed to the failure of the Cash Equities Product Control team to analyse the significant increases in the Desk's proprietary trading revenue."

107. ***UBS's Lack of Risk Management Policies and Internal Controls***: Despite defendants' repeated claims of "effective" and "disciplined" risk controls and "robust supervision" to "capture all risk across the firm," (*e.g.*, ¶¶25, 28, 47) the controls were illusory and the Company's executives failed to monitor and recklessly disregarded basic information necessary to assess risk.

108. Underpinning any risk management framework is the use of exposure or net delta limits to cap the maximum level of risk and potential losses a trader or desk could enter into at any given time. During the Class Period, however, UBS failed to formalize risk limits for proprietary traders in the Investment Bank. Rather, according to FINMA, intraday and overnight limits were simply communicated to traders orally and there was no policy for addressing breaches of the limits. According to Hughes, a UBS director and senior trader on the Delta One desk during the Class Period, "***I would describe the trading limits on the desk as loose . . . . It was very, very loose***."

- 60 -

Greenidge, the Delta One desk supervisor until April 2011, testified that the only written risk limits were at a "very high level" within the Investment Bank and that any limits were treated with "some flexibility." Greenidge himself repeatedly acknowledged and allowed breaches of risk limits so long as the Delta One desk was generating a profit, as did his successor DiBacco. According to the trial record, Greenidge and DiBacco's superior, Honegger, the Global Head of Synthetic Equities at UBS, also commended Adoboli for making a profit and told him that "*if you ever need permission [to exceed risk limits], take it you have it. It will be granted retrospectively*." As Adoboli himself testified, "[t]here were no secrets, there was no hiding, there was no holding back. We were told to push the boundaries, so we pushed the boundaries."

109. During the Class Period, UBS's trade capture and processing systems were so deficient that they failed to monitor or report key metrics necessary to evaluate trading risk.

(a) With regard to risk limits, UBS's Market Risk systems for the Delta One desk did not include any automated monitoring of the desk's positions against any formal or informal risk limits. While UBS utilized an internal, online system, the SCP, to generate risk management reports and identify violations of risk controls, the SCP did not include any report of daily or overnight risk limits during the Class Period.

(b) During most of the Class Period, UBS also failed to monitor or generate any reports on deferred settlement trades. Such trades are easily manipulated or cancelled before reaching settlement and are a primary indicator of suspicious trading activity. At UBS, deferred settlement trades were supposed to be monitored through a T+14 report, which would identify the status of specific trades, including any amendments, 14 days from booking. However, *the T+14 report was not operational or generated within UBS from November 2010 to September 2011. According to FINMA, "there was no working control in place to identify the large, deferred*

- 61 -

*settlement trades book by the [Delta One] desk*.″  Consequently, trades were not checked until just before settlement, giving traders up to 27 days to cancel and rebook fictitious and high-risk trades. As *The Economist* later reported, the "mechanism for verifying trades was mysteriously switched off" until the Delta One desk generated losses and Adoboli's unhedged proprietary trades were exposed.

(c)      The failure to monitor deferred settlement trades and generate T+14 reports was exacerbated by the decision not to automatically flag off-market or large notational transactions. There was also no control in place to generate alerts within UBS when these techniques were used by proprietary traders.  UBS's risk systems also failed to capture price amendments that were made by proprietary traders.  Indeed, the FSA Market Watch Issues 25 and 29, published in March and October 2008 and provided to British financial corporations including UBS, specifically identified off-market transactions and those with price amendments as indicia of high-risk activities that should be investigated.  They were not, however, captured by UBS's risk systems during the Class Period or included in any of the Company's internal risk reports.

(d)      The SCP did have the capability of showing detailed profit and loss reports, as well as issuing alerts on specific trading activity.  According to FINMA, the "monitoring of cancelled, amended and late booked . . . trades is a key element in the detection of suspicious trading activity."  Until the final month of the Class Period, however, cancelled, amended and late-booked activity for future trades, such as those done by the Delta One desk, did not generate SCP alerts due to the lack of any data feed from the desk's systems to the SCP.  External future trades could be booked into the futures settlement system, but were not contemporaneously booked into UBS's risk systems.  Even after future trade data was included within the SCP system, alerts for cancelled,

amended and late booked activity were sent directly to the senior traders on the Delta One desk, rather than their superiors at UBS, and they were permitted to sign off on their own trades.

(e)     The SCP system also had the capability of creating and sending alerts regarding suspicious trading activity directly to UBS's Operations Division.  Due to the high number of alerts generated by the system, and the lack of resources or management support, the Operations Division did not utilize this feature of the SCP system.  In addition, the SCP system was only designed to provide limited trend analysis and any investigation of suspicious trading had to be performed manually.  Particularly with the reduced staffing and directive to assist the proprietary traders, it was not possible for UBS's Operations Division to perform such manual reviews for the high volume trading done by the Delta One desk.

(f)     The profit and loss reports that were generated by the SCP and UBS's Investment bank were easily manipulated.  UBS had no formal policy governing profit and loss adjustments and, according to FINMA, traders were regularly permitted to make adjustments to reported profit and loss "to compensate for trade booking errors, trade capturing timing differences and delayed pricing."  Not only were the  Delta One desk senior traders permitted to make adjustments to the reported profit and loss, but such adjustments were not identified in daily or monthly profit and loss statements prepared by the Finance Division's Product Control staff.  During the Class Period, there was no investigation of the escalating profit and loss adjustments associated with proprietary trading, and UBS had no thresholds for the approval or investigation of such adjustments.

(g)     The profit and loss reports were also incomplete, and easily manipulated, as a result of using net, rather than gross, trading positions to analyze risk.  As a result, total gross exposure, including exposure for proprietary trades with internal counterparties, was not reported

- 63 -

and there was no reporting or investigation of discrepancies between gross risk exposure and risk limits for proprietary trading.

(h)    During the Class Period, the Delta One desk also maintained an "umbrella" or "suspense" account that was used to smooth reported profits and hide losses from proprietary trading activity.  The lack of comprehensive profit and loss reporting allowed proprietary traders to delay reporting profits from successful or deferred trading activity.  While the umbrella account was used by the head of the Delta One desk, Hughes, as well as Adoboli, it was not captured because UBS failed to reconcile actual and reported profits with Investment Bank traders' claimed trading positions.  According to UBS's December 2011 GIA Report, Adoboli's supervisor at the Company was aware of his "propensity to smooth profits and loss and take unacceptably, high levels of net debt [risk]," but took no steps to end the practice.

(i)    During the Class Period, UBS's risk management systems also allowed proprietary trades to be booked to an unnamed internal counterparty at material off-market prices. There was no requirement for an automatic mirror trade or the identification of the particular internal counterparty.  Neither through the SCP nor any other report were such proprietary trades with internal counterparties identified or flagged for investigation and, according to the FSA, there was no effort to identify or investigate when trades occurred at off-market prices.

110.    According to the FSA, UBS "*fail[ed] to put in place systems and controls to adequately mitigate the risk that its employees would undertake unauthorised trading, and where such unauthorised trading was carried out, to detect the trading in a timely manner*."  Moreover, "*UBS failed to ensure that [risk] systems and controls were fully complied with and implemented in the business*."

- 64 -

111.    ***Knowledge Within UBS of Risk Control Failures***:  While UBS's internal controls failed to generate the reports necessary to effectively monitor trading risks, the Delta One desk breaches were well known within the Company during the Class Period.

112.    UBS's senior management charged with supervising the Delta One desk's proprietary trading, including the Company's Global Head of Synthetic Equities, Honegger, Managing Director of the Delta One desk, Greenidge, and the Global Head of Synthetic Equity Trading, were all aware of and condoned high-risk proprietary trading in violation of risk limits.  After hearing that Adoboli had generated a substantial profit on a trade far in excess of the Delta One desk's trading limits, Honegger not only failed to discipline Adoboli, but assured him that "***if you ever need permission [to exceed risk limits], take it you have it.  It will be granted retrospectively***."  Through UBS's electronic chat system, Greenidge was repeatedly informed that Adoboli and the Delta One desk had taken proprietary trading positions far in excess of risk limits, but he never questioned or challenged these practices.  When Adoboli told Greenidge that he had made short trades up to $200 million, four times the purported Delta One desk risk limit, Greenidge simply responded "You're properly mad," but did not investigate the trading or reprimand or report Adoboli for his violations of internal controls.  On another occasion, in response to outsize profits generated by Adoboli and the Delta One desk, Greenidge simply responded you "must have a book the size of a small planet."  No effort was made to investigate that book – the unhedged proprietary trades – so long as the Delta One desk was generating profits.  Hughes, the senior trader on the Delta One desk, even warned Greenidge in 2010 about Adoboli's risky trading positions, but no effort was taken to investigate those trades or prevent violations of internal controls.  Even after replacing Greenidge in April 2011, DiBacco, who had been cautioned "not to stifle" the traders when he took over supervision of the Delta One desk,

congratulated Adoboli for generating a one-day profit of $6 million, despite knowing that the profit was possible only because Adoboli took risk positions that far exceeded UBS's risk limits.

113.    During the Class Period, personnel in UBS's Back Office were also well aware of risk management failures and internal control breaches on the Delta One desk.  According to FINMA, these personnel *knew about "the [Delta One] Desk's persistent late and mis-booked trades, trades with huge notional values, and frequent and material reconciliation breaks*."  No effort was taken to investigate or prevent future occurrences of these transgressions.  And the *Product Control Division knew, but failed to investigate, the "frequent and material adjustments to the Desk's P&L, and the issues surrounding the GBSOV break*."  Yet, like the Front Office personnel, UBS's Back Office personnel did nothing to stop or otherwise address these breaches.

114.    UBS's risk control personnel were also aware of the Delta One desk's increasing profits and the fact that such profits were attainable only by breaching risk limits.  As FINMA and the FSA found, "*Product Control was aware of significant increases in the [Delta One] Desk's proprietary trading revenue," but they failed to investigate or "seek any detailed explanation as to how this increase in profitability was being created, and conducted no analysis of the drivers and size of the underlying intra-day positions*."

115.    According to UBS's December 2011 GIA Report, there was "strong evidence of collusion at the local desk level," and as confirmed in testimony, Hughes, Adoboli's supervisor on the Delta One desk, was aware of his "propensity to smooth profit and loss and take unacceptably high levels of net delta [risk]," but took no steps to end that practice.  To the contrary, Hughes made his own off-book trades and used the umbrella account to facilitate those trades.  The other traders on the Delta One desk also knew about and condoned the use of the umbrella account and it was the subject of banter among the traders of the Delta One desk.  For example, "You wait til I book some

- 66 -

more umbrella," Adoboli told a trader on his desk in an electronic chat in February 2011, to which the trader answered "ella ella ella" in reference to a hit song by the artist Rihanna.

116.    ***UBS's Certifications to Shareholders***: In conjunction with UBS's public financial statements filed with the SEC during the Class Period, UBS issued certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that the Company's senior management had reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  To assure that the certifications were not simply a hollow gesture, members of UBS senior management were required to and did further confirm that they were responsible for establishing and maintaining UBS's disclosure controls and procedures, had designed such controls to assure that material information relating to the Company's business was promptly made known to UBS's senior executives, and had routinely evaluated the effectiveness of the Company's policies to assure that they and other executives were made aware of material information.  At no time during the Class Period did UBS or any other defendant assert that they were not aware of material aspects of the Company's internal controls and risk management systems which, as set forth herein, were materially deficient.

117.    ***Corporate Admissions and the Quick Settlement of Regulatory Investigations***: In the aftermath of the September 15, 2011 disclosure of unhedged, proprietary trading at UBS, the Company admitted that the internal controls had been materially inadequate and, as a result, defendants' prior statements could not be relied upon.

118.    On October 5, 2011, UBS's interim CEO admitted that "[i]n no circumstances should something like this ever occur.  The fact that it did is evidence of a failure to exercise appropriate controls.  ***Our internal investigation indicates that risk and operational systems did detect***

- 67 -

*unauthorized or unexplained activity but this was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced*."

119.    On October 25, 2011, UBS filed its Form 6-K, which further admitted that "*certain controls designed to prevent or detect the use of unauthorized and fictitious transactions on a timely basis were not operating effectively*."   "We have further determined that the control deficiencies that led to the failure to prevent or detect unauthorized and fictitious trading on a timely basis also existed at the end of 2010."

120.    UBS also agreed to settle and pay fines totaling £29.7 million prior to the FSA even releasing its results of their investigation.  According to the FSA, UBS settled the regulatory action with the FSA at "Stage 1" of the regulatory body's four-stage regulatory process.  For these purposes, "Stage 1" is "the period from commencement of an investigation" until the time the FSA has "a sufficient understanding of the nature and gravity of the breach . . . and [has] communicated that assessment to the person concerned."  In other words, UBS quickly settled with the FSA before receiving and responding to a "warning notice" (Stage 2) and long before the issuance of a "decision notice" (Stage 3).  Prior to UBS's settlement, the largest FSA fine for internal control failures had been £8 million (also incurred by UBS).

121.    While FINMA is not empowered to seek monetary fines, UBS also agreed to settle with FINMA prior to the agency releasing the results of its investigation.  In doing so, the Company agreed to numerous supervisory measures designed to "limit the operational risk exposure of UBS until [it is] able to give evidence that the operational control environment of its Investment Bank is working effectively."

122.   ***Prior and Contemporaneous Risk Management Failures***:   The pattern of risk management failures and regulatory warnings at UBS evidence a knowledge or reckless disregard of the flaws with the Company's internal controls.

123.   In November 2009, UBS was fined £8 million by the FSA for "failings in relation to the systems and controls" around UBS's wealth management business.   In particular, the FSA identified that UBS failed to provide an appropriate level of supervision over employees or implement effective remedial measures in response to warning signs of improper activity.   In its report on the risk management failures disclosed on September 15, 2011, the FSA specifically noted that it "expects firms to consider whether the issues identified in [a prior] enforcement action are applicable to other business areas and whether remedial action is necessary."   "In this case," according to the FSA, "***UBS failed to give such proper consideration***."

124.   On October 25, 2011, FINRA announced that it had fined UBS $12 million "for violating Regulation SHO and failing to properly supervise short sales of securities."   Commenting on the "systemic supervisory failure" and resulting fine, J. Bradley Bennett, FINRA's enforcement chief, stated that the "fine reflect[s] broad gaps in [UBS's] compliance system.   I think it's very significant."   FINRA found that UBS's "supervisory system regarding locates and the marking of sale orders was significantly flawed and resulted in a systemic supervisory failure that contributed to serious Reg SHO failures across its equities trading business."   According to FINRA, "[a]s a result of its supervisory failures, many of UBS' violations were not detected or corrected until after FINRA's investigation caused UBS to conduct a substantive review of its systems and monitoring procedures for Reg SHO compliance."

125.   In December 2012, less than a month after the release of the FSA and FINMA Reports on risk management failures with the Investment Bank's proprietary trading, the FSA and

FINMA issued separate reports on UBS's manipulation of the LIBOR and EURIBOR. Those reports found that the "improper actions of many UBS employees involved in the misconduct were at least reckless and frequently deliberate" and concluded that, "because of a poor culture" "and weak systems and controls," UBS "failed to prevent the deliberate, reckless and frequently blatant actions of its employees." To date, UBS has paid more than $1.5 billion in fines as a result of the internal control failures associated with the manipulation of LIBOR and EURIBOR.

126. ***The Fraudulent Conduct Allowed Defendants to Create the Impression of Sustainable Growth at UBS and Meet Earnings Projections Set in November 2009***: Having promised investors and the market that UBS would increase revenue and realize annualized pre-tax profits of CHF 15 billion, defendants were under tremendous pressure to meet expectations. The only division within UBS with the capacity to generate the significant boost in revenue and earnings necessary to meet those expectations was the Investment Bank. Moreover, while revenues within the Investment Bank were primarily limited to commissions from client trading, UBS was able to book all of the revenue and earnings from successful proprietary trading. Accordingly, during the Class Period, defendants encouraged an aggressive, risk-taking culture within the Investment Bank and specifically with UBS's proprietary traders. While publicly portraying to investors and the market that defendants had implemented "a controlled and disciplined risk culture" governed by "robust supervision of trade capture and valuation," defendants' aggressive, earnings-focused culture was facilitated by the Company's risk management failures and lax enforcement of internal controls.

127. As a result of the unchecked proprietary trading, the revenue generated by the Delta One desk increased rapidly. In the first quarter of 2011 alone, the desk generated $21 million, more than double the total for all of 2010. By the next quarter, the revenue reported by the Delta One desk was $52 million, exceeding the purported risk limits for the desk. Defendants booked this revenue,

and UBS reported increased profitability from the Investment Bank, without any inquiry into how it was generated by what was supposed to be a low-risk position.  As Hughes testified, the Delta One desk was as an "oasis of profit" during the Class Period, primarily as a result of the unchecked proprietary trading.  Following the release of the FSA and FINMA Report, *The Guardian* aptly reported that "***UBS was too busy counting the profits to examine their source properly***."

128.     Defendants were also motivated to portray UBS as having the ability to achieve sustainable growth while adhering to robust and comprehensive risk controls to stave off Swiss regulators' insistence that they divest themselves of the Investment Bank business.  During the Class Period, Swiss financial regulators urged UBS to either hold sharply higher capital reserves (increasing reserves to 19%), or to rid itself of the Investment Bank division.   Along with defendants' claims of robust risk management, however, Grübel insisted that the Investment Bank was "'indispensible'" to "'our integrated business model'" and knew that he could not meet earnings expectations without the profits generated by the Investment Bank.  To the market and the Swiss authorities it was critical that UBS and the Investment Bank be portrayed as a conservative financial institution with robust and comprehensive risk management systems and internal controls, while at the same time demonstrating that with those robust controls defendants could grow profitability and regain a competitive position.  Following the disclosure of UBS's risk management failures, and in the wake of regulatory actions to shore up internal controls, UBS has now largely exited the investment banking business.

129.     ***Defendants' Fraudulent Conduct Allowed Them to Preserve UBS's Positive Credit Ratings***: Defendants were further motivated to obfuscate the deficiencies and material weaknesses in UBS's risk management systems and internal controls in order to maintain positive credit ratings.  The vast majority of UBS's activities are done through the capital markets and, prior to and

- 71 -

throughout the Class Period, UBS was heavily dependent on access to affordable credit. As a result, far more than most non-financial companies, UBS's credit ratings were critical to the ongoing success of the business as a whole. As defendants said in UBS's annual filings, "[r]eductions in our credit ratings can increase our funding costs . . . and can affect the availability of certain kinds of funding. In addition, as we experienced in recent years, ratings downgrades can require us to post additional collateral or make additional cash payments" and "[o]ur credit ratings, together with our capital strength and reputation, also contribute to maintaining client and counterparty confidence." "[I]t is possible that ratings changes could influence the performance of some of our businesses."

130.    Not long before the Class Period, UBS was on the precipice of ruin as it struggled to emerge from the financial crisis. The Company was forced to write down $50 billion as a result of its subprime mortgage losses and took a $6.6 billion capital injection from the Swiss government to survive. As a result of the Swiss government's bailout and defendants' projections of future profits and assurances of risk controls during the Class Period, UBS was able to maintain a high credit rating.

131.    Immediately following the September 15, 2011 disclosure, however, Moody's and Standard & Poor's placed UBS's long-term ratings on negative watch and under review for possible downgrade, respectively. Thereafter, on October 13, 2011, Fitch Ratings downgraded the Company's long-term issuer default and, on November 29, 2011, Standard & Poor's downgraded UBS's long-term senior unsecured debt rating.

**Defendant Grübel Acted with the Requisite Scienter**

132.    Defendant Grübel was CEO of UBS from February 26, 2009 until his resignation on September 24, 2011. Grübel was also a member of the GEB throughout the Class Period. As CEO, Grübel was authorized to speak to investors and the market on behalf of UBS, publicly spoke and

addressed inquiries regarding the Company's internal controls and risk management and, accordingly, had the opportunity to commit the fraudulent acts alleged herein.  As part of his duties, Grübel was responsible for monitoring and maintaining UBS's internal controls and risk management systems and had risk authority over transactions, positions and exposures, allocating portfolio limits within the Company's business divisions.  During the Class Period, the GEB had executive management responsibility for UBS and assumed responsibility for the development of the Company's and each business division's strategies, including the implementation of approved strategies.  The GEB also served as UBS's risk council and had overall responsibility for establishing and supervising the implementation of risk management and control principles, for approving the core risk policies as proposed by the CRO, the CFO and the General Counsel, as well as for controlling UBS's risk profile as a whole.  The GEB held a total of 21 meetings in 2009, 20 meetings in 2010 and 18 meetings in 2011.  As CEO and a member of the GEB, Grübel had access to information from UBS's SCP, as well as daily and monthly reports detailing the Investment Bank's profit and loss.

133.    ***Investors Were Assured that Grübel Knew About UBS's Risk Exposure and Internal Controls***:  Given UBS's near collapse in 2008 and history of risk control failures, during the Class Period, Grübel assured investors that he was fully aware of UBS's risk positions and the internal controls for monitoring risk.  Defendants publicly asserted that Grübel reviewed the risks and risk management controls at UBS's Investment Bank "nearly twice a week," and held "***weekly risk calls with the leaders in investment bank*** [and] with the Chief Risk Officer [Lofts] . . . where ***we go through our risk position in the old bank weekly***."  ¶48.  Grübel also explained that he was "kept informed" about UBS's risk by having "calls with senior bankers every day" and meeting "***at least once in a month***" with "***the whole management***" and "***the executive board***" to go over "***all***

*the risks we have in the bank*." *Id.*  As defendant Lofts described, there was a "*very hands on involvement of the CEO* [and] the firm *in terms of what the risk positions are*." ¶30.  In response to public concerns about the internal controls under his watch, Grübel touted: "One thing *I can assure you as long as I'm here, and as long as my colleagues are here, we do know about risk*. . . .  And *we do understand the risks* we are going in." ¶48.  And, with a full understanding of UBS's risk, on July 26, 2011, only two months before the end of the Class Period, Grübel assured investors that "*we have no undue risk in our positions*." proclaiming "*I'm pretty convinced that we have one of the best risk management in the industry*." ¶61.

134.    Based on his asserted attention to risk management and knowledge of UBS's risk and risk management systems, Grübel assured investors "since *I know about them* I feel responsible for them as well.  And you can ask the guys I do feel responsible for them." ¶29.  Indeed, Grübel insisted, "if ever anything goes wrong, at least *you will not hear any of us say, we didn't know. . . ; we do know*.  *We do know what we are doing*.  *We do know what kind of risks we have*." ¶48.

135.    ***Grübel's Certification of UBS's Controls***: In conjunction with UBS's public financial statements filed with the SEC during the Class Period, Grübel issued certifications pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filings to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  To assure that the certification was not simply a hollow gesture, Grübel was required to and did further confirm that he, along with UBS's CFO, defendant Cryan, was responsible for establishing and maintaining UBS's disclosure controls and procedures, had designed such controls to assure that material information relating to the Company's business was promptly made known to UBS's senior executives, and had routinely evaluated the effectiveness of

- 74 -

the Company's policies to assure that he and other executives were made aware of material information.  At no time during the Class Period did Grübel or any other defendant assert that they were not aware of material aspects of UBS's internal controls and risk management systems.

136.    ***Grübel Knew or Recklessly Disregarded the Deficiencies with UBS's Internal Controls that Rendered Defendants' Statements False and Misleading***:  As a result of Grübel's involvement and oversight in UBS's risk controls, he knew or recklessly disregarded that UBS's internal controls and reporting systems were deficient.  While publicly stating that he was fully aware of and understood the risks within the Investment Bank and personally reviewed "all the risks we have in the bank," as set forth in ¶48, Grübel would not have received any reports regarding the following, all of which are critical for any assessment of risk exposure:

- violations of daily or overnight trading risk limits or investigations regarding violations of risk limits within the Investment Bank;

- the volume or risks involved with deferred settlement trades – while Grübel would have had access to T+14 reports prior to November 2010, those reports ceased to be generated at that time and were not replaced with any other reporting or analysis of deferred settlement trading activity;

- off-market trades, large notational transactions and trades with subsequent price amendments, which had been flagged by the FSA as indicia of high-risk activities that should be investigated;

- the volume or risk of cancelled, amended and late booked activity for future trades;

- trend analysis of the risks associated with high volume proprietary trading;

- the volume of or basis for manual adjustments to profit and loss reports;

- the gross, as opposed to net, trading positions taken by the Investment Bank traders or the discrepancy between gross risk exposure and UBS's risk limits; and

- reconciliation of actual and reported profits with Investment Bank traders' claimed trading positions.

137.    The internal profit and loss reports available to Grübel would have identified the significant increases in revenue and profits being generated by the Delta One desk, as set forth in

- 75 -

¶90.  Grübel, however, did not request and did not receive any information regarding how that revenue, exceeding UBS's purported risk limits, was being achieved by the desk or whether any investigation had been undertaken into the basis for the Delta One desk's trading revenue.

138.    While defendants publicly insisted that Grübel had "very hands on management" of the internal controls and Grübel himself touted that UBS had "one of the best risk management in the industry," as set forth in ¶61, he failed to institute internal controls or require that adoption of controls that:

- required notification and enforcement of formal risk limits for proprietary trading;

- required automated monitoring of any breaches of UBS's risk limits;

- required investigation, reporting or disciplinary action of violations of trading risk limits;

- required investigation, reporting or disciplinary action for the use of deferred settlement trades;

- required investigation, reporting or disciplinary action for large notational trades or trades with significant price amendments;

- required investigation, reporting or disciplinary action for persistent cancelled, amended or late booked trades;

- required investigation, reporting or disciplinary action for large proprietary trades with unverified internal counterparties;

- required investigation, reporting or disciplinary action for proprietary trades at material off-market prices;

- required the assessment and reporting of gross risk exposure;

- required confirmation or testing of the results of risk self-assessment by traders and internal controllers;

- required UBS's Operations Division to monitor, investigate and report on SCP alerts of suspicious trading activity;

- prohibited proprietary traders from signing off on risk alerts regarding their own trades; and

- 76 -

- prohibited manual adjustments of profit and loss reports or required that any manual adjustments be identified in profit and loss reports.

139.     Not only did Grübel fail to institute the internal controls necessary to assess the trading risk at UBS, he promoted a change in the Company's risk culture that contrasted sharply with the public claims of a "controlled and disciplined risk culture."  ¶28.  As set forth in ¶¶83-84, former UBS executives have testified that, under Grübel, there was "a change of ethos" that encouraged more risk taking by Investment Bank traders and that there was a "culture that was risk-seeking and not risk-averse" at UBS under Grübel's leadership.  That culture of risk was encouraged by Grübel's efforts to cut costs by reducing staffing for Back Office risk control functions, even as traders were hired and the Investment Bank's value at risk increased.  As set forth in ¶¶105-106, under Grübel "[s]upport and control functions were under pressure to reduce staff numbers, and requests for additional headcount were denied."

140.     ***Additional Indicia of Grübel's Scienter***: In addition to his knowledge and reckless disregard of the true undisclosed facts regarding UBS's internal controls and risk management, as detailed herein, Grübel also had both the motive and opportunity to make the alleged false and misleading statements.  In addition to creating the perception of sustainable growth and preserving UBS's credit ratings, as set forth in ¶¶129-131, Grübel was motivated to, and did, preserve his position as CEO and personally collect millions of dollars in compensation and bonuses.  While UBS had quickly dispatched with two CEOs in the months before his hiring, during the Class Period Grübel alone was awarded options to purchase four million shares of UBS stock and collected an additional CHF 5.25 million in compensation in 2010 and 2011.

141.     ***Grübel's Forced Resignation***: Immediately following the September 15, 2011 disclosure, media reports circulated that the Company's Board of Directors would request Grübel's resignation for his role in the risk management failures at UBS.  On September 24, 2011, following a

- 77 -

meeting of the Company's Board of Directors, UBS issued a press release stating that Grübel took responsibility for those failures and had resigned from his position as CEO.  In an email to his staff at UBS, he wrote "I did not take the step of resigning lightly," but "I am convinced that it is in the best interests of UBS to approach the future with a new leader."

**Defendant Cryan Acted with the Requisite Scienter**

142.    Defendant Cryan was CFO of UBS from September 2008 until his departure on May 31, 2011.  Cryan was also Chairman and CEO of UBS AG London Branch and UBS Limited from November 2010 through May 31, 2011.  Cryan was also a member of the GEB during the Class Period, until leaving UBS in May 2011 for "personal reasons."  As CFO, Cryan was authorized to speak to investors and the market on behalf of UBS, publicly spoke and addressed inquiries regarding the Company's internal controls and risk management and, accordingly, had the opportunity to commit the fraudulent acts alleged herein.  As part of his duties, Cryan was responsible for monitoring and maintaining UBS's internal controls and risk management systems and had risk authority over transactions, positions and exposures, allocating portfolio limits within the Company's business divisions.

143.    While Cryan was a member of the GEB, it had executive management responsibility for UBS and assumed responsibility for the development of the Company's and each business division's strategies, including the implementation of approved strategies.  The GEB also served as UBS's risk council and had overall responsibility for establishing and supervising the implementation of risk management and control principles, for approving the core risk policies as proposed by Cryan, the CRO and the General Counsel, as well as for controlling UBS's risk profile as a whole.  The GEB held a total of 21 meetings in 2009, 20 meetings in 2010 and 18 meetings in

2011.  As CFO and a member of the GEB, Cryan had access to information from UBS's SCP, as well as daily and monthly reports detailing the Investment Bank's profit and loss.

144.     As part of his duties and responsibilities as CFO, Cryan was responsible for transparency in, and appraisal of, the financial performance of UBS and its business divisions, and UBS's financial reporting, forecasting, planning and controlling processes.   Cryan also was responsible for: (i) implementing the risk management and control frameworks for capital management, liquidity, funding and tax; (ii) managing the divisional and corporate financial control functions, as well as managing and controlling UBS's tax affairs and treasury and capital management, including management and control of funding and liquidity risk; and (iii) ensuring that disclosure of UBS's financial disclosures met regulatory requirements and corporate governance standards.

145.     ***Investors Were Assured that Cryan Knew About UBS's Risk Exposure and Internal Controls***: During the Class Period, investors were assure that Cryan and the other members of senior management were fully aware of UBS's risk positions and the internal controls for monitoring risk.  Defendants publicly asserted that Cryan reviewed UBS's risks and risk management controls by meeting ***"at least once in a month" with "the whole management" and "the executive board" to go over "all the risks we have in the bank."***  ¶48.  In response to public concerns about UBS's internal controls, Grübel touted:  "One thing ***I can assure you*** as long as I'm here, and ***as long as my colleagues are here, we do know about risk*** . . . .  And ***we do understand the risks*** we are going in."  *Id.*

146.     Based on their asserted attention to risk management and knowledge of UBS's risk and risk management systems, defendants insisted "if ever anything goes wrong, at least ***you will not hear any of us say, we didn't know . . . ; we do know***.  ***We do know what we are doing***.  ***We do***

*know what kind of risks we have*." ¶48.  Defendants further assured investors that "***Management is***

***clearly accountable for taking off on the management of risks of the firm***."  ¶26.

147.    ***Cryan's Certification of UBS's Controls***: In conjunction with UBS's public financial

statements filed with the SEC during the Class Period, Cryan issued certifications pursuant to §302

of the Sarbanes-Oxley Act, attesting that he had reviewed the contents of the filings to confirm the

"report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements

were made, not misleading."  To assure that the certification was not simply a hollow gesture, Cryan

was required to and did further confirm that he, along with UBS's CEO, defendant Grübel, was

responsible for establishing and maintaining UBS's disclosure controls and procedures, had designed

such controls to assure that material information relating to the Company's business was promptly

made known to UBS's senior executives, and had routinely evaluated the effectiveness of the

Company's policies to assure that he and other executives were made aware of material information.

At no time during the Class Period did Cryan or any other defendant assert that they were not aware

of material aspects of UBS's internal controls and risk management systems.

148.    ***Cryan Knew or Recklessly Disregarded the Deficiencies with UBS's Internal***

***Controls that Rendered Defendants' Statements False and Misleading***: As a result of Cryan's

involvement and oversight in UBS's risk controls, he knew or recklessly disregarded that UBS's

internal controls and reporting systems were deficient.  While investors were assured that Cryan was

fully aware of and understood the risks within the Investment Bank and reviewed "all the risks we

have in the bank," as set forth in ¶48, Cryan would not have received any reports regarding the

following, all of which are critical for any assessment of risk exposure:

- violations of daily or overnight trading risk limits or investigations regarding
  violations of risk limits within the Investment Bank;

- the volume or risks involved with deferred settlement trades – while Cryan would have had access to T+14 reports prior to November 2010, those reports ceased to be generated at that time and were not replaced with any other reporting or analysis of deferred settlement trading activity;

- off-market trades, large notational transactions and trades with subsequent price amendments, which had been flagged by the FSA as indicia of high-risk activities that should be investigated;

- the volume or risk of cancelled, amended and late booked activity for future trades;

- trend analysis of the risks associated with high volume proprietary trading;

- the volume of or basis for manual adjustments to profit and loss reports;

- the gross, as opposed to net, trading positions taken by the Investment Bank traders or the discrepancy between gross risk exposure and UBS's risk limits; and

- reconciliation of actual and reported profits with Investment Bank traders' claimed trading positions.

149.    The internal profit and loss reports available to Cryan would have identified the significant increases in revenue and profits being generated by the Delta One desk, as set forth in ¶90.  Cryan, however, did not request and did not receive any information regarding how that revenue, exceeding UBS's purported risk limits, was being achieved by the desk or whether any investigation had been undertaken into the basis for the Delta One desk's trading revenue.

150.    While defendants publicly insisted that UBS had "one of the best risk management in the industry," as set forth in ¶61 Cryan failed to institute internal controls or require the adoption of controls that:

- required notification and enforcement of formal risk limits for proprietary trading;

- required automated monitoring of any breaches of UBS's risk limits;

- required investigation, reporting or disciplinary action of violations of trading risk limits;

- required investigation, reporting or disciplinary action for the use of deferred settlement trades;

- required investigation, reporting or disciplinary action for large notational trades or trades with significant price amendments;

- required investigation, reporting or disciplinary action for persistent cancelled, amended or late booked trades;

- required investigation, reporting or disciplinary action for large proprietary trades with unverified internal counterparties;

- required investigation, reporting or disciplinary action for proprietary trades at material off-market prices;

- required the assessment and reporting of gross risk exposure;

- required confirmation or testing of the results of risk self-assessment by traders and internal controllers;

- required UBS's Operations Division to monitor, investigate and report on SCP alerts of suspicious trading activity;

- prohibited proprietary traders from signing off on risk alerts regarding their own trades; and

- prohibited manual adjustments of profit and loss reports or required that any manual adjustments be identified in profit and loss reports.

151.    ***Additional Indicia of Cryan's Scienter***: In addition to his knowledge and reckless disregard of the true undisclosed facts regarding UBS's internal controls and risk management, as detailed herein, Cryan also had both the motive and opportunity to make the alleged false and misleading statements.  In addition to creating the perception of sustainable growth and preserving UBS's credit ratings, as set forth in ¶¶129-131, Cryan was motivated to, and did, preserve his position as CFO and personally collect millions of dollars in compensation and bonuses.

**Defendant Lofts Acted with the Requisite Scienter**

152.    Defendant Lofts was CRO of UBS from November 2008 through December 31, 2010, when he was promoted to CEO of UBS Group Americas.  Lofts was also a member of the GEB throughout the Class Period.  As CRO, Lofts was authorized to speak to investors and the market on behalf of UBS, publicly spoke and addressed inquiries regarding the Company's internal

- 82 -

controls and risk management and, accordingly, had the opportunity to commit the fraudulent acts alleged herein.  As part of his duties and responsibilities as CRO, Lofts was responsible for developing and implementing principles and appropriate independent control frameworks for credit, market, country and operational risks within UBS.  In particular, Lofts was responsible for formulating and implementing the frameworks for risk capacity/appetite, risk measurement, portfolio controls and risk reporting and had management responsibility over the divisional and firm-wide risk control functions.  Lofts was also charged with implementing the risk control mechanisms as determined by the members of UBS's Board of Directors and the CEO.  During the Class Period, Lofts approved transactions, positions, exposures, portfolio limits and provisions in accordance with the delegated risk control authorities, and monitored the firm's risk-taking activities, including investment banking and trading activity.

153.    While Lofts was a member of the GEB, it had executive management responsibility for UBS and assumed responsibility for the development of the Company's and each business division's strategies, including the implementation of approved strategies.  The GEB also served as UBS's risk council and had overall responsibility for establishing and supervising the implementation of risk management and control principles, for approving the core risk policies as proposed by Lofts, the CFO and the General Counsel, as well as for controlling UBS's risk profile as a whole.  The GEB held a total of 21 meetings in 2009, 20 meetings in 2010 and 18 meetings in 2011.  As CRO and a member of the GEB, Lofts had access to information from UBS's SCP, as well as daily and monthly reports detailing the Investment Bank's profit and loss.

154.    ***Investors Were Assured that Lofts Knew About UBS's Risk Exposure and Internal Controls***: During the Class Period, Lofts assured investors that he was fully aware of UBS's risk positions and the internal controls for monitoring risk.  Defendants publicly asserted that Lofts

reviewed the risks and risk management controls at UBS's Investment Bank "nearly twice a week," and held "*weekly risk calls with [Grübel and] the leaders in investment bank* . . . where *we go through our risk position in the old bank weekly*."  ¶48.  Defendants publicly asserted that Lofts reviewed UBS's risks and risk management controls by meeting "*at least once in a month*" with "*the whole management*" and "*the executive board*" to go over "*all the risks we have in the bank*."  *Id.*  Lofts further explained management's focus on and oversight over UBS's risk management systems, assuring investors: "*the nature of and the size of the risk that we take is one of the core discussions topics among senior management*."  ¶26.  As Lofts described, there was a "*very hands on involvement of the CEO* [and] the firm *in terms of what the risk positions are*."  ¶30.  In response to public concerns about UBS's internal controls under defendants' watch, Grübel touted:  "One thing *I can assure you* as long as I'm here, and *as long as my colleagues are here, we do know about risk* . . . .  And *we do understand the risks* we are going in."  ¶48.

155.    Based on their asserted attention to risk management and knowledge of UBS's risk and risk management systems, defendants insisted "if ever anything goes wrong, at least *you will not hear any of us say, we didn't know . . . ; we do know*.  *We do know what we are doing*.  We do know what kind of risks we have*."  ¶48.  Lofts further assured investors that "*Management is clearly accountable for taking off on the management of risks of the firm*."  ¶26.

156.    *Lofts Knew or Recklessly Disregarded the Deficiencies with UBS's Internal Controls that Rendered Defendants' Statements False and Misleading*:  As a result of Lofts' involvement and oversight in UBS's risk controls, he knew or recklessly disregarded that UBS's internal controls and reporting systems were deficient.  While publicly stating that he was fully aware of and understood the risks within the Investment Bank and reviewed "all the risks we have in

the bank," as set forth in ¶48, Lofts would not have received any reports regarding the following, all

of which are critical for any assessment of risk exposure:

- violations of daily or overnight trading risk limits or investigations regarding violations of risk limits within the Investment Bank;

- the volume or risks involved with deferred settlement trades – while Lofts would have had access to T+14 reports prior to November 2010, those reports ceased to be generated at that time and were not replaced with any other reporting or analysis of deferred settlement trading activity;

- off-market trades, large notational transactions and trades with subsequent price amendments, which had been flagged by the FSA as indicia of high-risk activities that should be investigated;

- the volume or risk of cancelled, amended and late booked activity for future trades;

- trend analysis of the risks associated with high volume proprietary trading;

- the volume of or basis for manual adjustments to profit and loss reports;

- the gross, as opposed to net, trading positions taken by the Investment Bank traders or the discrepancy between gross risk exposure and UBS's risk limits; and

- reconciliation of actual and reported profits with Investment Bank traders' claimed trading positions.

157.    The internal profit and loss reports available to Lofts would have identified the

significant increases in revenue and profits being generated by the Delta One desk, as set forth in

¶90.  Lofts, however, did not request and did not receive any information regarding how that

revenue, exceeding UBS's purported risk limits, was being achieved by the desk or whether any

investigation had been undertaken into the basis for the Delta One desk's trading revenue.

158.    While defendants publicly insisted that UBS had "one of the best risk management in

the industry," as set forth in ¶61, Lofts failed to institute internal controls or require the adoption of

controls that:

- required notification and enforcement of formal risk limits for proprietary trading;

- required automated monitoring of any breaches of UBS's risk limits;

- required investigation, reporting or disciplinary action of violations of trading risk limits;

- required investigation, reporting or disciplinary action for the use of deferred settlement trades;

- required investigation, reporting or disciplinary action for large notational trades or trades with significant price amendments;

- required investigation, reporting or disciplinary action for persistent cancelled, amended or late booked trades;

- required investigation, reporting or disciplinary action for large proprietary trades with unverified internal counterparties;

- required investigation, reporting or disciplinary action for proprietary trades at material off-market prices;

- required the assessment and reporting of gross risk exposure;

- required confirmation or testing of the results of risk self-assessment by traders and internal controllers;

- required UBS's Operations Division to monitor, investigate and report on SCP alerts of suspicious trading activity;

- prohibited proprietary traders from signing off on risk alerts regarding their own trades; and

- prohibited manual adjustments of profit and loss reports or required that any manual adjustments be identified in profit and loss reports.

159.    ***Additional Indicia of Lofts's Scienter***: In addition to his knowledge and reckless disregard of the true undisclosed facts regarding UBS's internal controls and risk management, as detailed herein, Lofts also had both the motive and opportunity to make the alleged false and misleading statements.  In addition to creating the perception of sustainable growth and preserving UBS's credit ratings, as set forth in ¶¶129-131, Lofts was motivated to, and did, preserve his position as CRO, secure a promotion to the position of CEO of UBS Group Americas and personally collect millions of dollars in compensation and bonuses.

- 86 -

**Defendant Kengeter Acted with the Requisite Scienter**

160.    Defendant Kengeter was co-CEO of UBS Investment Bank from April 27, 2009 until November 1, 2010, when he became sole head of the Investment Bank.  Kengeter was also a member of the GEB throughout the Class Period.  As CEO of the Investment Bank, Kengeter was authorized to speak to investors and the market on behalf of UBS, publicly spoke and addressed inquiries regarding the Company's internal controls and risk management and, accordingly, had the opportunity to commit the fraudulent acts alleged herein.  As part of his duties, Kengeter was responsible for monitoring and maintaining UBS's internal controls and risk management systems within the Investment Bank and had risk authority over transactions, positions and exposures, allocating portfolio limits within the bank.  Kengeter was also accountable for the results of the Investment Bank and was responsible for "the active and continuous management of risk exposures to ensure that risks and returns are balanced."  As the leader of the Investment Bank, Kengeter held weekly risk calls with Grübel and Lofts to go over the Investment Bank's risk position and was responsible for monitoring the risk position and internal controls in the Investment Bank.

161.    While Kengeter was a member of the GEB, it had executive management responsibility for UBS and assumed responsibility for the development of the Company's and each business division's strategies, including the implementation of approved strategies.  The GEB also served as UBS's risk council and had overall responsibility for establishing and supervising the implementation of risk management and control principles, for approving the core risk policies as proposed by the CRO, the CFO and the General Counsel, as well as for controlling UBS's risk profile as a whole.  The GEB held a total of 21 meetings in 2009, 20 meetings in 2010 and 18 meetings in 2011.  As CEO of the Investment Bank and a member of the GEB, Kengeter had access

to information from UBS's SCP, as well as daily and monthly reports detailing the Investment Bank's profit and loss.

162.     ***Investors Were Assured that Kengeter Knew About UBS's Risk Exposure and Internal Controls***: During the Class Period, investors were assured that Kengeter was fully aware of UBS's risk positions and the internal controls for monitoring risk.  Defendants publicly asserted that Kengeter reviewed the risks and risk management controls at UBS's Investment Bank with Grübel "nearly twice a week," and held "***weekly risk calls***" with Grübel and Lofts "where ***we go through our risk position in the old bank weekly***."  ¶48.  Defendants also explained that Kengeter met "***at least once in a month***" with "***the whole management***" and "***the executive board***" to go over "***all the risks we have in the bank***."  *Id.*  In response to public concerns about UBS's internal controls under defendants' watch, Grübel touted:  "One thing ***I can assure you*** as long as I'm here, and ***as long as my colleagues are here, we do know about risk*** . . . .  And ***we do understand the risks*** we are going in."  *Id.*

163.     Based on their asserted attention to risk management and knowledge of UBS's risk and risk management systems, defendants insisted "if ever anything goes wrong, at least ***you will not hear any of us say, we didn't know . . . ; we do know***.  ***We do know what we are doing***.  ***We do know what kind of risks we have***."  ¶29.  Defendants further assured investors that "***Management is clearly accountable for taking off on the management of risks of the firm***."  ¶26.

164.     ***Kengeter Knew or Recklessly Disregarded the Deficiencies with the Investment Bank's Internal Controls that Rendered Defendants' Statements False and Misleading***: As a result of Kengeter's involvement and oversight in the Investment Bank's risk controls, he knew or recklessly disregarded that the bank's internal controls and reporting systems were deficient.  While defendants publicly assured investors that he was fully aware of and understood the risks within the

Investment Bank and personally reviewed "all the risks we have in the bank," as set forth in ¶48, Kengeter would not have received any reports regarding the following, all of which are critical for any assessment of risk exposure:

- violations of daily or overnight trading risk limits or investigations regarding violations of risk limits within the Investment Bank;

- the volume or risks involved with deferred settlement trades – while Kengeter would have had access to T+14 reports prior to November 2010, those reports ceased to be generated at that time and were not replaced with any other reporting or analysis of deferred settlement trading activity;

- off-market trades, large notational transactions and trades with subsequent price amendments, which had been flagged by the FSA as indicia of high-risk activities that should be investigated;

- the volume or risk of cancelled, amended and late booked activity for future trades;

- trend analysis of the risks associated with high volume proprietary trading;

- the volume of or basis for manual adjustments to profit and loss reports;

- the gross, as opposed to net, trading positions taken by the Investment Bank traders or the discrepancy between gross risk exposure and UBS's risk limits; and

- reconciliation of actual and reported profits with Investment Bank traders' claimed trading positions.

165.   The internal profit and loss reports available to Kengeter would have identified the significant increases in revenue and profits being generated by the Delta One desk, as set forth in ¶90.  Kengeter, however, did not request and did not receive any information regarding how that revenue, exceeding UBS's purported risk limits, was being achieved by the desk or whether any investigation had been undertaken into the basis for the Delta One desk's trading revenue.

166.   While defendants publicly insisted that UBS had "one of the best risk management in the industry," as set forth in ¶161, Kengeter failed to institute internal controls or require the adoption of controls in the Investment Bank that:

- required notification and enforcement of formal risk limits for proprietary trading;

819129_1

- required automated monitoring of any breaches of UBS's risk limits;

- required investigation, reporting or disciplinary action of violations of trading risk limits;

- required investigation, reporting or disciplinary action for the use of deferred settlement trades;

- required investigation, reporting or disciplinary action for large notational trades or trades with significant price amendments;

- required investigation, reporting or disciplinary action for persistent cancelled, amended or late booked trades;

- required investigation, reporting or disciplinary action for large proprietary trades with unverified internal counterparties;

- required investigation, reporting or disciplinary action for proprietary trades at material off-market prices;

- required the assessment and reporting of gross risk exposure;

- required confirmation or testing of the results of risk self-assessment by traders and internal controllers;

- required UBS's Operations Division to monitor, investigate and report on SCP alerts of suspicious trading activity;

- prohibited proprietary traders from signing off on risk alerts regarding their own trades; and

- prohibited manual adjustments of profit and loss reports or required that any manual adjustments be identified in profit and loss reports.

167.    ***Additional Indicia of Kengeter's Scienter***: In addition to his knowledge and reckless disregard of the true undisclosed facts regarding UBS's internal controls and risk management, as detailed herein, Kengeter also had both the motive and opportunity to make the alleged false and misleading statements.  In addition to creating the perception of sustainable growth and preserving UBS's credit ratings, as set forth in ¶¶129-131, Kengeter was motivated to, and did, preserve his position as CEO of the Investment Bank and personally collect millions of dollars in compensation and performance bonuses.  During the Class Period, Kengeter was the highest paid member of the

- 90 -

GEB, collecting over CHF 20 million in performance-based cash bonuses and equity awards. Following the September 15, 2011 disclosure, however, Kengeter received no performance-based cash bonuses or equity awards, and because the Investment Bank did not meet its profitability requirements in 2011, 50% of Kengeter's award installment in the Senior Executive Equity Ownership Plan was forfeited, the maximum amount that could be forfeited.

168.   ***Kengeter's Demotion and Resignation***: Immediately following the September 15, 2011 disclosure, Kengeter was quickly removed from the GEB and as head of the Investment Bank. Kengeter was relegated to a role in an ancillary non-core department responsible for managing the Company's assets it is looking to shed as part of UBS's efforts to shutter the Investment Bank.  In February 2013, UBS announced Kengeter's "expected resignation" from the Company, as new management continued to try to erase any connection to UBS's risk management failures during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

169.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained the price of UBS securities and operated as a fraud or deceit on Class Period purchasers of UBS securities by misrepresenting and omitting material information about the Company's risk and disclosure controls.  When defendants' prior misrepresentations and omissions became apparent to the market on September 15, 2011, the price of UBS's securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of UBS securities during the Class Period, Plaintiffs and other members of the Class, as defined in ¶¶2, 177, suffered economic loss, *i.e.*, damages, under the federal securities laws.

170.    Defendants' misleading statements and omissions, identified herein at ¶¶25-30, 34-37, 39-40, 43, 45-48, 52-55, 59-61, had the intended effect and caused UBS securities to trade at artificially inflated levels throughout the Class Period.

171.    As a direct result of the September 15, 2011 disclosure, the price of UBS securities suffered significant declines.  On that day, the price of UBS stock traded on the NYSE dropped 10.02%, $1.26 per share, on unusually high volume of 29.9 million shares.  The price of UBS stock traded on the SIX Swiss Exchange similarly fell 10.8%, CHF 1.18, on high volume.  As *The Wall Street Journal* reported, "[t]he crisis slammed shares of UBS, which Thursday fell nearly 11% in Swiss trading and 10% in New York Stock Exchange trading."

172.    The decline in UBS's stock price on September 15, 2011 was a direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to investors and the market.  The timing and magnitude of UBS's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to defendants' fraudulent conduct.  Indeed, on September 15, 2007, both the Dow Jones Industrial Average and the Standard & Poor's 500 rose 1.7%.  As reported by CNN on September 15, 2011, "European bank stocks rally, with one exception. . . .  Shares of Societe Generale rose 5%, BNP Paribas gained 13%, Deutsche Company added 5%, Banco Santander rose 5%, and the MSCI Europe Financial Sector Index gained 2.5%.  ***The only exception to the rule was UBS***."  The economic loss suffered by Plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to artificially maintain the inflated prices of UBS securities and the subsequent decline in the value of those securities when defendants' prior misrepresentations and omissions were revealed.

## NO SAFE HARBOR

173.    The statutory "safe harbor" provided for forward-looking statements under certain circumstances does not apply to any of the misleading statements alleged in this complaint.  The statements pleaded herein were not specifically identified as forward-looking statements when made and the statements concerned purported historical fact and/or representations about UBS's present status to which the statutory safe harbor does not apply.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance.

174.    Even to the extent any statement is characterized as forward looking, the statutory safe harbor would not apply because defendants knew the statement was false or misleading and/or the statement was authorized and/or approved by an executive officer of UBS who knew that the statement was false or misleading.  Moreover, none of the false and misleading statements alleged herein were accompanied by meaningful cautionary statements.  Any purported disclosures that accompanied defendants' false and misleading statements were generic and unparticularized boilerplate that failed to provided any meaningful cautionary information.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

175.    Plaintiffs and the Class are entitled to the presumptions of reliance set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  During the Class Period, defendants made material misstatements and omissions. Throughout the Class Period, the market for UBS securities on the NYSE and SIX Swiss exchange were open, efficient and well developed.  The material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of UBS, thus causing the Company's securities prices to be overvalued and artificially inflated.  Plaintiffs and other members

- 93 -

of the Class purchased UBS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

176.    At all relevant times, the market for UBS securities was efficient for the following reasons, among others:

(a)    UBS securities met the requirements for listing and were listed and actively traded on the NYSE and SIX Swiss Exchange, both of which are highly efficient markets;

(b)    UBS securities were actively traded throughout the Class Period, with substantial volume and average weekly turnover, and high institutional investor participation;

(c)    As a regulated issuer, UBS filed periodic public reports with the SEC;

(d)    UBS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(e)    UBS was followed by numerous analyst firms, which issued in excess of 255 reports covering the Company during the Class Period.

## CLASS ACTION ALLEGATIONS

177.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of UBS securities on any U.S. exchange and/or in any domestic transaction during the November 17, 2009 through September 15, 2011 Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of UBS, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

819129_1

178.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, UBS securities were actively traded on the NYSE and SIX Swiss Exchange.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by UBS or its transfer agent(s) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

179.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business and operations of UBS; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

180.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of defendants' wrongful conduct.

181.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

182.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

183.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

184.    During the Class Period, UBS, the individual defendants Grübel, Cryan, Lofts and Kengeter, and UBS's officers, management and agents disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

185.    UBS, the individual defendants and UBS's officers, management and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

- 96 -

misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of UBS's securities during the Class Period.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

186.    UBS, the individual defendants and UBS's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of UBS common stock during the Class Period.

187.    UBS is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in Form 20-F filings.

188.    UBS is further liable for the false and misleading statements made by UBS's officers, management, and agents in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

189.    UBS, the individual defendants and UBS's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about UBS's risk management systems and internal controls as specified herein.

190.    The allegations above establish a strong inference that UBS, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even

- 97 -

though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true nature of UBS's operating condition and controls from the investing public.  By concealing these material facts from investors, UBS maintained its artificially inflated share price throughout the Class Period.

191.    The individual defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true nature of UBS's operating condition and controls from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' misstatements and omissions, if they did not have actual knowledge of the alleged misrepresentations and omissions alleged, defendants were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

192.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UBS securities.  Plaintiffs and the Class would not have purchased UBS securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

193.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of UBS securities during the Class Period.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

194.　Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count II is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a).

195.　Defendants Grübel, Cryan, Lofts and Kengeter acted as controlling persons of UBS within the meaning of §20 of the 1934 Act.  UBS controlled all of its employees and each of the individual defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of UBS's finances and operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the defendants Grübel, Cryan, Lofts and Kengeter had the power to influence and control and did influence and control, directly or indirectly, the Company's decision making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants Grübel, Cryan, Lofts and Kengeter participated in conference calls with investors and analysts and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Plaintiffs to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

196.　In particular, each of these defendants had direct and supervisory involvement in the Company's day-to-day operations and, in particular, the design and implementation of UBS's internal controls and risk management systems, and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

- 99 -

197.    As set forth above, defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of UBS publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as class representatives under Federal Rule of Civil Procedure 23;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive or other and further relief as the Court may deem just and proper.

## JURY DEMAND

198.    Plaintiffs demand a trial by jury.

DATED:  March 4, 2013                    ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
                                                     DAVID A. ROSENFELD


                                                     _David A. Rosenfeld_
                                                     DAVID A. ROSENFELD

- 100 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
TOR GRONBORG
BRIAN O. O'MARA
AUSTIN P. BRANE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

819129_1

EXHIBIT A

Financial Services Authority



---

# FINAL NOTICE

---

To:          **UBS AG**

Of:          1 Finsbury Avenue, London, EC2M 2AN

Date:       25 November 2012

## ACTION

1. For the reasons given in this notice, and pursuant to section 206 of the Financial Services and Markets Act 2000 ("the Act"), the FSA imposes on UBS AG ("UBS") a financial penalty of £29.7 million in respect of breaches of Principles 2 and 3 of the FSA's Principles for Businesses (the "Principles").  These breaches occurred between 1 June 2011 and 14 September 2011 (the "Relevant Period") in the Global Synthetic Equities ("GSE") business conducted from the London Branch of UBS (the "London Branch").

2. UBS agreed to settle at an early stage of the FSA's investigation. UBS therefore qualified for a 30% Stage 1 discount under the FSA's executive settlement procedures. Were it not for this discount, the FSA would have imposed a financial penalty of £42.4 million on UBS.

## SUMMARY OF REASONS

3. During the Relevant Period, UBS breached Principle 3 by failing to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems and breached Principle 2 by failing to conduct its business from the London Branch with due skill, care and diligence.

4. These breaches became apparent when UBS discovered that a UBS employee, Kweku Adoboli (the "Trader") on the Exchange Traded Funds desk (the "Desk") in the GSE trading division had amassed substantial losses amounting to $2.3 billion through his trading.

5. On 14 September 2011, the Trader was arrested. He was subsequently tried on an indictment containing two counts of fraud by abuse of position and four counts of false accounting. On 20 November 2012, the Trader was convicted of the two counts of fraud by abuse of position and acquitted of the four counts of false accounting. He was sentenced to 7 years' imprisonment.

6. The losses were incurred primarily on exchange traded index future positions. The underlying positions were disguised by the use of offsetting strategies which had no economic reality and no associated external risk position. These strategies involved a combination of late bookings of real trades, booking unmatched (i.e. fictitious) trades to internal accounts and the use of deferred settlement trades for which there was no external counterparty (i.e. also fictitious).

7. During the Relevant Period, there was insufficient focus on the key risks associated with unauthorised trading within the GSE business conducted from the London Branch which resulted in significant control breakdowns which allowed the concealment to remain undetected for an extended period of time.

8. In particular, in relation to the GSE business conducted from the London Branch, UBS failed to:

    i. adequately supervise the GSE business with due skill, care and diligence;

    ii. put adequate systems and controls in place to detect the unauthorised trading in a timely manner; and

    iii. have adequate focus on risk management systems and to sufficiently escalate or take sufficient action in respect of identified risk management issues.

**DEFINITIONS**

9. The definitions below are used in this Final Notice.

"Break" means an item which does not reconcile between one system and another or between one counterparty and another

"DEPP" means the Decision Procedure and Penalties Manual

"ETF" means Exchange Traded Funds

"GBSOV" means Global Balance Sheet Ownership Verification process, a reconciliation process undertaken at month end

"GSE" means Global Synthetic Equities

"SCP" means Supervisory Control Portal

"the Act" means the Financial Services and Markets Act 2000

"the Desk" means the ETF Desk

"the FSA" means the Financial Services Authority

"the London Branch" means the London Branch of UBS AG

"the Principles" means the FSA's Principles for Businesses

"the Tribunal" means the Upper Tribunal (Tax and Chancery Chamber)

"UBS" means UBS AG


## STATUTORY AND REGULATORY PROVISIONS

10. The FSA is authorised, pursuant to section 206 of the Act, to impose a penalty of such amount as it considers appropriate in the circumstances, if it considers that an authorised person has contravened a requirement imposed on him by or under the Act.

11. Pursuant to section 2(2) and sections 3 and 6 of the Act, two of the FSA's statutory objectives are maintaining confidence in the financial system and the reduction of financial crime.

12. Principle 2 of the Principles states that:

   *"A firm must conduct its business with due skill, care and diligence".*

13. Principle 3 of the Principles states that:

   *"A firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems".*

14. The FSA's approach to exercising its enforcement powers to impose a financial penalty on an authorised person is set out in the Enforcement Guide ("EG").


## RELEVANT CONTEXT

   *Rogue trading incident 2008*

15. As a result of an incident of rogue trading at Société Générale, on 11 March 2008, the FSA published issue 25 of its Market Watch Newsletter ("Market Watch") in which it highlighted the measures firms should consider when reviewing the systems and controls which protect them against rogue trader risks. Market Watch considered:

   i.   Front Office culture and governance;

   ii.  trading mandates and limits;

    iii.   culture and challenge within the control functions; and

    iv.   risk management and limits.

16. Further information was provided in issue 29 of Market Watch in which the FSA highlighted the key issues which had arisen in the course of their discussions with firms around their systems and controls to prevent and detect unauthorised trading.

17. The FSA considers that firms that conduct trading activities should be vigilant to the risks arising from unauthorised trading activities given the systemic risks that such events pose to firms and the wider financial system.

*Recent enforcement action*

18. On 5 August 2009 UBS was fined £8 million (discounted from £10 million for early settlement) in respect of breaches of Principles 2 and 3 of the Principles within the London Branch's international wealth management business. In particular, the enforcement action identified the following failures:

    i.   to provide an appropriate level of supervision;

    ii.   to challenge appropriately the employees in question; and

    iii.   to implement effective remedial measures in response to several warning signs that occurred during the course of its business.

19. The FSA has an expectation that firms should give consideration as to whether the system and control deficiencies identified in an enforcement action are applicable to other business areas within the same branch and whether remedial action is necessary.


**FACTS AND MATTERS**

**The UBS Business Division**

*Background*

20. UBS is a major global financial group with its headquarters in Zurich.  Since early 2009, UBS has operated four business divisions which includes the Investment Bank ("UBS IB"). UBS IB has three distinct business areas, one of which is Global Equities.

*Global Synthetic Equities ("GSE")*

21. At the beginning of 2011, Global Equities was restructured and the GSE trading division was created to combine the synthetic equity products traded across Global Equities into a single business sector.  GSE was brought together by the amalgamation of existing businesses within Global Equities.

4

*The Exchange Traded Funds Desk ("the Desk")*

22. The Desk was one of the last desks to be transferred into the new GSE trading division in April 2011. The products traded by the Desk were cash equities, equity futures and equity index futures. The Desk also had a mandate to undertake proprietary trading. Shortly after its transfer to GSE, the Desk limits were set at $50 million net delta overnight and $100 million net delta intraday.

**Identification of the Issues**

23. On 14 September 2011 UBS became aware that substantial unauthorised trading had been carried out on the Desk. After taking urgent action to close out UBS's positions relating to the unauthorised trading, the losses incurred by UBS were calculated at $2.3 billion (the "Loss"). UBS promptly notified the City of London Police, the FSA and the Swiss Financial Market Supervisory Authority ("FINMA").

**Independent Investigation**

24. On 22 September 2011 the FSA and FINMA requested that UBS appoint an independent person to conduct an investigation into the circumstances surrounding the Loss on the Desk which was incurred during the Relevant Period ("the Independent Investigation").

25. The Independent Investigation was primarily focused on the Relevant Period and identified that the true underlying loss making positions were concealed by the use of fictitious off-setting trades which appeared to be profitable. However, these trades had no economic reality and no associated external risk position. The following sets out the Independent Investigation's findings on the strategies used to conceal the unauthorised trading in the trade capture systems:

   i. *The booking of unmatched trades to internal counterparties*: the Front Office risk system allowed internal futures trades to be booked to a generic counterparty of 'internal' and did not require an automatic mirror trade or identification of the particular internal counterparty.

   ii. *The late booking of trades*: Genuine external futures trades were booked into the futures settlement system but were late in being booked into the Front Office risk system which allowed manipulation of the profit and loss.

   iii. *The use of false ETF trades, including false ETF trades with a deferred settlement date, false trades at off market prices and amendments to the prices of ETFs*: There was no automatic filter in the trade input systems which identified off market or large notional transactions and the amendment of a price in the Front Office risk system did not alter the price in the Front Office deal capture system.

*The risk control environment*

26. UBS designed and operated a number of risk control processes to prevent unauthorised trading. There were three main lines of defence within these risk control

5

processes. The first line focused on the supervision and oversight of the trading desk within Front Office and the verification and settlement of trades, undertaken by the Operations Division. The second line focused on specific risk control tasks within the Finance, Risk and Compliance Divisions. The third line was the Group Internal Audit undertaken by UBS.

27. The Independent Investigation identified significant control breakdowns during the Relevant Period which allowed the concealment to remain undetected.  In summary, the Independent Investigation found that:

  i. Front Office supervision was inadequate, with reported desk limits breaches which were not adequately acted upon by line management.

  ii. The level of co-operation and co-ordination between front and back office was not adequate and there was an insufficient level of understanding of the trading activities "front to back".  This led to a lack of sufficient enquiry and clarity of accountability between functions.

  iii. The back office function teams relevant to the Desk demonstrated a lack of capability to effectively identify, challenge and escalate significant and sustained control issues.

28. The following sets out the Independent Investigation's findings in relation to each of the three lines of defence:

**First Line of Defence**

_Supervision of the Desk_

29. The Desk was transferred into the GSE Division in April 2011, having previously sat within the Cash Equities Division. The transfer of the business groups and their supporting infrastructure into the GSE Division began in early 2011. In relation to the Desk, transfer of the supporting infrastructure was deliberately intended to be a phased handover. It was intended to be completed in advance of September 2011 but was incomplete when the losses were identified.

_Supervision issues_

30. Prior to the Desk's transfer into the GSE Division, the Desk was supervised by a London based supervisor who sat in close proximity to the trading desk. After the transfer into the GSE Division the Desk was supervised by a US based supervisor. However, the previous supervisor continued to receive some of the supervisory reports, despite having no ongoing supervisory responsibilities over the desk.

_Increase in revenue_

31. The net revenue recorded by the Desk increased significantly between 2010 and the first and second quarters of 2011. In 2010, the net revenue of the Desk was $9 million for the year. In the first quarter of 2011 it had risen to $21 million and by the second quarter of 2011 it stood at $52 million. This increase in revenue was several times

greater than the increase in the risk limits of the Desk. The Desk's line management did not make any enquiries into how the increase in revenue was being generated, although some increase in revenues was expected after the transfer to GSE and the increase in risk limits.

*Desk limits*

32. Between 23 June and 15 July 2011 the Desk breached the desk risk limits set by the Desk supervisor on four occasions. These breaches were escalated to various individuals within the Front Office. On one of these occasions, the Desk's supervisor congratulated the desk for the profit made that day, but made clear that the Desk needed his or the Global Head of GSE's permission to have a risk position in excess of the limits and informed his supervisor. On another of these occasions, the Trader sought permission from one of his supervisors for holding an overnight position in excess of his risk limit. On the other two occasions, no specific action was taken and no detailed investigation was undertaken into the underlying reasons for those breaches.

*Breaks arising from the Desk*

33. On 8 August 2011 the Desk's line management were informed that the reconciliations process had uncovered breaks arising from the Desk as a result of the late booking of external futures trades. The Desk supervisor informed the Operations Division that he had spoken to the Trader and the positions would be booked out by him that day. He did not seek any further explanation from the Trader as to how or why the position had arisen.

34. On 19 August 2011 the Desk supervisor was notified that there were breaks developing on one-sided internal futures. The Trader's explanation for this was that he was building a position for an ETF provider. He had been too busy to book the new ETFs and so had been incorrectly booking internal futures instead of ETFs to replicate the correct risk position of the forthcoming ETF trades. The Desk's line management considered this practice to be unacceptable, and reinforced this in writing to the Trader, but it was not properly investigated.

*System failures*

35. In addition to the personal supervision of the Desk, UBS also utilised a specifically developed computer system called the Supervisory Control Portal (SCP) to aid in risk control supervision. The SCP was fed by various underlying UBS computer systems, including the trading desk deal capturing systems and the Front Office risk systems. The SCP showed details of profit and loss reports, risk reports and could also create reports for the review and approval of cancelled, amended and late trades.  The following illustrates some of the SCP's deficiencies:

    i.    the report for cancelled, amended or late ETF trades was sent to the previous desk supervisor who had no ongoing supervisory responsibilities over the Desk;

    ii.   the report feature was not functioning in respect of futures trades until 26 August 2011; and

7

    iii.    from 26 August 2011, the report in respect of futures trades was only sent to the traders on the Desk and they were not therefore approved by the Desk's supervisory management.

36. In addition to the creation of alerts, the SCP had the ability for items to be flagged by the Operations Division for specific review by the supervisor. This was a manually operated feature which appears not to have been utilised by the Operations Division despite the fact that there were a high number of alerts generated by the system.

### The Operations Division

37. The purpose of the Operations Division was to establish and maintain an appropriate and robust control environment in order to ensure the completeness and accuracy of the trade population, as well as to ensure its integrity with relevant systems, counterparties and inter-company. In particular the Operations Division held responsibility for confirmations, reconciliations and end of day reporting (including cancelled, amended and late trades).

*Efficiency versus control*

38. Within UBS the Operations Division acted as a facilitation division rather than having a specific risk control mandate, providing a logistic support role and working closely with the Front Office to resolve and clear any trading breaks. There was a culture of helping the traders to clear breaks on the basis of the explanations they provided as opposed to challenging the traders and questioning whether their explanations were correct. As such their primary focus appears to have been on driving efficiency as opposed to more control based activities.

*Historical perceptions*

39. The effectiveness of the Operations Division to exercise and control the Desk throughout the Relevant Period may have been undermined in the following ways:

    i.    The fact that some Middle Office staff aspired to roles in the Front Office may have generated behaviours aligned to Front Office interests rather than those required to exercise effective control. The Independent Investigation did not consider specific individuals in its findings.

    ii.    The Desk was previously identified as generating a large number of breaks across various controls operated by the Operations Division. There appears to have been an expectation from junior personnel in the Operations Division involved with the Desk that it would generate a significant number of breaks, leading them not to investigate further or escalate breaks caused by the trading activity to management.

*The Reconciliations Process*

40. The reconciliations process undertaken by the Operations Division did reveal some of the breaks created by the unauthorised trading. The lack of an internal counterparty to the one sided internal futures was identified by two internal reconciliations performed

by the Operations Division and one transaction appeared as an exception on the Operations Division's daily reconciliation from mid July until August 2011, when the Trader reversed the position. The Trader's explanation for the breaks was accepted by a junior member of the Operations Division without adequate challenge, further analysis or upward escalation. The break was cleared in August 2011 without further investigation from the Operations Division and was therefore not identified to Product Control.

**Second Line of Defence**

*The Finance Division*

41. In relation to unauthorised trading, the key role undertaken by the Finance Division was that of Product Control. Their role was to understand and validate the profit and loss and the related trading positions.

*Profit & Loss suspensions*

42. Product Control could suspend or adjust profit and loss to reflect booking errors, trade capture timing differences and the delayed pricing of marks. These suspensions were typically communicated to Product Control by the Trader and were not separately identified as part of the daily profit and loss report until 18 August 2011. Profit and loss suspensions to the value of $1.6 billion were requested by the Trader during the course of August 2011. These suspensions were not adequately challenged by or escalated within Product Control by the junior product controller.

*Desk profitability*

43. The profit and loss recorded by the Desk in respect of proprietary trading increased significantly between 2010 and the first and second quarters of 2011. Product Control did not seek any detailed explanation as to how this increase in profitability was being created, and conducted no analysis of the drivers and size of the underlying intra-day positions.

*Global Balance Sheet Ownership and Verification process (GBSOV)*

44. Product Control was also responsible for running the GBSOV process. This process is intended to identify "Amounts Under Investigation" and "Amounts At Risk". Any unsubstantiated, aged, questionable or doubtful items should be highlighted for a management review. However, on occasions this process did not act to reveal the nature of the underlying activity. By way of example:

    i.    The July GBSOV revealed a break of CHF209 million arising from the Desk.

    ii.    By 11 August 2011, the closing date for the July GBSOV, the break still had not been cleared.

    iii.    On 19 August 2011 the break was escalated to senior personnel within GSE.

    iv.    On 24 August 2011 the Trader was formally asked to provide an explanation for the break (although he had been asked for an explanation previously

through a dialogue with Operations and Product Control).   This was subsequently discussed at a meeting of the Finance London Operational Risk Committee. The Committee concluded that no amounts were deemed to be at risk.

    v.   On 31 August 2011 the Trader cleared the break and the Operations Division confirmed the positions as flat on 1 September 2011.

*The Risk Division*

*Operational Risk Control*

45. In July 2008 Operational Risk Control undertook a detailed review with the aim of assessing UBS's exposure to a significant loss as a result of unauthorised trading (the "Rogue Trader Review"). The catalyst for the review was a significant rogue trading incident which occurred at Société Générale in January 2008. The Rogue Trader Review included a consideration of the information provided by the FSA as part of issue 25 of its Market Watch.

46. Operational Risk Control concluded that, while unauthorised trading could not be prevented in its entirety, no evidence was found in 2008 of control deficiencies within UBS that could be systematically exploited over an extended period as part of a rogue trading incident. However, the review identified the following areas of weakness:

    i.   cancel and amend reports were proving ineffective as a way of identifying abnormal trading patterns;

    ii.   Front Office supervision was hampered due to a lack of effective management information being provided to supervisors;

    iii.   there were weaknesses related to the culture of challenge required in the logistic and control functions; and

    iv.   there was a suggestion to undertake a specific review into the controls in place for the ETF area of the business given its added complexity.

47. The findings of the Rogue Trader Review were provided to the FSA who were satisfied with UBS's proposals to remediate those areas in which control weaknesses had been identified.

48. In December 2010, Operational Risk Control completed a follow up review of the Rogue Trader Review (the "Second Review"). In relation to the areas of weakness identified above the follow up review concluded as follows:

    i.   the SCP had been implemented, providing trading activity reports and alerts to supervisors for follow up and it had increased the capability of supervisors to identify abnormal trading patterns;

    ii.   management reporting and supervision in the Front Office had improved, due in part to the implementation of the SCP which had improved the capabilities of supervisors to properly supervise the Front Office;

10

    iii.    the weaknesses related to the culture of challenge in the logistics and control functions had been addressed through communication and training; and

    iv.    further investigation and discussion had determined that a review of the ETF business was not required because the Desk had been in scope for a recent GIA audit.

49. Notwithstanding that Operational Risk had reviewed the risk of rogue trading and implemented programs designed to reduce the risk through the strengthening of processes and internal controls, nevertheless control failures arose during the relevant period.

**Third Line of Defence**

*Group Internal Audit*

50. Group Internal Audit acted as an independent examination of UBS's risk management, control and governance processes, with a view to improving their effectiveness. They reported directly to the Chairman of the Board of Directors and to the Risk Committee.

51. The Independent Investigation conducted only a limited review of relevant audit reports. In June 2010, Group Internal Audit identified the following issues:

    i.    project plans or goals were necessary for improving the end of day process or accuracy of supervisory alerts, in particular, implementing red flag analyses and reporting;

    ii.    lack of effective procedure for delegation by desk supervisors of supervisory responsibility during leave or absence;

    iii.    a failure to ensure desk supervisors always received the necessary reports to perform their role; and

    iv.    an absence of monitoring by Compliance over the use of the SCP by supervisors in relation to irregular alerts.

52. Group Internal Audit graded these issues as "Other", the grade below significant and indicating that they were medium risk. Issues rated as "Other" were not escalated to the Board Risk and Audit Committees.  In addition, such issues could be closed by Group Internal Audit on an evidential rather than substantively tested basis. All of the issues in the June 2010 audit were resolved to the satisfaction of GIA.

53. In the audit report of July 2011 a "significant" issue was identified in respect of the agreement of responsibilities between Equities and Operations management to review completeness of the system feeds generating alerts within the SCP and the implementation of filters applied to late, cancelled and amended trades before producing SCP alerts. This was rated as "Senior Leadership Action Required".  The deadline for action was 31 December 2011, so had not been completed by the time the unauthorised trading was discovered.

**ANALYSIS OF THE FAILINGS**

54. UBS's breaches of the Principles can be grouped into two separate categories:

    i.   breaches of Principle 3 (risk management systems and controls); and

    ii.   breaches of Principle 2 (due skill, care and diligence).

Principle 3 (risk management systems and control)

55. Principle 3 required UBS to establish and maintain such systems and controls as were appropriate to its business.

56. By reason of the facts and matters set out below, the FSA considers that UBS breached the requirements of Principle 3 by failing to put in place systems and controls to adequately mitigate the risk that its employees would undertake unauthorised trading, and where such unauthorised trading was carried out, to detect the trading in a timely manner.

57. The following failings were specifically identified in the Independent Investigation. The FSA agrees with the principal findings of the Independent Investigation and considers that these findings constitute a breach of Principle 3:

*First line of defence*

    i.   The SCP system operated by UBS to assist in risk management of the Desk was not effective in controlling the risk of unauthorised trading.

    ii.   The trade capture and processing system also had weaknesses, which were exploited in order to conceal the unauthorised trading. The system allowed trades to be booked to an internal counterparty without sufficient details, there were no effective methods in place to detect trades at material off-market prices and there was a lack of integration between systems.

    iii.   There was an understanding amongst personnel supporting the Desk that the Operations Division's main role was that of facilitation. Their main focus was on efficiency as opposed to risk control and they did not adequately challenge the Front Office.

    iv.   The reconciliations process undertaken by the Operations Division was not robust enough, and there was a failure to properly escalate issues to the Desk's supervisory management or the Finance, Risk or Compliance Divisions.

*Second line of defence*

    v.    Product Control had responsibility for running the GBSOV process. However, this process was not sufficiently robust to reveal the nature of the underlying activity causing the breaks in the balance sheet.

*Conclusion*

58. For the reasons set out above, the FSA considers that UBS was in breach of Principle 3 during the Relevant Period in that it failed to take reasonable care to:

    i.    organise and control its affairs responsibly and effectively, with adequate risk management systems;

    ii.    establish and maintain systems and controls that were appropriate to that business; and

    iii.    establish and maintain effective systems and controls for countering the risks posed by unauthorised trading.

Principle 2 (due skill, care and diligence)

59. Principle 2 required UBS to act with due skill, care and diligence in conducting its business.

60. By reason of the facts and matters detailed below, the FSA considers that UBS breached the requirements of Principle 2 by failing to ensure that the necessary skill, care and diligence was applied across the business to ensure the prevention of unauthorised trading. To the extent that UBS had systems and controls in place to prevent or detect unauthorised trading, UBS failed to ensure that such systems and controls were fully complied with and implemented in the business.

61. The following findings were specifically identified or reflected in the Independent Investigation. The FSA agrees with the principal findings of the Independent Investigation and the FSA considers that these failings constitute a breach of Principle 2:

*First line of defence*

    i.    The transfer of the Desk into the GSE Division took place in an incomplete and unsystematic manner. The underlying support and control functions for the Desk did not transfer to GSE at the same time as the Desk itself. The phased handover was incomplete at the time the losses were identified.

    ii.    The post transfer supervision arrangements for the Desk were poorly executed and ineffective. The SCP reports for cancelled, amended and late trades were not provided to the new desk supervisor post transfer.

iii. The Desk breached the risk limits set for their desk without being disciplined for doing so. This created a situation in which risk taking was not actively discouraged or penalised by those with supervisory responsibility.

iv. There was insufficient scrutiny by the Front Office management of explanations provided by the trading desk for breaks arising during the reconciliations process. Further, the Front Office management failed to adequately investigate the increased revenue being generated by the Desk to satisfy themselves that there were no risk issues associated with the increased profitability.

v. The Operations Division failed to adequately analyse how the breaks identified as part of the reconciliation process were subsequently cleared. Furthermore, much of the Management Information provided by the Operations Division was designed to support efforts to improve efficiency and the cleanliness of the control environment rather than to identify trends and patterns at the Desk and/or trader level that may have indicated potential unauthorised trading activity.

*Second line of defence*

vi. Product Control failed to investigate the underlying reasons for the substantial increase in profitability of the Desk despite the fact that this could not be explained by reference to the end of day risk positions. The product controllers responsible for the Desk accepted requests for significant profit and loss suspensions without challenging the suspensions or escalating the request to their superiors, prior to 18 August 2011. The combined factors of unexplained profitability and large profit and loss suspensions should have indicated the need for greater scrutiny.

*Conclusion*

62. For the reasons above, the FSA considers that UBS was in breach of Principle 2 during the Relevant Period, as it failed to conduct its business with due skill, care and diligence.

**SANCTION**

**Financial penalty**

63. The FSA's policy for imposing a financial penalty is set out in Chapter 6 of DEPP. In respect of conduct occurring on or after 6 March 2010, the FSA applies a five-step framework to determine the appropriate level of financial penalty. DEPP 6.5A sets out the details of the five-step framework that applies in respect of financial penalties imposed on firms.

**Step 1: disgorgement**

64. Pursuant to DEPP 6.5A.1G, at Step 1 the FSA seeks to deprive a firm of the financial benefit derived directly from the breach where it is practicable to quantify this. The FSA has not identified any financial benefit that UBS derived directly from its breach. Step 1 is therefore £0.

**Step 2: the seriousness of the breach**

65. Pursuant to DEPP 6.5A.2G, at Step 2 the FSA determines a figure that reflects the seriousness of the breach.

66. In assessing the seriousness level, the FSA takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly. DEPP 6.5A 2G (5)-(7) sets out the factors the FSA will consider in deciding which level of seriousness is most appropriate. Of these, the FSA considers the following factors to be relevant:

    i. The effect on the market: market confidence was put at risk, given the sudden announcement to the market and size of the losses announced.. Negative announcements, such as this, put at real risk the confidence investors are prepared to have in financial markets.

    ii. The breach revealed serious or systemic weaknesses in the firm's procedures, management systems and internal controls relating to part of the firm's business: UBS's breach revealed serious weakness in the risk management procedures, systems and controls.

    iii. The scope for financial crime to occur as a result of the breach: the Trader in question has been convicted of two counts of fraud by abuse of position as a result of the unauthorised trading.

67. Taking all of these factors into account, the FSA considers this to be a serious breach and it is appropriate to apply a level 4 (15%) percentage.   The FSA has decided that it is most appropriate to use revenue figures for the GSE trading division for the 12 month period prior to September 2011 (excluding the losses suffered by UBS as a result of the unauthorised trading).   Therefore, the step 2 figure at level 4 is £42.4 million.

**Step 3: mitigating and aggravating factors**

68. Pursuant to DEPP 6.5A.3G, at Step 3 the FSA may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

69. The FSA considers that the following factors aggravate the breach:

    i. The firm's previous disciplinary history: In November 2009 UBS was fined £8 million for failings in relation to the systems and controls around the

15

international wealth management business conducted with non-UK resident clients in the London branch of UBS. While the circumstances of the case and the particular control failings involved were different from the current matter, the enforcement action identified the following failures:

> (a) to provide an appropriate level of supervision over customer-facing employees;
>
> (b) to challenge appropriately the employees in question; and
>
> (c) to implement effective remedial measures in response to several warning signs that occurred during the course of its business.

The FSA has an expectation that firms should give consideration as to whether the issues identified in an enforcement action are applicable to other business areas within the same branch and whether remedial action is necessary. In this case UBS failed to give such proper consideration.

ii. Whilst the FSA's investigation has focussed on the Relevant Period, the Independent Investigation has identified unauthorised trading, and the use of concealment mechanisms, from December 2008. Whilst the levels of unauthorised trading were much lower than in the Relevant Period, as were the associated profits and losses, there was however a consistent use of concealment mechanisms from this date.

70. The FSA considers that the following factors mitigate the breach:

i. No losses were suffered by clients or other third parties.

ii. UBS was the subject of fraudulent trading. The Trader received a custodial sentence of seven years' imprisonment.

iii. The conduct of the firm and its senior management in bringing the breach promptly to the attention of the FSA, FINMA and the City of London Police and fully co-operating with them throughout their investigations, which allowed for timely and effective resolution.

iv. UBS agreed to engage an independent firm to conduct a substantive investigation into the unauthorised trading incident, expending considerable resources (approximately £16m to date) in doing so. UBS's new senior management has committed significant resources to undertake an extensive programme of remediation.

v. UBS has taken disciplinary action against employees who were involved in the events which gave rise to the regulatory breach, including clawing back bonuses and withholding 50% of their deferred compensation from relevant individuals in an aggregate amount of more than £34m.

vi.   FINMA has also taken action against UBS in relation to the breach which is the subject of this Notice and UBS has undertaken to comply with the separate requirements imposed on it by FINMA.

71. Having taken into account these aggravating and mitigating factors, the FSA considers that, on balance, no adjustment is made to the Step 3 figure.  Accordingly, the Step 3 figure remains at £42.4 million.

**Step 4: adjustment for deterrence**

72. Pursuant to DEPP 6.5A.4G, if the FSA considers the figure arrived at after Step 3 is insufficient to deter the firm who committed the breach, or others, from committing further or similar breaches, then the FSA may increase the penalty. The FSA considers that the Step 3 figure of £42.4 million represents a sufficient deterrent to UBS and others, and so has not increased the penalty at Step 4.

**Step 5: settlement discount**

73. Pursuant to DEPP 6.5A.5G, if the FSA and the firm on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the FSA and the firm reached agreement. The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1. The FSA and UBS reached agreement at Stage 1 and so a 30 % discount applies to the Step 4 figure. Step 5 is therefore £29.7 million.

**Penalty**

74. The FSA therefore imposes a total financial penalty of £29.7 million on UBS for breaching Principles 3 and 2.

**PROCEDURAL MATTERS**

**Decision maker**

75. The decision which gave rise to the obligation to give this Notice was made by the Settlement Decision Makers.

76. This Final Notice is given under, and in accordance with, section 390 of the Act.

**Manner and time for payment**

77. The financial penalty must be paid in full by UBS to the FSA by no later than 10 December 2012, 14 days from the date of the Final Notice.

**If the financial penalty is not paid**

78. If all or any of the financial penalty is outstanding on 11 December 2012, the FSA may recover the outstanding amount as a debt owed by UBS and due to the FSA.

**Publicity**

79. Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates.  Under those provisions, the FSA must publish such information about the matter to which this notice relates as the FSA considers appropriate.  The information may be published in such manner as the FSA considers appropriate.  However, the FSA may not publish information if such publication would, in the opinion of the FSA, be unfair to you or prejudical to the interests of consumers.

80. The FSA intends to publish such information about the matter to which this Final Notice relates as it considers appropriate.

**FSA contacts**

For more information concerning this matter generally, contact Helena Varney (020 7066 1294), Philip Annett (020 7066 0534) or Eleanor Searley (020 7066 9076).

Jamie Symington

FSA Enforcement and Financial Crime Division

EXHIBIT B



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

21 November 2012

# SUMMARY REPORT

FINMA Investigation into the Events surrounding Trading Losses of USD 2.3 billion incurred by the Investment Banking Division of UBS AG in London



Einsteinstrasse 2, 3003 Bern
Phone +41 (0)31 327 91 00, Fax +41 (0)31 327 91 01
**www.finma.ch**

A257050/1688219/3089243



## I.      Summary

(1)      On 15 September 2011 UBS AG ("UBS" or the "Bank") announced that it had discovered a significant loss due to unauthorised trading by a trader in its Investment Bank.  This loss, which was calculated to be approximately USD 2.3 billion (the "Loss"), was incurred on the Exchange-Traded Funds Desk ("Desk" or "ETF Desk") within the Investment Bank's London Branch and was primarily the result of trading by one of the traders on the Desk ("Trader X").  FINMA's investigation into this incident has found serious failings in UBS's risk management and control environment.  These failings contributed to UBS's inability, over an extended period of time, to detect or prevent the loss-making trading activity.  Immediately following the discovery of the Loss, FINMA imposed a range of preventive supervisory measures, designed to limit the operational risk exposure of UBS.  Furthermore, FINMA subsequently ordered enforcement measures controlling UBS's remediation actions.

## II.     Background

(2)      Following the announcement of the Loss, UBS was required by FINMA and the UK Financial Services Authority ("FSA") to appoint a third party to conduct (i) an independent investigation into the events surrounding the Loss, and (ii) a wider examination of the adequacy of UBS's systems and controls to prevent unauthorised trading across the Investment Bank.  The choice of the third party investigator and the scope of its investigation was determined by FINMA and the FSA.  The investigation is now closed.

(3)      On 2 February 2012 FINMA announced that it had commenced enforcement proceedings against UBS to examine the adequacy of UBS's controls and its compliance with relevant Swiss laws and regulations.  At the same time, the FSA announced that it had commenced enforcement proceedings against UBS for suspected breaches of UK regulatory requirements.  The enforcement proceedings of FINMA and the FSA were separate, but closely co-ordinated.

(4)      On 20 November 2012 Trader X was found guilty on charges of fraud by abuse of position and not guilty on charges of false accounting in London's Southwark Crown Court.

(5)      This report sets out the facts and findings of FINMA's enforcement proceedings against UBS in relation to the circumstances surrounding the Loss incurred within the London Branch of UBS's Investment Bank.



## III.   Facts

### A.   UBS's organisation

(6)   UBS's Investment Bank comprises a number of business divisions, including the Global Equities division.  The divisions are sub-divided into a number of specific business sectors.  The ETF Desk was located within the Global Equities division, where historically it formed part of the Cash Equities business sector and was supervised by a senior, London-based Cash Equities trader.  In April 2011, the ETF Desk was transferred to a new business sector, Global Synthetic Equities ("GSE").  GSE had been formed in early 2011, when UBS restructured its existing Global Equities business sectors to combine the trading and sale of synthetic equity products  into a new business sector.  This transfer was accompanied by a change in supervisor.  The Desk's new supervisor within GSE was based in New York.  While plans for him to relocate to London later in 2011 were underway, no arrangements for local supervision of the Desk in the interim period were put in place.  There was no concrete hand-over of responsibilities between the Desk's old and new supervisors.

(7)   During the period investigated by FINMA, there were four traders on the ETF Desk.  The Desk's mandate permitted client and proprietary trading in certain cash equity products.[1]  Trading for the bank's own account ("proprietary trading") was chiefly undertaken by the two most senior traders (both Directors, one of whom was Trader X), who also undertook client trading.  The two junior traders (both Associate Directors) mainly undertook client trading.  The Desk was subject to net delta limits, which represented the maximum level of risk that the Desk could enter into at any given time unless specifically authorised to do otherwise.  The intended intraday net delta limit was USD 50 million, while the overnight net delta limit was USD 25 million.  These limits were increased in April 2011 when the Desk moved to GSE, to USD 100 million and USD 50 million respectively.  The Desk's trading mandate and risk limits were not formally documented at Desk level, but were instead communicated to the traders verbally.[2]

(8)   Proprietary trading was expected to generate the majority of the ETF Desk's revenues.  This contrasted with the position in the overall Global Equities division, where revenues were predominantly driven by commissions from client trading.  Proprietary trading revenues on the Desk increased sharply from 2010 (when they stood at USD 11.7 million for the entire year), reaching USD 15.9 million in Q1 2011 and USD 47.8 million in Q2 2011.  These increases, which were attributed to intraday trading, were not analysed in detail.

(9)   The Back Office functions that supported and controlled the ETF Desk included, amongst others, Operations, Product Control (part of Finance) and Market Risk.

---

[1] The Desk's mandate permitted trading in the following products: ordinaries (vanilla cash equities), including those forming part of a basket or index; American Depositary Receipts; Global Depositary Receipts; ETFs; investment trusts; and (as hedges) exchange-traded options and futures and spot foreign exchange.

[2] The Desk's intraday net delta limit was documented in a June 2011 email from the Desk's supervisor; however, this email was not sent to all the traders on the Desk.



9.1.    Operations' key relevant areas of responsibility in respect of the Desk were the reconciliation process and trade confirmation and settlement.

    9.1.1.    The reconciliation process involved ensuring that items recorded in different systems reconciled with each other.   Any reconciliation failures (known as reconciliation 'breaks') were required to be investigated by Operations to ensure their resolution, although there was no requirement to effectively analyse the causes of breaks or the manner in which breaks were eventually resolved.

    9.1.2.    Operations was also responsible for ensuring the timely confirmation of trades with deferred settlement terms.   Such trades were identified on a specific report maintained by an outsourcing provider based in India (the "T+14 report").

9.2.    Product Control was responsible for the validation and reporting of profit and loss ("P&L") and the verification and substantiation of balance sheet items.

    9.2.1.    P&L reports were prepared by Product Control on a T+1 basis and circulated within the Front Office, Product Control and Risk.  In addition to the Product Control T+1 report, the ETF Desk itself produced a T+0 P&L estimate for distribution to the Desk's supervisor and Product Control.  The T+1 report and the T+0 estimate showed the net end of day P&L only; they did not show P&L at trade level or attributed by subproduct, as UBS's Product Control systems did not have the capability to show this level of data for the products traded by the Desk.

    9.2.2.    Balance sheet verification and substantiation took place at month end, through the Global Balance Sheet Ownership and Verification ("GBSOV") process.  Any unverifiable balance sheet items in excess of CHF 10 million were required to be escalated to senior Finance management for review.

9.3.    Market Risk was responsible for measuring and controlling all market risks taken by business areas.  Market Risk focused on end of day risk reporting and analysis.  It did not have a mandate to formally monitor and control desk level risk limits, as this was the responsibility of the Front Office.  The market risk system in place in respect of the ETF Desk did not support automated monitoring of the Desk's positions against their risk limits.

(10)    The support and control infrastructure underlying the ETF Desk was not fully realigned  when the Desk was moved out of Cash Equities.  In particular, Product Control responsibilities continued to be exercised by a Cash Equities team for several months (and had not been transferred to the GSE Product Control team by the time that the Loss was discovered).

## B.    Activity that led to the Loss

(11)    The Loss was incurred on large exchange-traded index futures positions that were initiated by Trader X.  These positions were in fact unhedged.  Approximately USD 2.1 billion of the Loss arose from long EURO STOXX 50 and S&P 500 futures positions that peaked at a size of USD 12.1 billion



on 8 August 2011 and were closed out by 11 August 2011.  The remainder of the Loss was incurred on short S&P 500 and DAX futures positions that were entered into after 11 August 2011 (following close out of the long exposure).  The short exposure peaked at USD 8.5 billion on 15 September 2011, when UBS closed out the positions following the discovery of Trader X's activities.

(12)    Trader X used a number of mechanisms to disguise the Desk's true risk exposures.  These mechanisms generated fictitious P&L and risk exposure, thereby offsetting and concealing the Desk's true P&L and risk.  This enabled Trader X to take positions that were grossly in excess of the Desk's net delta limits, while appearing (on P&L and risk reports) to remain within those limits.  Concealment mechanisms were in use from late 2008.  From late 2008 to the end of 2010, the use of concealment mechanisms generated fictitious risk exposures of up to USD 296 million and fictitious P&L in excess of USD 40 million.  The scale of the activity increased significantly in 2011.

(13)    The main concealment mechanisms used were as follows:

13.1.   One-sided internal futures trades: these trades were not matched against an internal counter-party, did not require confirmation and were subject to less stringent control processes.  The trades were fictitious and generated fictitious risk exposure and P&L.

13.2.   Late booking of genuine external futures trades into the Front Office risk system: the effect of delaying the booking of these trades was to misreport the Desk's risk exposure and P&L.

13.3.   Fictitious ETF trades with deferred settlement dates: these trades, which were cancelled be-fore reaching settlement, generated fictitious risk exposure and P&L.  Deferred settlement trades should have been identified on the T+14 report.  However, this report was non-operational between May and November 2009, and from November 2010 to September 2011 (shortly before discovery of the Loss).  The following variants of these trades were also used:

13.3.1.   Fictitious ETF trades at off-market prices: the off-market pricing of these trades gen-erated significant immediate ('day 1') P&L.

13.3.2.   Amendments to the prices of fictitious ETF trades: the pricing amendments had the ef-fect of further misreporting the Desk's P&L.

13.4.   Zero-notional bullet cash trades: these were fictitious trades with a quantity and price of zero and an added cash flow (usually used to book cash-settled events such as dividends).  The cash flows were used to clear reconciliation breaks generated by the use of other conceal-ment mechanisms.

(14)    Trader X also developed a profit smoothing mechanism which came to be known on the Desk as the 'umbrella' from January 2011.  The umbrella involved the use of a number of concealment mechanisms in use throughout the period from late 2008 (particularly zero-notional bullet cash trades) to hold back profits from the Desk's reported P&L and to later 'leak' profits back into the P&L.  It was employed to smooth the Desk's reported P&L over time.  The mechanism was in breach of UBS poli-



cy, which required P&L to be reported when earned.  Other traders on the Desk were aware of the umbrella; none of them escalated any concerns to senior management.

(15)     In December 2010, an incident took place that resulted in Trader X being disciplined by the Desk's supervisor.  On this occasion, Trader X failed to follow an instruction to flatten the Desk's risk exposure, yet informed the supervisor that he had complied with the direction.  The disciplinary measure taken was a verbal warning.  The incident was not escalated beyond the Desk's immediate supervisor.

(16)     The ETF Desk's supervisor and his line manager (who was the head of GSE) were made aware of breaches of the Desk's net delta limits on at least four occasions between June and July 2011.  On one such occasion, when the Desk had made a large profit of USD 6 million, it was made clear by Trader X that this had been achieved by taking intraday positions in excess of USD 200 million (i.e. more than twice the Desk's intraday net delta limit).  The supervisor initially congratulated the Desk on this performance, before reminding them that his authorisation was required if they wished to exceed the Desk's risk limits.  This was the extent of the response to the breach of risk limits.  On three other occasions, daily risk reports circulated to the Desk's supervisor (and his line manager) indicating that breaches of the Desk's overnight net delta limit had occurred.  No apparent action was taken in response.

(17)     The monitoring of cancelled, amended and late booked ("C/A/L") trades is a key element in the detection of suspicious trading activity.  Within UBS's London Branch, Front Office supervisors monitored C/A/L trades using an online system, the Supervisory Control Portal ("SCP").  This system generated daily reports (known as 'alerts') of C/A/L trades, which were sent to Front Office supervisors for investigation and sign-off.  Futures trades did not, however, generate SCP alerts due to the lack of a data feed from the relevant Front Office system to SCP, a failing that was not remedied until 26 August 2011.  UBS did not have any formal policy covering the allocation and delegation of SCP C/A/L trade alerts among supervisors.  One consequence of this was that when the ETF Desk was transferred to GSE, there was a failure to redirect SCP C/A/L trade alerts to the Desk's new supervisor.  The alerts continued to be sent to, and signed off by, the Desk's previous supervisor, even though he was no longer supervising the Desk.  A second consequence was that when SCP alerts for ETF futures trades went live in August 2011, the alerts for the Desk were sent to traders on the Desk (including Trader X) for sign-off, rather than to their supervisor.

(18)     UBS also lacked a clear policy describing Front Office supervisors' responsibilities in respect of reviewing and signing off SCP C/A/L alerts.  Confusion about these responsibilities meant that alerts for the ETF Desk were not properly reviewed.  Consequently, C/A/L alerts for fictitious, deferred settlement ETF trades each generating material P&L (in excess of USD 0.5 billion) were signed off in August 2011 without any investigation.

(19)     Traders were able to influence their reported P&L to compensate for trade booking errors, trade capturing timing differences and delayed pricing .  This was done by making a request to Product Control.  UBS had no formal policy governing the P&L adjustment process, and Product Controllers were not required to obtain supervisory approval before adjusting P&L.  At the request of Trader X, material adjustments were made to the ETF Desk's reported P&L on numerous occasions, particu-



larly in August 2011. One set of adjustments, on 11 August 2011, was for approximately USD 1 billion: this offset a USD 1 billion loss that appeared in the Desk's P&L that day. The Desk's Product Controllers processed these adjustments without challenge and without informing their supervisors. As the T+1 reports produced by Product Control showed the P&L after any adjustments had been applied, these adjustments were not visible to the Desk's supervisor in the Front Office. By 18 August 2011, Product Control supervisors were aware that a number of material adjustments had been made to the ETF Desk's P&L. They were not concerned at this, believing the adjustments were connected to material reconciliation break issues that were being dealt with by Product Control and Operations at that time (described in paragraph (21)). They did, however, subsequently tighten the P&L adjustment process, requiring details of any adjustments to be made visible in the T+1 P&L reports prepared by Product Control.

(20)     Within UBS's London Branch, it was well known amongst junior Operations staff that the ETF Desk (particularly Trader X) created a lot of reconciliation breaks, often due to late or mis-booked trades. This issue was not raised with the Desk's supervisor or with senior Operations management. From June 2011, the breaks became material in size: many were connected to trades with huge notional values (sometimes in excess of USD 1 billion). In investigating these breaks, Operations usually liaised with Trader X. Operations staff tended to take the explanations given by him at face value, even where material breaks persisted for several weeks, without effective escalation to their supervisors.

(21)     On 2 August 2011, a material ETF Desk-related break was identified by Finance during the July month end GBSOV process (the "GBSOV break"). This break was valued at CHF 209 million, which represented the net difference between two control accounts; however, the gross open risk position associated with the break amounted to EUR 4 billion. The GBSOV break was the result of large futures trades that had not been booked in the Front Office risk system. Product Control and Operations repeatedly contacted Trader X about the break and were told that the missing futures trades would be booked shortly, clearing the break. Although this did not happen, and the break persisted for some time, Product Control and Operations continued to accept the explanations given by Trader X. They did not escalate the break to the ETF Desk's supervisor for more than two weeks after its initial identification. With input from Trader X, Product Control prepared a detailed explanation of the reasons for the GBSOV break. Despite lacking credibility in many respects, the explanation was not challenged by any of the Front Office, Operations or Product Control staff who saw it and was accepted by those present at a senior Finance committee meeting on 24 August 2011. The conclusion of this meeting was that no amounts were at risk.

(22)     Queries about the ETF Desk's trades continued to be raised by Operations in late August and early September 2011. By 13 September 2011, senior Finance managers had begun asking questions about credit risk issues relating to deferred settlement ETF trades booked by Trader X. The next day, in response to this line of questioning, Trader X effectively admitted that the ETF trades in question were not real trades and had been booked to hide losses incurred on genuine "off book" (meaning unauthorised) positions. UBS began an investigation and closed out Trader X's positions in the following days. The total Loss resulting from these trades was calculated to be approximately USD 2.3 billion.



## IV.    Findings

*(i)*      *Mismanaged transfer of the ETF Desk*

(23)      The process around the ETF Desk's transfer from Cash Equities to GSE was not adequately managed.  This jeopardised the supervision and effective functioning of the business.  A smooth transfer of the Desk would have required a well-planned and transparent handover of supervisory responsibilities between the old and new supervisors.

(24)      The ETF Desk's support and control infrastructure was not realigned at the same time as the Desk's transfer to GSE.  The delay in transferring Product Control responsibilities for the Desk caused difficulties for the Cash Equities Product Control team.  This team had understood that it would continue to exercise Product Control responsibilities for the Desk for only a short time after the transfer and did not, therefore, invest the necessary time to remain familiar with the Desk's activities.  By failing to appropriately adapt the support and control infrastructure at the time of the Desk's transfer, UBS prioritised risk taking at the expense of support and control.  In so doing, UBS contributed to the failure of the Cash Equities Product Control team to analyse the significant increases in the Desk's proprietary trading revenue.

(25)      Upon the transfer of the ETF Desk to GSE, the previous Cash Equities supervisor ceased to have any supervisory responsibilities over the Desk.  Being based in New York, the Desk's new GSE supervisor was unable to supervise the Desk effectively on a day-to-day basis.  A local, London-based supervisor was needed to bridge the gap, but no such arrangement was put in place.  The outcome was a lack of oversight of the Desk's day-to-day activities.  This is incompatible with the Bank's duty to have in place an adequate organisational structure with clearly defined and understood responsibilities and reporting lines.

*(ii)*     *Poor supervision*

(26)      Relationships between supervisors and the traders on the Desk were characterised by too much trust and not enough discipline and control.  For example, significant increases in the Desk's proprietary trading revenue were not questioned by senior Front Office managers.  The Desk's explanation, that the increases were due to intraday trading, was not analysed or verified.

(27)      Risk limit breaches were brought to the attention of the Desk's supervisor and his line manager on at least four occasions, but no investigation was carried out, nor was any disciplinary action taken.  On one such occasion, the supervisor's first reaction was to offer congratulations, before later giving a reminder of the Desk's intraday net delta limit.  The lack of an appropriate response to such incidents demonstrates that excessive risk taking and breaches of risk limits were not actively discouraged or penalised.

(28)      The Desk's supervisor travelled to London in August 2011 to investigate the GBSOV break (described in paragraph (21)), but failed to conduct an adequate investigation.  Instead, he relied upon assurances from Operations and Finance that the break had been resolved, without appreciating that



those assurances were based on information given by Trader X.  The explanation for the break lacked credibility, but was not challenged by the Desk's supervisor.

(29)     The Desk's supervisor was dropped from the circulation list for the Desk's T+0 P&L estimate in late July 2011 but did not question why he was no longer receiving this report, suggesting that he did not regularly review this information.  In addition, he did not query the absence of reports on the Desk's C/A/L trades, suggesting that he did not consider such information to be a necessary supervisory tool.

(30)     The level of supervision of the Desk failed to meet the standards prescribed in UBS's supervision policy.  The failure to respond to policy and guideline violations encouraged non-compliance.  The lack of discipline meant that Trader X was not deterred from breaching the Desk's risk limits, resulting in significant increases in the Desk's risk exposure and, eventually, a major loss to the Bank.  The failure of the Desk's supervisors to exercise proper challenge and supervision hindered earlier detection of Trader X's activities and contributed to the Loss.  By tolerating Trader X's repeated policy infringements and failing to appropriately challenge and supervise the Desk, UBS violated its obligations to conduct its business in a fit and proper manner and ensure an adequate organisation.

### (iii)     Ineffective control systems

(31)     A number of failures undermined the effectiveness of the SCP control (described in paragraph (17)).  In particular:

31.1.     UBS failed to identify the absence of data on C/A/L futures trades in a timely manner.  As a result, SCP C/A/L alerts for futures trades were not operational until late August 2011.

31.2.     As the information available within SCP provided only limited trend analysis, the identification of suspicious trading patterns had to be performed manually.  However, it was not generally feasible for Operations or Front Office desk supervisors to perform this task for high volume trading desks, such as the ETF Desk.

31.3.     SCP roles and responsibilities were not clearly defined, leading to confusion about the SCP review process between Operations and the Front Office.  This confusion was exacerbated by a lack of appropriate training.  The inadequate review process performed by the Desk's previous supervisor, together with the new supervisor's failure to query the absence of alerts, illustrate that SCP's purpose as an important supervisory tool was not understood.

31.4.     UBS failed to adequately control the mapping and delegation of SCP C/A/L alerts.  This resulted in a failure to redirect alerts to the Desk's new supervisor, while alerts on futures trades (when they eventually went live) were sent to the traders on the ETF Desk, rather than to their supervisor.

(32)     The purpose of the T+14 report was to identify deferred settlement trades, as these posed a greater risk to the Bank than trades settling within the usual T+3 cycle (see paragraph 9.1.2).  The importance of this report was not understood.  The report failed twice, for extended periods of time,



and the second failure of the report went unnoticed by UBS for approximately 10 months (see paragraph 13.3). Consequently, there was no working control in place to identify the large, deferred settlement trades booked by the ETF Desk.

(33)    SCP and the T+14 report were key controls for the detection of suspicious trading activity, but both proved to be ineffective. The failures of these controls serve to illustrate poor organisation and risk management within UBS.

### (iv)    Insufficient understanding and challenge by Operations

(34)    Trade reconciliation is a key element of a bank's internal controls. A proper understanding of trading activity is essential for successful reconciliation. A bank's management must ensure that trades are properly reconciled. Operations' poor understanding of the ETF Desk's trading activities meant that it was not in a position to identify the risks arising from the large, persistent reconciliation breaks caused by the Desk. Relevant Operations staff did not fully understand that the function of Operations was to exercise control over the Front Office, as well as to provide support.

(35)    The explanation given by Trader X for the large reconciliation breaks caused by his use of concealment mechanisms was that they were the result of trade booking errors and that these would be corrected. Junior Operations staff did not adequately question what they were told; instead they continued to accept Trader X's explanations, even when the explanations were unsatisfactory (as in the case of the GBSOV break) or the breaks persisted for several weeks. A contributing factor to this lack of challenge was the tendency of Operations staff to view their role in terms of supporting and facilitating Front Office trading activity, rather than controlling it. Operations focused on clearing reconciliation breaks; insufficient emphasis was placed on understanding the causes of breaks, or how they were resolved.

### (v)    Inappropriate analysis and challenge by Product Control

(36)    A bank's management must ensure that accounting entries are properly verified. This is achieved by having in place the appropriate staff and providing the infrastructure necessary to perform control tasks. Any failures by Product Control to analyse significant 'red flag' issues in this case can partly be attributed to a failure by UBS to provide Product Control with the tools necessary to properly perform its function, a failure that undermined Product Control's ability to detect Trader X's use of concealment mechanisms.

(37)    Product Control accepted the Desk's explanation for the significant increases in the Desk's proprietary trading revenue without performing any satisfactory analysis. Product Control did not have the infrastructure necessary to review the Desk's P&L at trade level. The absence of a detailed, trade level P&L review meant that the significant P&L impact of the concealment mechanisms used by Trader X was not generally visible to Product Control. Furthermore, no satisfactory controls identified trades at off-market prices once they had been booked.

(38)    Controls over P&L adjustments were inadequate (see paragraph (19)). UBS had no policy on escalating P&L adjustments: traders were not routinely required to evidence requests for adjustments,



Product Controllers did not challenge such requests, no escalation or approval thresholds were defined, and P&L adjustments were not visible to Front Office supervisors (in daily T+1 P&L reports) until 18 August 2011.  The consequence of the lack of controls in this area was that material adjustments were made to the ETF Desk's P&L, concealing the significant losses incurred.

(39)   The GBSOV process proved to be ineffective.  The objective of GBSOV was to ensure that balance sheet balances were understood and fairly stated, and that unsubstantiated amounts were risk assessed, escalated and had the necessary remediation plans put in place.  Even though the GBSOV break was escalated for review by a senior Finance committee, the GBSOV process failed to identify the significant amounts that were at risk (see paragraph (21)).  Furthermore, Product Control's level of challenge to the Front Office was inadequate.  In particular, Trader X's explanation for the GBSOV break was unsatisfactory in many respects, but was not challenged by Product Control.

*(vi)    Failure to identify and escalate risk issues*

(40)   Bank employees must inform their managers or Compliance departments of any events that represent a risk to the institution (FINMA Bulletin 1/2010, p. 51).  To do this, employees must be made aware (by management) of their obligations and be able to recognise when escalation is appropriate.  In this case there were a number of issues that, when considered together, could have alerted the support and control functions to the need for closer scrutiny of, and escalation of issues regarding, the ETF Desk.  For example, Operations was aware of the Desk's persistent late and mis-booked trades, trades with huge notional values, and frequent and material reconciliation breaks.  Product Control was aware of significant increases in the Desk's proprietary trading revenue, frequent and material adjustments to the Desk's P&L, and the issues surrounding the GBSOV break.  These were not identified as significant risk issues and, consequently, were not appropriately escalated to senior Operations and Product Control management, or to the Desk's supervisors in the Front Office.  Furthermore, in responding to these issues, neither function worked effectively with other support and control functions.

*(vii)   Ineffective Operational Risk Framework*

(41)   UBS's Operational Risk Framework relied heavily upon a process of self assessment by the Front Office and support and control functions.[3]  Within this framework, UBS's Operational Risk department did not require evidence, or conduct substantive testing, to validate self assessment results.  Self assessment was performed on an annual basis, which meant that it was possible for control deficiencies to go undetected for extended periods of time.

(42)   In 2008, the Operational Risk unit reviewed the risk of a rogue trading event occurring within UBS.  This review was carried out in response to the identification of rogue trading as a material fraud risk, following the Société Générale rogue trading incident earlier that year.  The review identified a number of issues that are relevant to this case, including: in some areas, weaknesses in the challenge culture within the support and control functions (contributed to by significant staff turnover); weakness-

---

[3] A new, more robust Operational Risk Framework has since been implemented by UBS.  The implementation process began in January 2011 (before the Loss was discovered) and was due to be completed in June 2012.



es in Front Office supervision relating to C/A/L trades; and concerns about the use of trades with de-ferred settlement dates.  A follow up review in late 2010 reported that several actions had been taken since the 2008 review and that the issues described above had largely been addressed.  These re-views, which were carried out in accordance with UBS's Operational Risk Framework, failed to ensure that identified control deficiencies were in fact sustainably remediated.

### (viii)   Ineffective policies and guidelines

(43)   UBS failed to formalise and appropriately communicate the Desk's reporting lines and risk limits.  Reporting lines were unclear, leading to confusion about whether one of the traders on the Desk had any supervisory responsibilities over his colleagues.  Risk limits and trading mandates were not properly formalised and communicated to the Desk's traders, leaving the Bank unable to control compliance (see paragraph (7)).

(44)   UBS had policies and processes in place to govern initiatives to create or change business lines.  These included the Changes to Existing Business ("CEB") Policy, which was intended to ensure that proposed business changes were reviewed in conjunction with the relevant support and control functions and that the impact of the change was fully assessed and approved by those functions.  The formation of GSE, and the subsequent transfer of the ETF Desk, involved changes to existing busi-ness lines, hence the CEB Policy should have been applied.  While the support and control functions were involved in discussions about these changes, UBS did not formally apply the CEB Policy and the support and control functions did not give their formal approval.  The failure by senior management to adhere to the Bank's own policies is indicative of a lack of focus on instilling a culture of compliance within the business.

### (ix)   Reward and recognition systems

(45)   Despite several breaches of UBS's compliance policies relating to personal account dealing and spread betting, and despite a reputation for poor adherence to control standards, Trader X was highly remunerated and had been chosen to participate in a highly selective internal scheme for tal-ented employees.  This financial and non-financial recognition provided implicit incentives for risk-seeking behaviour.

### (ix)   Conclusion: inadequate control environment and business culture

(46)   UBS failed to detect that trading activity had occurred outside the ETF Desk's risk limits and concealment mechanisms had been in use since late 2008.  The failure to detect this activity for such a long period of time indicates widespread deficiencies across the Investment Bank's control environ-ment.  Despite efforts to improve the control framework, significant and sustained control deficiencies remained.  This was not recognised or addressed by senior management.

(47)   The focus of the Front Office was on generating profits.  Front Office managers showed leni-ence to traders and had little interest in controlling their activities.  Breaches of management instruc-tions and risk limits were tolerated, not penalised, while significant increases in the Desk's proprietary



trading revenue were not examined.  The emphasis on profits came at the expense of control and sound risk management.

(48)     Senior management's emphasis on increasing efficiency compromised the effectiveness of certain controls.  Support and control functions were under pressure to reduce staff numbers, and requests for additional headcount were denied. The transfer of the ETF Desk to GSE without the re-alignment of the support and control infrastructure shows that senior management did not consider these functions to be essential to sound business activity.

(49)     Numerous 'red flags' relating to the ETF Desk were evident for some time, particularly since June 2011.  These were not followed up appropriately.  A stronger control framework may have ena-bled UBS to detect Trader X's activities at an earlier stage, reducing the eventual losses incurred.

(50)     In conclusion, UBS's failure to control its trading and operational risks over an extended period of time resulted in a loss of approximately USD 2.3 billion.  Accordingly, UBS failed to demonstrate fit and proper conduct.

## V.     Measures

(51)     Immediately following the discovery of the Loss, FINMA imposed until further notice a range of preventive supervisory measures, designed to limit the operational risk exposure of UBS until able to give evidence that the operational control environment of its Investment Bank is working effectively:

   a)   Any new business initiative in the Investment Bank which is likely to materially increase the operational complexity of UBS needs FINMA's prior consent;

   b)   The Investment Bank's overall risk weighted assets are capped at specific and declining val-ues for the years ending 2012-2015, in accordance with the bank's strategic plan;

   c)   The Investment Bank's risk weighted assets within its London Branch are also capped, with the cap declining over time;

   d)   UBS is forbidden from undertaking any acquisitions through its Investment Bank division.

(52)     FINMA published, on 13 December 2011, its expectations for all Swiss banks and securities dealers relative to controls against unauthorised trading and required larger firms to assess them-selves against these best practice standards, demanding follow-up action where necessary.

(53)     Since the discovery of the Loss, UBS has taken a number of organisational measures aimed at strengthening its risk management and control capability (the "UTIR Programme").  Process im-provements implemented across the UBS group include the documentation of key procedural controls and consistent handling and reporting for operational risk issues.  UBS has also taken steps to insti-gate behavioural change by increasing the focus on risk control and supervision across the organisa-tion.  Within the Investment Bank, significant staffing changes have taken place, key appointments have been made to strengthen management, improvements have been made to core Front and Back



Office processes, and material weaknesses on long dated settlement trades and balance sheet sub-stantiation have been remediated.  Additional measures are under way.

(54)    In concluding its enforcement proceedings on 21 November 2012, FINMA further reprimanded UBS for severe violation of its obligation to assure the fit and proper conduct of its business opera-tions. FINMA also: *(i)* directed UBS to appoint an independent third party to report on the progress and completion of the Bank's UTIR Programme, *(ii)* required the appointment of a third party to ensure operational effectiveness of controls against unauthorised trading, subsequent to the implementation of remediating measures, *(iii)* announced that it will consider the appropriateness of the capitalisation of UBS's operational risks in the light of these and other failings.

## CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on March 4, 2013, I caused a true and correct copy of the annexed:

**First Amended Consolidated Complaint for Violation of the Federal Securities Laws**

to be: (i) filed by hand with the Clerk of the Court of the Southern District of New York; and (ii) served by U.S. mail to all counsel listed on the attached service list.

Kelly Stadelmann

UBS 12

Service List - 3/4/2013    (12-0106)

Page 1 of 1

## Counsel For Defendant(s)

Mark A. Kirsch
Gibson, Dunn & Crutcher LLP
200 Park Avenue, 47th Floor
New York, NY  10166-0193
  212/351-4000
  212/351-4035 (Fax)

## Counsel For Plaintiff(s)

David A. Rosenfeld
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)

Spencer A. Burkholz
Tor  Gronborg
Brian O. O'Mara
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)