UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
C.D.T.S. NO. 1 & A.T.U. LOCAL 1321
PENSION PLAN, Individually and on
Behalf of All Others Similarly Situated,

                  Plaintiffs,

                  -v-

UBS AG, et al.,

                  Defendants.
------------------------------------------------------------X

12 Civ. 4924 (KBF)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: DEC 13 2013

KATHERINE B. FORREST, District Judge:

Over the past several years, it has been ever so easy to make banks the target of lawsuits alleging securities fraud: what banks said, how those statements failed to match up to what happened, and who did or should have known. One might think of the tired but appropriate phrase "shooting fish in a barrel." But the securities laws have limits; and it is the responsibility of the courts to ensure that those limits are enforced, and that lawsuits which cannot withstand the most basic scrutiny find their way into whatever great beyond awaits suits dismissed for failure to state a claim.

The securities laws do not, for instance, require that banks be prescient or omniscient; they do require, <u>inter alia</u>, that a company and officers or directors accused of fraud have the requisite state of mind; they do require that the maker of statements alleged to be false knew of the falsity at the time.

This is a lawsuit which essentially asserts that statements regarding risk controls must have been false because they occurred while a rogue trader racked up

a massive loss; this lawsuit fails to meet the basic requirements for stating a claim. This case is, therefore, dismissed.[1]

I.   FACTUAL ALLEGATIONS

In the context of a motion to dismiss, this Court accepts as true all well-pled factual allegations.

UBS AG ("UBS"), and Oswald J. Grübel (CEO of UBS from February 26, 2009 to September 24, 2011), John Cryan (CFO of UBS from September 2008 until May 31, 2011; also Chairman and CEO of UBS London Brand and UBS Limited from November 2010 through May 31, 2011), Philip J. Lofts (the Chief Risk Officer of UBS from November 2008 through December 31, 2010), and Carsten Kengeter (the co-CEO of UBS Investment Bank from April 27, 2009 until November 1, 2010, when he became the sole head of the Investment Bank) (referred to together as the "Individual Defendants"), are alleged to have violated the Securities and Exchange Act of 1934 during the period from November 17, 2009 through September 15, 2011. (Am. Compl. ¶¶ 2, 12-15, March 4, 2013, ECF No. 46.)

Plaintiffs' assertions of fraud are based on a series of alleged material misstatements and omissions "regarding UBS's purportedly robust risk management systems and internal controls." (Id. ¶ 4.) Plaintiffs have selected a

---

[1] Plaintiffs have also asserted a claim pursuant to Section 20 of the 1934 Act. A Section 20 claim requires an underlying securities law violation. SEC v. First Jersey Secs., Inc., 101 F. 3d 1450, 1472 (2d Cir. 1996). Plaintiffs' failure to state a 10b-5 claim therefore requires dismissal of their Section 20 claim. Id. In assessing the adequacy of such allegations, the Court is required to consider whether competing inferences may equally explain the conduct. Cherry Street, LLC v. Hennessee Group LLC, 573 F. 3d 98, 111 (2d Cir. 2009).

number of statements which, in various ways, describe UBS as taking a "more cautious approach" to trading and risk management and as having effective controls in place. (Id.)

For instance, plaintiffs assert that on November 17, 2009, the first day of the class period, defendants "began a campaign to highlight [their] purportedly disciplined and effective risk management and control systems . . . ." (Id. ¶ 25.) For example, Lofts allegedly stated "that one of the 'key messages' investors should take away from a presentation" at UBS's Investor Day in Zurich, Switzerland was "that we have made significant improvements in the way in which we measure and manage risk care at UBS. We have instilled a new risk culture at the firm." (Id. ¶ 25.) Lofts is also alleged to have said that "there is robust supervision of trade capture and valuation" and that "the nature and size of the risk that we take is one of the core discussion topics among senior management." (Id. ¶ 26.)

Additional alleged misstatements include that "there is a new risk culture at the bank" (id. ¶ 27)[2] and "we . . . have a controlled and disciplined risk culture" (id. ¶ 28).[3] On other occasions, Grübel stated that "we have weekly risk calls . . . where we go through our risk position in the old bank weekly . . . ." (Id. ¶ 29.) In its 2009 Annual Report, signed by Grübel, and reviewed by Cryan, Lofts and Kengeter, UBS states: "Our operational risk management and control systems and processes are designed to help ensure that the risks associated with our activities . . . are

---

[2] This statement was allegedly made by Alexander Wilmot-Sitwell, as co-CEO of UBS's Investment Bank, while speaking at the annual Investor Day conference. (Am. Compl. ¶ 27.) Wilmot-Sitwell is not a defendant in this action.
[3] This statement was allegedly made by defendant Kengeter.

3

appropriately controlled." (Id. ¶ 35.) In other filings with the Securities and Exchange Commission, management reported that UBS's internal control over financial reporting was effective. (Id. ¶ 36.) In November 2010, the Individual Defendants spoke at an investor conference. Lofts stated that "senior management are aware of all material risks" and Kengeter stated "[e]verything we do is tied to risk management." (Id. ¶¶ 45-46.)

Plaintiffs allege that these statements are appropriately contrasted with, inter alia, defendants' failure to integrate risk assessment into UBS's compensation framework (id. ¶ 56(a)),[4] incentivized high risk trading (id. ¶ 56(b)), had insufficient risk controls in various areas (id. ¶ 56(c)-(j)), permitted individual traders to maintain "umbrella" or "suspense" accounts (id. ¶ 56(k)),[5] and failed to robustly supervise risk (id. ¶ 56(n)).[6]

According to plaintiffs, the falsity of these statements was revealed on September 15, 2011, when UBS disclosed that a "'rogue' trader in the Investment Bank division had engaged in unhedged proprietary trades with non-existent counterparties that exposed [UBS] to losses that ultimately exceeded $2.3 billion."

---

[4] Plaintiffs argue that defendants have instead "incentivized Investment Bank traders and management to engage in high risk transactions to generate earnings for the Company, including tying compensation and promotions to earnings generated through proprietary trading activity." (Am. Compl. ¶ 56(a).)
[5] According to plaintiffs, these accounts allowed profits made by a trading desk to be held in order to "offset and hide future trading losses and activity which exposed UBS to trading losses." (Am. Compl. ¶ 56(k).)
[6] Plaintiffs allege that "defendants had reduced costs and increased reported earnings by laying off predominantly 'Back Office' staff involved in internal controls and risk management, even while hiring additional 'Front Office' personnel and increasing UBS's value at risk in Investment Bank trading." (Am. Compl. ¶ 56(n).)

(Id. ¶ 5.)[7] Plaintiffs contend that this incident "forced to disclose that UBS's risk and disclosure controls were inadequate and that unauthorized trading in excess of risk limits in its Investment Bank" had occurred. (Id. ¶ 64.)

Finally, plaintiffs point to a series of media reports, investigations, admissions, and settlements relating to this trading incident to illustrate the purportedly inadequate controls that UBS had in place. (Id. ¶¶ 65-74.) On October 5, 2011, UBS's interim CEO Sergio Ermotti[8] stated in an internal memo:

> In no circumstances should something like this ever occur. The fact that it did is evidence of a failure to exercise appropriate controls. Our internal investigation indicates that risks and operational systems did detect unauthorized or unexplained activity but this was not sufficiently investigated nor was appropriate action taken to ensure existing controls were enforced.

(Id. ¶ 74; see also id. ¶¶ 75-79.)

II.    MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

---

[7] This revelation is alleged to have caused an immediate stock drop of more than 10%. (Am. Compl. ¶ 5.)
[8] Sergio Ermotti is not named as a defendant in this action.

5

Presented with such a motion, a court must accept "all factual claims in the complaint as true" and draws "all reasonable inferences in the plaintiff's favor." Famous Horse, Inc. v. 5th Ave. Photo, Inc., 624 F.3d 106, 108 (2d Cir. 2010). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate. Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010).

In addition to meeting the pleading requirements pursuant to Rule 12(b)(6), a complaint alleging a violation of Section 10(b) and Rule 10b-5 must also comply with the requirements of Federal Rule of Civil Procedure 9(b), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See In re Alstom SA, 406 F. Supp. 2d 433, 444-45 (S.D.N.Y. 2005).

Rule 9(b) requires that plaintiffs allege with particularity the circumstances constituting the fraud. Fed. R. Civ. P. 9(b). The PSLRA requires both that plaintiffs identify the alleged false statements and reasons why those alleged statements are misleading, and that they allege sufficient facts to set forth a "strong inference of scienter." See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007) (explaining that Section 21D(b)(2) of the PSLRA requires that plaintiffs "'state with particularity facts giving risk to a strong inference that the defendant acted with the required state of mind'") (quoting 15 U.S.C. § 78u-4(b)(2)).

III. ANALYSIS

To state a claim pursuant to Section 10(b) or Rule 10b-5, plaintiffs must adequately allege that in connection with the domestic purchase or sale of a security, defendants made one or more materially false statements or omissions, with scienter, and that these acts are causally related to plaintiffs' loss. See ECA, Local 134 IBEW Joint Pension Trust of Chi. v. J.P. Morgan Chase Co., 553 F. 3d 187, 197 (2d Cir. 2009); Lawrence v. Cohn, 325 F. 3d 141, 147 (2d Cir. 2003) (citations omitted).

Here, defendants assert that plaintiffs have failed adequately to allege the falsity of a statement or omission, scienter, or loss causation. (Defs.' Mem. at 1-3, Mar. 26, 2013, ECF No. 48.) The Court agrees.

a. Falsity

A violation of Rule 10b-5 cannot occur unless an alleged material misstatement or omission was false at the time it was made. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F. 3d 801, 812-13 (2d Cir. 1996). A statement believed to be true when made, but later shown to be false, is insufficient. Id. Without contemporaneous falsity there simply is no fraud. Id.; see also Novak v. Kasaks, 216 F. 3d 300, 306, 309 (2d Cir. 2000) (fraud by hindsight is not actionable).

Falsity is a failure to be truthful – it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made. See San Leandro, 75 F. 3d at 813 (explaining that "plaintiffs have not alleged circumstances

to show that the defendants lacked a reasonable basis for their optimistic, but qualified predictions as to the company's future performance"); see also 15 U.S.C. § 78u-4(b)(1). That a statement true when made later becomes untrue – or is later shown to be untrue – does not constitute falsity. San Leandro, 75 F.3d at 812-13. To state a claim, plaintiffs must do more than assert in a conclusory fashion that statements were or must have been false – they must allege facts supportive of how and why this is the case. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (explaining that to succeed on their claim, plaintiffs need to have done "more than say that the statements in the press releases were false and misleading; they [needed to have] demonstrate[d] with specificity why and how that [was] so").

In Royal Bank of Scotland Group PLC Securities Litigation, the court was confronted with a situation similar to that here: plaintiffs challenged defendants' disclosures of their internal controls as false and misleading. No. 09 Civ. 300, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012). The court there found that such statements were insufficient as a matter of law. Id. ("Plaintiffs fail to cite any contemporaneous support to show that the credit management procedures were not followed. Pointing to the subsequent subprime market collapse and alleging that RBS must therefore have failed to follow its internal control procedures is not sufficient.").

As set forth above, plaintiffs' allegations of false statements are simply a litany of general statements regarding risk controls at UBS. (See, e.g., Am. Compl. ¶¶ 25-30, 34-40, 43-48.) A number of courts have rightly rejected this type of

8

"pleading by list." See Alcatel Sec. Litig., 382 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2005) (citing cases).

Here, each series of alleged misstatements are followed by a series of conclusory statements; for example, that these statements had to have been false and misleading because traders were incentivized to take high risks (Am. Compl. ¶ 31(a)-(b)), that there was a failure to monitor desk trading positions in any automated manner (id. ¶ 31(i)), that risk supervision was not robust (id. ¶ 31(n)), and the like. The conclusory language contained the operative Complaint is insufficient to support falsity. At most, the allegations are supportive of internal management issues and competing incentives – a far cry from the speaker knowing (or having reason to know) at the time that he was making an alleged statement that the statement was in fact false. Put another way, a statement, even if based on flimsy scaffolding, is false only if untrue.

Plaintiffs attempt to support falsity by pointing to two ex post facto reports, filings, and statements criticizing UBS's risk controls. These are insufficient to support an inference of falsity at the time the alleged statements were made.

First, all of the reports, filings, and statements are ex post. At most, the reports, filings, and statements amount to a later realization that risk controls were not catching certain conduct and could be improved upon.

Second, not a single one of the reports, filings, or subsequent statements is directly tied to any particular alleged misstatements. None, for instance, refer to a specific statement and say, in substance, "the prior statement or statements we

made we knew were wrong at the time." None provide sufficient information that would allow this Court to draw such an inference even circumstantially.

    b. Risk control statements as "puffery"

Statements which are "puffery" are not false. The type of statements regarding internal controls to which plaintiffs point are akin to what courts have held constitute inactionable puffery. See, e.g., ECA, Local 134 IBEW Joint Pension Trust, 553 F.3d at 206 (explaining that the statements were inactionable because they were "too general to cause a reasonable investor to rely on them"); In re UBS AG Secs. Litig., No. 07 Civ. 11225, 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012); Stratte-McClure v. Morgan Stanley, 784 F. Supp. 2d 373, 385 (S.D.N.Y. 2011); In re Societe Generale Secs. Litig., No. 08 Civ. 2495, 2010 WL 3910286, at *8 (S.D.N.Y. Sept. 29, 2010); In re Australia & N.Z. Banking Grp. Ltd. Secs. Litig., No. 08 Civ. 11278, 2009 WL 4823923, at *11-12 (S.D.N.Y. Dec. 14, 2009).

At the time the statements regarding risk controls were made here, the banking sector had experienced enormous losses. In such a context, touting good risk controls is the equivalent of positive, aspirational puffery found inactionable by courts. ECA & Local 134 IBEW Joint Pension Trust, 553 F.3d at 206; Rombach, 355 F.3d at 174 (reasoning that "companies must be permitted to operate with a hopeful outlook . . . plaintiffs must do more than say that the statements were false and misleading; they must demonstrate with specificity how and why that is so.")

c. Scienter

Violations of Section 10(b) and Rule 10b-5 allege fraud – that is, an intentional act to mislead. It is a serious accusation, necessarily impugning the integrity of the accused party. See Rombach, 355 F.3d at 171 (the particularity requirement of rule 9(b) serves to "'safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit'") (citing O'Brien v. National Prop. Analysts Ptnrs., 936 F.2d 674, 676 (2d Cir. 1991)).

Appropriately, the law therefore requires that a claim must be supported by sufficient, particularized facts to give rise to a "strong" inference of scienter. Tellabs, 551 U.S. at 314 (holding that "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent"); ECA & Local 134 IBEW Joint Pension Trust, 553 F.3d at 198. Scienter is an intent to "'deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 and n.12 (1976)); Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) (citations omitted). Recklessness is a sufficiently culpable state of mind for securities fraud. See ECA & Local 134 IBEW Joint Pension Trust, 553 F.3d at 198. Recklessness is defined as "'at the least . . . an extreme departure from the standards of ordinary care;'" that is, the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Id. (quoting Novak, 216 F.3d at 308-09).

A plaintiff can support an inference of scienter by alleging facts that a defendant had motive and opportunity to commit a fraud, or by alleging sufficient facts to support a strong circumstantial inference of conscious misbehavior or recklessness. See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (citing Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)). Sufficient motive allegations require concrete benefits that could be obtained as a result of the fraud; motives of most directors and officers for the corporation to appear profitable or simply to keep the stock price high to increase compensation have been held insufficient. Kalnit, 264 F.3d at 139, 142; Novak, 216 F.3d at 307-08 (2d Cir. 2000).

Here, plaintiffs have sued a number of Individual Defendants along with UBS. Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading. S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 482 n.10 (S.D.N.Y. 2008) (citing In re BISYS Secs. Litig., 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005)).

As an initial matter, the operative Complaint fails to allege with any specificity conscious wrongdoing by any defendant. In addition, there are no allegations that would support improper motivation by any of the Individual Defendants. There are a number of cases in which plaintiffs have sought to base claims of fraud on statements regarding risk and internal control systems that later prove not to deter or catch trading losses; courts often dismiss such actions for a failure adequately to plead scienter. See, e.g., Chill v. General Elec. Co., 101 F.3d 263, 271 (2d Cir. 1996) (finding that the district court properly dismissed the claim

because "GE [ ] failed to allege the requisite scienter with regard to its claim that GE misrepresented the efficacy of its financial controls"); In re Societe Generale Secs. Litig., 2010 WL 3910286; In re Citigroup, Inc. Secs. Litig., 330 F. Supp. 2d 367, 375-76.[9]

In Societe Generale, plaintiffs alleged that defendants stated that their risk control systems were "highly sophisticated" but in fact were not, and that these systems contributed to losses incurred by a trader. Id. at *3. The court dismissed the complaint on the basis that it was at least as likely as not that defendants believed they were taking adequate risk management and cautionary measures. Id. at *7. In particular the court stated that "plaintiffs' 'amalgam of suggestions' that [d]efendants were aware of facts suggesting that their public statements regarding internal risk controls and subprime holdings were inaccurate and false do not give rise to the inference of scienter." Id. at *8 (citing City of Brockton Ret. Sys. v. Shaw Grp., Inc., 540 F. Supp. 2d 464, 473, 475 (S.D.N.Y. 2008)); see also In re Citigroup, Inc. Sec. Litig., 753 F. Supp. 2d 206, 245-46 (S.D.N.Y. 2010).

---

[9] In the certain instances where courts have allowed such claims to proceed, the facts as alleged made a stronger showing of scienter than the allegations currently before this Court. See, e.g., In re Fannie Mae 2008 Secs. Litig., 742 F. Supp. 2d 382, 406-07 (S.D.N.Y. 2010) (holding that emails suggesting "Fannie was conscious of its internal inability to manage the risks associated with subprime loans . . . show an inference of scienter and therefore survive a motion to dismiss"); Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 606-07 (S.D.N.Y. 2009) (holding that plaintiff's allegations were sufficient to support a claim of recklessness because they "point[ed] to the repeated disclosures of [defendant's] weak internal controls as evidence that the [defendants] were aware of the deficient controls, and that these flaws were likely influencing financial results").

Here, plaintiffs claim that defendants had access to, or should have know of facts which would have demonstrated that their statements regarding risk were untrue – but, plaintiffs have failed to specify such other information. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., 531 F. 3d 190, 196 (2d Cir. 2008). In the absence of a showing that false statements were knowingly or recklessly made, plaintiffs have failed to state a claim pursuant to Section 10(b).

Moreover, as set forth above, the alleged misstatements are set forth in the operative Complaint in list form. Plaintiffs fail to sufficiently link misstatements to particular intentional to manipulate or deceive in making such statements. For instance, the operative Complaint alleges generally that "defendants' fraudulent conduct allowed them to preserve UBS's positive credit ratings." (Am. Compl. ¶ 129). This is precisely the sort of generalized corporate conduct courts have found insufficient to support a strong inference of scienter. See, e.g., Kalnit, 264 F.3d at 139, 142; Novak, 216 F.3d at 307-09.

As to the Individual Defendants, plaintiffs' allegations are similarly generalized and inadequate. For instance, plaintiffs assert that the Individual Defendants acted recklessly by certifying UBS's risk, or making statements regarding risk, in the absence of a variety of reports and other information that would have revealed to them that their positive statements regarding risk controls were wrong. (Am. Compl. ¶¶ 135-37, 147-48, 156, 164.) However, the information to which plaintiffs point is no more than generalized corporate reporting; plaintiffs fail to tie any of the specific report or information to the particular statements

14

made. Nothing in the operative Complaint suggests that certification in the absence of such information constitutes an "egregious departure" from expected conduct. There are many reasons why each of the Individual Defendants could have made the certifications and statements that they did – most of which have nothing at all to do with fraud. Under the Supreme Court's decision in Tellabs, these competing inferences negate a strong inference of scienter. Tellabs, 551 U.S. at 314 (the inferences of scienter must be more than plausible or reasonable; they must be at least as compelling as any competing inference.)

Plaintiffs also suggest that an inference of scienter can be drawn from Grübel's resignation (see Am. Compl. ¶ 141), and Kengeter's demotion and resignation. (Id. ¶ 268.) Again, there are a number of other, more plausible reasons why personnel may have been demoted and resigned, some of which may be related to significant trading loss but are not suggestive of intentional fraud. Under such circumstances, they are insufficient. See Tellabs, 551 U.S. at 313.

Plaintiffs also assert that each of the Individual Defendants had a motive to preserve his corporate position. (Am. Compl. ¶¶ 140, 151, 159, 167.) As discussed, these generalized allegations of motive connected to corporate position (and compensation) have been found insufficient to support scienter. Kalnit, 264 F.3d at 139, 142; Novak, 216 F.3d at 307 (citation omitted); In re BISYS Secs. Litig., 397 at 446 n.85.

It is well established in the Second Circuit that Section 10(b) claims are not supported if the crux of the allegations is that a company was mismanaged; the

allegations must allege "manipulation or deception." Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (citations omitted); In re Citigroup, Inc. Secs. Litig., 330 F. Supp. 2d at 376. Here, that a "rogue" trader was able to cause such a significant loss to UBS is more akin to a claim of mismanagement than of fraud.

d. Loss Causation

Plaintiffs have also failed adequately to allege loss causation. Loss causation is an essential element of any 10b-5 claim. See ECA, Local 134 IBEW Joint Pension Trust, 553 F.3d at 197. It is not simply that plaintiffs have to allege that they suffered loss; rather, plaintiffs must tie the allegedly fraudulent conduct to the loss they assert they have experienced.

Here, plaintiffs contend that following the revelation of the "rogue trader's" loss, the UBS stock price declined significantly. (Am. Compl. ¶ 171.) According to plaintiffs, that decline was the "direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to the market." (Id. ¶ 172.) Plaintiffs make this assertion in a conclusory manner: they do not attempt to tie the particular misstatements to the particular events on September 15, 2011, the last day of the class period. Such a conclusory statement as to loss causation is insufficient as a matter of law. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005).

There can be little doubt that it would take a significant number of steps to tie the alleged misstatements and omissions to the diminution in UBS's stock price that occurred on a particular day. The fact that a rogue trader's loss was revealed

16

does not, ipso facto, demonstrate fraud; similarly, it does not causally tie the alleged statements to loss. This is too speculative to support the type of loss causation needed to sustain a claim of securities fraud. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005) ("To plead loss causation, the complaints must allege facts that support an inference that Merrill's misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud.").

IV. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 47 and to terminate this action.

SO ORDERED.

Dated:    New York, New York
          December ___, 2013

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge